**OFFICE OF THE CITY ATTORNEY**
**City of Long Beach**
Charles Parkin, City Attorney (SBN 159162)
Charles.Parkin@longbeach.gov
Amy Webber, Deputy City Attorney (SBN 132174)
Amy.Webber@longbeach.gov
Dawn McIntosh, Deputy City Attorney (SBN 162173)
Dawn.McIntosh@longbeach.gov
333 W. Ocean Blvd, 11th Floor
Long Beach, CA 90802
Telephone: (562) 570-2200

**GOMEZ TRIAL ATTORNEYS**
John H. Gomez (SBN 171485)
john@gomeztrialattorneys.com
John P. Fiske (SBN 249256)
fiske@gomeztrialattorneys.com
655 W. Broadway, #1700
San Diego, CA 92101
Telephone: (619) 237-3490

**BARON & BUDD, P.C.**
Celeste Evangelisti (SBN 225232)
cevangelisti@baronbudd.com
3102 Oak Lawn Ave, #1100
Dallas, TX 75219
Telephone: (214) 521-3605

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| CITY OF LONG BEACH, a municipal corporation;<br><br>                Plaintiff,<br><br>v.<br><br>MONSANTO COMPANY, SOLUTIA INC., and PHARMACIA CORPORATION, and DOES 1 through 100,<br>                Defendants. | CASE NO.: 2:16-cv-03493-FMO-AS<br><br>**PLAINTIFFS' FIRST AMENDED COMPLAINT**<br><br>Honorable Fernando M. Olguin |

## I.     INTRODUCTION

1.     Polychlorinated biphenyls (or "PCBs") are man-made chemical compounds that have become notorious as global environmental contaminants — found in bays, oceans, rivers, streams, soil, and air.  As a result, PCBs have been detected in the tissues of all living beings on earth including all forms of marine life, various animals and birds, plants and trees, and humans.

2.     The extent of PCB contamination is troubling because PCBs cause a variety of adverse health effects.  In humans, PCB exposure is associated with cancer as well as serious non-cancer health effects, including effects on the immune system, reproductive system, nervous system, endocrine system and other health effects.  In addition, PCBs destroy populations of fish, birds, and other animal life.

3.     Monsanto Company has repeatedly held itself out as the sole manufacturer of PCBs in the United States from 1935 to 1979, and trademarked the name "Aroclor" for certain PCB compounds.  Although Monsanto knew for decades that PCBs were toxic and knew that they were widely contaminating all natural resources and living organisms, Monsanto concealed these facts and continued producing PCBs until Congress enacted the Toxic Substances Control Act ("TSCA"), which banned the manufacture and most uses of PCBs as of January 1, 1979.

4.     U.S. EPA (2000b) has classified PCBs as 'probable human carcinogens.' Studies have suggested that PCBs may play a role in inducing breast cancer. Studies have also linked PCBs to increased risk for several other cancers including liver, biliary tract, gall bladder, gastrointestinal tract, pancreas, melanoma, and non-Hodgkin's lymphoma. PCBs may also cause non-carcinogenic effects, including reproductive effects and developmental effects (primarily to the nervous system).  PCBs tend to accumulate in the human body in the liver, adipose tissue (fat), skin, and breast milk. PCBs have also been found in human plasma, follicular fluid, and sperm fluid.  Fetuses may be exposed to PCBs in utero, and babies may be exposed to PCBs during breastfeeding.  According to U.S. EPA (2000b), '[s]ome human studies have also

TRIAL ATTORNEYS

2

PLAINTIFF'S FIRST AMENDED COMPLAINT

2:16-cv-03493-FMO-AS

suggested that PCB exposure may cause adverse effects in children and developing fetuses while other studies have not shown effects.  Reported effects include lower IQ scores, low birth weight, and lower behavior assessment scores.

5.     PCBs have traveled into many Long Beach Waters (as defined below) by a variety of ways.  PCBs were used in many industrial and commercial applications such as paint, caulking, transformers, capacitors, coolants, hydraulic fluids, plasticizers, sealants, inks, lubricants, and other uses.  PCBs regularly leach, leak, off-gas, and escape their intended applications, causing runoff during naturally occurring storm and rain events, after being released into the environment.  The runoff originates from multiple sources and industries and enters Long Beach Waters with stormwater and other runoff.

6.     The natural fate and transport of PCBs result in the gathering and collection in stormwater through no fault of the City of Long Beach, which lawfully discharges water into many bodies of water through an NPDES permit.

7.     Many watersheds, lakes, rivers, streams, creeks, bays, ports, harbors, and other bodies of water are contaminated with PCBs, which have been detected in water, sediment, fish, and wildlife.  These water bodies include but are not limited to the following ("Long Beach Waters"):

a.  The Port of Long Beach

b.  Colorado Lagoon

c.  Dominguez Watershed

8.     The U.S. Environmental Protection Agency ("U.S. EPA") has approved several PCB Total Maximum Daily Load ("TMDL") for Long Beach Waters.

9.     A Total Maximum Daily Load, or TMDL, is a calculation of the maximum amount of pollutant that an impaired body of water can receive and still safely meet

PLAINTIFF'S FIRST AMENDED COMPLAINT

2:16-cv-03493-FMO-AS

1   water quality standards.[1]

2       10.    Long Beach Waters are impaired due to the presence of PCBs.

3       11.    TMDLs are intended to achieve protection from PCBs of all beneficial uses

4   of Long Beach Waters including commercial sport fishing and the preservation of

5   wildlife, rare and endangered species, and habitat.[2]

6       12.    Long Beach Waters TMDLs are expressed as water column targets,

7   sediment targets, fish tissue targets, and/or stormwater wasteload allocations.

8         Plaintiff CITY OF LONG BEACH hereby alleges, upon information and belief,

9   as follows:

10  **II.    PARTIES**

11      13.    The CITY OF LONG BEACH ("Long Beach") is a California Charter City

12  and municipal corporation, duly organized and existing by virtue of the laws of the State

13  of California.

14      14.    "Plaintiff" shall refer to the CITY OF LONG BEACH.

15      15.    Plaintiff brings this suit pursuant to California Code of Civil Procedure

16  731, and California Civil Code sections 3479, 3480, 3491, 3493, and 3494 and any other

17  applicable codes or forms of relief available for monetary damages and removal of the

18  public nuisance caused by PCBs in Long Beach Waters.

19      16.    Plaintiff manages and operates municipal storm water systems, which

20  collect and transport stormwater to be discharged into Long Beach Waters.  In order to

21  discharge stormwater into Long Beach Waters, Plaintiff is required to receive a

22  Municipal Regional Stormwater Permit from the California Regional Water Quality

23  Control Board- Los Angeles Region, pursuant to the National Pollutant Discharge

24  Elimination System under the Clean Water Act.

25

26

----

27  [1] United States Environmental Protection Agency,
    www.water.epa.gov/lawsregs/lawsguidance/cwa/tmdl/

28  [2] *Id.*

GOMEZ
TRIAL ATTORNEYS

PLAINTIFF'S FIRST AMENDED COMPLAINT

17.     Plaintiff is a permittee under a Municipal Regional Stormwater Permit, which includes TMDLs for PCBs, as Long Beach Waters are impaired due to PCBs.

18.     Plaintiff is subject to PCB TMDLs under respective Municipal Regional Stormwater Permits. The PCB TMDLs require Plaintiff to limit its storm water discharge of PCBs and engage in many water, sediment, and tissue quality objective efforts.

19.     Thus, Plaintiff has spent money in efforts to remediate, reduce, and monitor PCBs toward these state-mandated TMDL goals.  Plaintiff will spend more money in the future, including possibly additional remediation efforts.

20.     Defendant Monsanto Company ("Monsanto") is a Delaware corporation with its principal place of business in St. Louis, Missouri.

21.     Defendant Solutia Inc. ("Solutia") is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri.

22.     Defendant Pharmacia LLC (formerly known as "Pharmacia Corporation" and successor to the original Monsanto Company) is a Delaware LLC with its principal place of business in Peapack, New Jersey.  Pharmacia is now a wholly-owned subsidiary of Pfizer, Inc.

23.     The original Monsanto Company ("Old Monsanto") operated an agricultural products business, a pharmaceutical and nutrition business, and a chemical products business.  Old Monsanto began manufacturing PCBs in the 1930s and continued to manufacture commercial PCBs until the late 1970s.

24.     Through a series of transactions beginning in approximately 1997, Old Monsanto's businesses were spun off to form three separate corporations.  The corporation now known as Monsanto operates Old Monsanto's agricultural products business.  Old Monsanto's chemical products business is now operated by Solutia.  Old Monsanto's pharmaceuticals business is now operated by Pharmacia.

25.     Solutia was organized by Old Monsanto to own and operate its chemical manufacturing business.  Solutia assumed the operations, assets, and liabilities of Old

GOMEZ
TRIAL ATTORNEYS

PLAINTIFF'S FIRST AMENDED COMPLAINT

2:16-cv-03493-FMO-AS

Monsanto's chemicals business.[3]

26.     Although Solutia assumed and agreed to indemnify Pharmacia (then known as Monsanto Company) for certain liabilities related to the chemicals business, Defendants have entered into agreements to share or apportion liabilities, and/or to indemnify one or more entity, for claims arising from Old Monsanto's chemical business --- including the manufacture and sale of PCBs.[4]

27.     In 2003, Solutia filed a voluntary petition for reorganization under Chapter 11 of the U.S. Bankruptcy Code.  Solutia's reorganization was completed in 2008.  In connection with Solutia's Plan of Reorganization, Solutia, Pharmacia and New Monsanto entered into several agreements under which Monsanto continues to manage and assume financial responsibility for certain tort litigation and environmental remediation related to the Chemicals Business.[5]

28.     Monsanto, Solutia, and Pharmacia are collectively referred to in this Complaint as "Defendants."

## III.     JURISDICTION AND VENUE

29.     This Court has jurisdiction pursuant to 28 U.S.C. §1332 because complete diversity exists between Plaintiff and Defendants.  The Plaintiff is located in California, but no Defendant is a citizen of California.  Monsanto is a Delaware corporation with its principal place of business in St. Louis, Missouri.  Solutia is a Delaware corporation with its principal place of business in St. Louis, Missouri.  Pharmacia is a Delaware limited liability company with its principal place of business in Peapack, New Jersey.

---

[3] See MONSANTO COMPANY'S ANSWER TO THE COMPLAINT AND JURY DEMAND, *Town of Lexington v. Pharmacia Corp., Solutia, Inc., and Monsanto Company*, C.A. No. 12-CV-11645, D. Mass. (October 8, 2013);  see also Relationships Among Monsanto Company, Pharmacia Corporation, Pfizer Inc., and Solutia Inc., http://www.monsanto.com/whoweare/pages/monsanto-relationships-pfizer-solutia.aspx (last accessed February 20, 2014).
[4] *See id*.
[5] *See* Monsanto's Form 8-K (March 24, 2008), and Form 10-Q (June 27, 2008), available at http://www.monsanto.com/investors/pages/sec-filings.aspx (last accessed February 20, 2014).

GOMEZ
TRIAL ATTORNEYS

PLAINTIFF'S FIRST AMENDED COMPLAINT

2:16-cv-03493-FMO-AS

30.     Venue is appropriate in this judicial district pursuant to 28 U.S.C. section 1391(a) because a substantial part of the property that is the subject of the action is situated in this judicial district.

## IV.   FACTUAL ALLEGATIONS

### A.   PCBs are Toxic Chemicals that Cause Environmental Contamination.

31.     Polychlorinated biphenyl, or "PCB," is a molecule comprised of chlorine atoms attached to a double carbon-hydrogen ring (a "biphenyl" ring).  A "PCB congener" is any single, unique chemical compound in the PCB category.  Over two hundred congeners have been identified.[6]

32.     PCBs were generally manufactured as mixtures of congeners.  From approximately 1935 to 1979, Monsanto Company was the only manufacturer in the United States that intentionally produced PCBs for commercial use.[7]  The most common trade name for PCBs in the United States was "Aroclor," which was trademarked by Old Monsanto.

33.     Monsanto's commercially-produced PCBs were used in a wide range of industrial applications in the United States including electrical equipment such as transformers, motor start capacitors, and lighting ballasts.  In addition, PCBs were incorporated into a variety of products such as caulks, paints, and sealants.

34.     As used in this Complaint, the terms "PCB," "PCBs," "PCB-containing products," and "PCB products" refer to products containing polychlorinated biphenyl congener(s) manufactured for placement into trade or commerce, including any product

_____

[6] Table of PCB Congeners, available at http://www.epa.gov/epawaste/hazard/tsd/pcbs/pubs/congeners.htm (last accessed February 20, 2014).
[7] See 116 Cong. Record 11695, 91st Congress, (April 14, 1970) ("Insofar as the Monsanto Co., the sole manufacturer of PCB's is concerned . . . ."); 121 Cong. Record 33879, 94th Congress, (October 23, 1975) ("The sole U.S. producer, Monsanto Co. . . . .").  See also MONS 058730-058752 at 058733 (identifying other producers as "all ex-USA.").  Didn't we decide to stop attaching (i.e., giving to other plaintiffs' lawyers) our good docs?  Let's just cite them but not attach.

7

GOMEZ
TRIAL ATTORNEYS

that forms a component part of or that is subsequently incorporated into another product.

35.     PCBs easily migrate out of their original source material or enclosure and contaminate nearby surfaces, air, water, soil, and other materials.  For example, PCB compounds volatilize out of building materials (such as caulk) into surrounding materials such as masonry, wood, drywall, and soil, thereby causing damage to those surrounding materials.  PCBs can also escape from totally-enclosed materials (such as light ballasts) and similarly contaminate and damage surrounding materials.

36.     PCBs present serious risks to the health of humans, wildlife, and the environment.

37.     Humans may be exposed to PCBs through ingestion, inhalation, and dermal contact.  Individuals may inhale PCBs that are emitted into the air.  They may also ingest PCBs that are emitted into air and settle onto surfaces that come into contact with food or drinks.  And they may absorb PCBs from physical contact with PCBs or PCB-containing materials.

38.     The EPA has determined that Monsanto's PCBs are probable human carcinogens.  In 1996, EPA reassessed PCB carcinogenicity, based on data related to Aroclors 1016, 1242, 1254, and 1260. [8]  The EPA's cancer reassessment was peer reviewed by 15 experts on PCBs, including scientists from government, academia and industry, all of whom agreed that PCBs are probable human carcinogens.

39.     In addition, the EPA concluded that PCBs are associated with serious non-cancer health effects.  From extensive studies of animals and primates using environmentally relevant doses, EPA has found evidence that PCBs exert significant toxic effects, including effects on the immune system, the reproductive system, the nervous system, and the endocrine system.

--------

[8] EPA, PCBs: Cancer Dose-Response Assessment and Application to Environmental Mixtures, EPA/600/P-96/001F (September 1996), available at http://www.epa.gov/epawaste/hazard/tsd/pcbs/pubs/pcb.pdf (last accessed May 5, 2014).

GOMEZ
TRIAL ATTORNEYS

PLAINTIFF'S FIRST AMENDED COMPLAINT

40.     PCBs affect the immune system by causing a significant decrease in the size of the thymus gland, lowered immune response, and decreased resistance to viruses and other infections.  The animal studies were not able to identify a level of PCB exposure that did not affect the immune system.  Human studies confirmed immune system suppression.

41.     Studies of reproductive effects in human populations exposed to PCBs show decreased birth weight and a significant decrease in gestational age with increasing exposures to PCBs.  Animal studies have shown that PCB exposures reduce birth weight, conception rates, live birth rates, and reduced sperm counts.

42.     Human and animal studies confirm that PCB exposure causes persistent and significant deficits in neurological development, affecting visual recognition, short-term memory, and learning. Some of these studies were conducted using the types of PCBs most commonly found in human breast milk.

43.     PCBs may also disrupt the normal function of the endocrine system.  PCBs have been shown to affect thyroid hormone levels in both animals and humans.  In animals, decreased thyroid hormone levels have resulted in developmental deficits, including deficits in hearing.  PCB exposures have also been associated with changes in thyroid hormone levels in infants in studies conducted in the Netherlands and Japan.

44.     PCBs have been associated with other health effects including elevated blood pressure, serum triglyceride, and serum cholesterol in humans; dermal and ocular effects in monkeys and humans; and liver toxicity in rodents.

45.     Children may be affected to a greater extent than adults.  The Agency for Toxic Substances and Disease Registry explained:  "Younger children may be particularly vulnerable to PCBs because, compared to adults, they are growing more rapidly and generally have lower and distinct profiles of biotransformation enzymes, as

GOMEZ
TRIAL ATTORNEYS

PLAINTIFF'S FIRST AMENDED COMPLAINT

2:16-cv-03493-FMO-AS

1   well as much smaller fat deposits for sequestering the lipophilic PCBs."[9]

2   46.    PCBs are known to be toxic to a number of aquatic species and wildlife

3   including fish, marine mammals, reptiles, amphibians, and birds.  Exposure is

4   associated with death, compromised immune system function, adverse effects on

5   reproduction, development, and endocrine function.  PCB exposure affects liver

6   function, the digestive system, and nervous systems and can promote cancer in a

7   number of animal species.  The presence of PCBs can cause changes in community and

8   ecosystem structure and function.[10]

9            **B.    Monsanto Has Long Known of PCBs' Toxicity.**

10   47.    Monsanto was well aware of scientific literature published in the 1930s that

11   established that inhalation in industrial settings resulted in toxic systemic effects. [11]

12   48.    An October 11, 1937, Monsanto memorandum advises that "Experimental

13   work in animals shows that prolonged exposure to Aroclor vapors evolved at high

14   temperatures or by repeated oral ingestion will lead to systemic toxic effects.  Repeated

15   bodily contact with the liquid Aroclors may lead to an acne-form skin eruption."[12]

16   49.    A September 20, 1955, memo from Emmet Kelly set out Monsanto's

17   position with respect to PCB toxicity:  "We know Aroclors are toxic but the actual limit

18   has not been precisely defined.  It does not make too much difference, it seems to me,

19   because our main worry is what will happen if an individual develops [*sic*] any type of

20   liver disease and gives a history of Aroclor exposure.  I am sure the juries would not pay

21   a great deal of attention to [maximum allowable concentrates]."[13]

22

23   ─────────────────────

24   [9] Agency for Toxic Substances and Disease Registry, Toxicological Profile for Polychlorinated Biphenyls (PCBs), (November 2000), at 405, available at www.atsdr.cdc.gov (last accessed May 1, 2014).

25   [10] *See* EPA, Understanding PCB Risks, available at

26   http://www.epa.gov/housatonic/understandingpcbrisks.html#WildlifeEcologicalRiskAssessment (last accessed March 5, 2015).

27   [11] *See* MONS 061332, MONS 095196-7, JDGFOX00000037-63.

     [12] MONS 061332.

28   [13] MONS 095196-7.

50.     On November 14, 1955, Monsanto's Medical Department provided an opinion that workers should not be allowed to eat lunch in the Aroclor department:

> It has long been the opinion of the Medical Department that eating in process departments is a potentially hazardous procedure that could lead to serious difficulties.  While the Aroclors are not particularly hazardous from our own experience, this is a difficult problem to define because early literature work claimed that chlorinated biphenyls were quite toxic materials by ingestion or inhalation.[14]

51.     On January 21, 1957, Emmet Kelly reported that after conducting its own tests, the U.S. Navy decided against using Monsanto's Aroclors:  "No matter how we discussed the situation, it was impossible to change their thinking that Pydraul 150 is just too toxic for use in a submarine."[15]

52.     In 1966, Kelly reviewed a presentation by Swedish researcher Soren Jensen, who stated that PCBs "appeared to be the most injurious chlorinated compounds of all tested."[16]  Jensen refers to a 1939 study associating PCBs with the deaths of three young workers and concluding that "pregnant women and persons who have at any time had any liver disease are particularly susceptible."[17]  Kelly does not dispute any of Jensen's remarks, noting only, "As far as the section on toxicology is concerned, it is true that chloracne and liver trouble can result from large doses."[18]

## C.   Monsanto Has Long Known that PCBs Were "Global Contaminants" Causing Harm to Animals and Fish.

53.     At the same time, Monsanto became aware that PCBs were causing widespread contamination of the environment, far beyond the areas of its use.[19]

---

[14] Monsanto Chemical Company, Memorandum to H.B. Patrick, November 14, 1955 (no Bates number).
[15] MONS 095640.
[16] *See* JDGFOX00000037-63.
[17] *Id*. at JDGFOX00000039.
[18] *Id*. at JDGFOX00000037.
[19] See MONSFOX00003427; MONS 030483-030486;  R.W. Risebrough, Polychlorinated Biphenls in the Global Ecosystem, Nature, Vol. 220 (December 14, 1968).

GOMEZ
TRIAL ATTORNEYS

11

54.     Monsanto's Medical Director reviewed an article by Swedish researcher Soren Jensen, who reported the detection of PCBs in the tissues of fish and wildlife in Sweden.[20]  The report noted that PCBs were also detected in the air over London and Hamburg and found in seals caught off the coast of Scotland.  Jensen concluded that PCBs can "be presumed to be widespread throughout the world."[21]

55.     A December 1968 article by Richard Risebrough identified chlorinated hydrocarbons (which include PCBs) as "the most abundant synthetic pollutants present in the global environment."[22]  The article reported finding significant concentrations of PCBs in the bodies and eggs of peregrine falcons and 34 other bird species.  The report linked PCBs to the rapid decline in peregrine falcon populations in the United States.

56.     Despite growing evidence of PCBs' infiltration of every level of the global ecology, Monsanto remained steadfast in its production of Aroclors and other PCBs.

57.     On March 6, 1969, Monsanto employee W. M. Richard wrote a memorandum discussing Risebrough's article that criticized PCBs as a "toxic substance", "widely spread by air-water; therefore, an uncontrollable pollutant . . . causing extinction of peregrine falcon … [and] endangering man himself."[23]  Richard explained that Monsanto could take steps to reduce PCB releases from its own plants but cautioned, "It will be still more difficult to control other end uses such as cutting oils, adhesives, plastics, and NCR paper.  In this applications exposure to consumers is greater and the disposal problem becomes complex."[24]

58.     On September 9, 1969, Monsanto employee W.R. Richard wrote an interoffice memo titled "Defense of Aroclor."[25]  He acknowledged the role of Aroclor in

---

[20] New Scientist (December 15, 1986), MONSFOX00003427.
[21] *Id.*
[22] R.W. Risebrough, Polychlorinated Biphenls in the Global Ecosystem, Nature, Vol. 220 (December 14, 1968).
[23] MONS 096509-096511.
[24] *Id.*
[25] DSW 014256-014263.

12

GOMEZ
TRIAL ATTORNEYS

water pollution: "Aroclor product is refractive, will settle out on solids – sewerage sludge – river bottoms, and apparently has a long life."  He noted that Aroclors 1254 and 1260 had been found along the Gulf Coast of Florida causing a problem with shrimp; in San Francisco Bay, where it was reported to thin egg shells in birds; and in the Great Lakes.  Richard advised that the company could not defend itself against all criticism: "We can't defend vs. everything.  Some animals or fish or insects will be harmed.  Aroclor degradation rate will be slow.  Tough to defend against.  Higher chlorination compounds will be worse [than] lower chlorine compounds.  Therefore we will have to restrict uses and clean-up as much as we can, starting immediately."[26]

59.     On January 29, 1970, Elmer Wheeler of the Medical Department circulated laboratory reports discussing results of animal studies.  He noted: "Our interpretation is that the PCB's are exhibiting a greater degree of toxicity in this chronic study than we had anticipated.  Secondly, although there are variations depending on species of animals, the PCB's are about the same as DDT in mammals."[27]

60.     Monsanto expressed a desire to keep profiting from PCBs despite the environmental havoc in a PCB Presentation to Corporate Development Committee.  The report suggests possible reactions to the contamination issue.  It considered that doing nothing was "unacceptable from a legal, moral, and customer public relations and company policy viewpoint."  But the option of going out of the Aroclor business was also considered unacceptable: "there is too much customer/market need and selfishly too much Monsanto profit to go out."[28]

61.     The Aroclor Ad Hoc Committee at Monsanto held its first meeting on September 5, 1969.  The committee's objectives were to continue sales and profits of Aroclors in light of the fact that PCB "may be a global contaminant."[29]  The meeting

---

[26] *Id.*
[27] MONS 098480.
[28] MONS 058737.
[29] MONS 030483-030486.

GOMEZ
TRIAL ATTORNEYS

PLAINTIFF'S FIRST AMENDED COMPLAINT

2:16-cv-03493-FMO-AS

minutes acknowledge that PCB has been found in fish, oysters, shrimp, birds, along coastlines of industrialized areas such as Great Britain, Sweden, Rhine River, low countries, Lake Michigan, Pensacola Bay, and in Western wildlife.  Moreover, the committee implicated the normal use of PCB-containing products as the cause of the problem: "In one application alone (highway paints), one million lbs/year are used. Through abrasion and leaching we can assume that nearly all of this Aroclor winds up in the environment."[30]

A month later, on October 2, 1969, the Committee reported extensive environmental contamination.  The U.S. Department of Interior, Fish and Wildlife found PCB residues in dead eagles and marine birds.  Similarly, the Bureau of Commercial Fisheries reported finding PCBs in the river below Monsanto's Pensacola plant.   The U.S. Food and Drug Administration had discovered PCBs in milk supplies.   The Committee advised that Monsanto could not protect the environment from Aroclors as "global" contaminants but could protect the continued manufacture and sale of Aroclors (highlight added):[31]

> The committee believes there is little probability ~~(c.a.~~)~~ that any action that can be taken will prevent the growing incrimination of specific polychlorinated biphenyls (the higher chlorinated--e.g. Aroclors 1254 and 1260) as nearly global environmental contaminants leading to contamination of human food (particularly fish), the killing of some marine species (shrimp), and the possible extinction of several species of fish eating birds.

> Secondly, the committee believes that there is no ~~possi-~~ ~~ble~~ *practical* course_of_action that can so effectively police the uses of these products as to prevent *completely some* environmental contamination. *in order*

> There are, however, *in order* a number of ~~possible~~ actions which must be undertaken to prolong the manufacture, sale and use of these particular Aroclors as well as to protect the continued use of other members of the Aroclor series.  *(Less than 5 chlorines*

---

[30] MONS 030485.
[31] DSW 014612-014624, at 014615.

GOMEZ
TRIAL ATTORNEYS

62.     Monsanto's desire to protect Aroclor sales rather than the environment is reflected in the Committee's stated objectives:

1.     Protect continues sales and profits of Aroclors;
2.     Permit continued development of new uses and sales, and
3.     Protect the image of the Organic Division and the Corporation as members of the business community recognizing their responsibilities to prevent and/or con-trol contamination of the global ecosystem.[32]

63.     In 1969, Monsanto's internal documents show they knew their products would contaminate the environment with PCBs, and Monsanto understood the foreseeable fate and transport, including "water contamination... for a lengthy period by leaching from the contaminated mud" (highlight added):

> For a clearer understanding of the general problem, the situation at Pensacola was reviewed. From a relatively negligible discharge of 1-3 gal/day into a large river, 1/4 mile downstream levels of 42 ppb in water and 476 ppm in mud were found. Although use of Aroclor was halted immediately, we can expect the water contamination to continue for a lengthy period by leaching from the contaminated mud. No downstream samples have yet been taken to measure the decrease in contamination (as of 9/5/69).

64.     Monsanto also knew how PCBs would foreseeably migrate from their PCB-containing products and wind up in the environment, as evidenced by internal Monsanto documents (highlight added):

> Our in-plant problems are very small vs. problems of dealing with environmental contamination by customers. In one application alone (highway paints), one million lbs/year are used. Through abrasion and leaching we can assume that nearly all of this Aroclor winds up in the environment.

---

[32] Id.

15

PLAINTIFF'S FIRST AMENDED COMPLAINT

GOMEZ
TRIAL ATTORNEYS

65.     An interoffice memorandum circulated on February 16, 1970, provided talking points for discussions with customers in response to Monsanto's decision to eliminate Aroclors 1254 and 1260: "We (your customer and Monsanto) are not interested in using a product which may present a problem to our environment." Nevertheless, the memo acknowledges that Monsanto "can't afford to lose one dollar of business."  To that end, it says, "We want to avoid any situation where a customer wants to return fluid. . . . We would prefer that the customer use up his current inventory and purchase [new products] when available.  He will then top off with the new fluid and eventually all Aroclor 1254 and Aroclor 1260 will be out of his system.  We don't want to take fluid back." [33]

66.     In 1970, the year after Monsanto formed the Ad Hoc Committee, and despite Monsanto's knowledge of the global reach of PCB contamination, PCB production in the United States peaked at 85 million pounds.

67.     Growing awareness of the ubiquitous nature of PCBs led the United States to conduct an investigation of health and environmental effects and contamination of food and other products.  An interdepartmental task force concluded in May 1972 that PCBs were highly persistent, could bioaccumulate to relatively high levels, and could have serious adverse health effects on human health. [34]

68.     After that report, environmental sampling and studies indicated that PCBs were a "more serious and continuing environmental and health threat than had been originally realized." [35]  To address these concerns, EPA undertook a study to assess PCB levels in the environment on a national basis.  That study revealed widespread occurrence of PCBs in bottom sediments in several states, including California; in fish and birds; in lakes and rivers; in the Atlantic Ocean, the Pacific Ocean, and the Gulf of

---

[33] MONS 100123-100124.
[34] EPA, Review of PCB Levels in the Environment, EPA-560/7-76-001 (January 1976).
[35] Id. at 1.

GOMEZ
TRIAL ATTORNEYS

PLAINTIFF'S FIRST AMENDED COMPLAINT

1  Mexico; sewage treatment facilities; in a variety of foods including milk, poultry, eggs,

2  fish, meat, and grains; and in human tissues, blood, hair, and milk.[36]

3        69.    EPA's study noted the particular burden on California.  "PCBs have

4  become a significant component of the marine food webs of southern California," were

5  found in sediments in the Santa Barbara Basin, and found in high levels in the San

6  Francisco Bay.[37]

7        70.    At the same time, Monsanto was promoting the use and sale of Aroclor and

8  other PCB compounds.  In a 1960 brochure, Monsanto promotes the use of Aroclors in

9  transformers and capacitors, utility transmission lines, home appliances, electric motors,

10 fluorescent light ballasts, wire or cable coatings, impregnants for insulation, dielectric

11 sealants, chemical processing vessels, food cookers, potato chip fryers, drying ovens,

12 thermostats, furnaces, and vacuum diffusion pumps.  Aroclors could also be used, the

13 brochure advertised, as a component of automotive transmission oil; insecticides;

14 natural waxes used in dental casting, aircraft parts, and jewelry; abrasives; specialized

15 lubricants; industrial cutting oils; adhesives; moisture-proof coatings; printing inks;

16 papers; mastics; sealant; caulking compounds; tack coatings; plasticizers; resin; asphalt;

17 paints, varnishes, and lacquers; masonry coatings for swimming pools, stucco homes,

18 and highway paints;  protective and decorative coatings for steel structures, railway tank

19 and gondola cars; wood and metal maritime equipment;  and coatings for chemical

20 plants, boats, and highway marking. [38]

21       71.    A 1961 brochure explains that Monsanto's Aroclors are being used in

22 "lacquers for women's shoes,"  as "a wax for the flame proofing of Christmas trees," as

23 "floor wax,"  as an adhesive for bookbinding, leather, and shoes,  and as invisible

24 marking ink used to make chenille rugs and spreads. [39]

25

---

26 [36] Id., passim.

27 [37] Id.

28 [38] The Aroclor Compounds (hand dated May 1960), 0509822- 66.
   [39] Plasticizer Patter (February 1961), 0627503-21.

GOMEZ
TRIAL ATTORNEYS

PLAINTIFF'S FIRST AMENDED COMPLAINT

Case 2:16-cv-03493-FMO-AS   Document 13   Filed 06/09/16   Page 18 of 31   Page ID #:258

72.     Thus, by February 1961, at the latest, Monsanto knew that its Aroclors were being used in a variety of industrial, commercial, household, and consumer goods. Moreover, Monsanto affirmatively encouraged these uses by encouraging salesmen to market products for these and other applications.

73.     A few years later, in 1970, Monsanto tried to distance itself from the variety of applications of Aroclors that it proudly espoused a few years before.  In a press release, the company claimed:  " 'What should be emphasized . . . is that PCB was developed over 40 years ago primarily for use as a coolant in electrical transformers and capacitors.  It is also used in commercial heating and cooling systems.  It is not a 'household' item."[40]

### D.     Monsanto Concealed the Nature of PCBs from Governmental Entities.

74.     While the scientific community and Monsanto knew that PCBs were toxic and becoming a global contaminant, Monsanto repeatedly misrepresented these facts, telling governmental entities the exact opposite — that the compounds were not toxic and that the company would not expect to find PCBs in the environment in a widespread manner.[41]

75.     In a March 24, 1969 letter to Los Angeles County Air Pollution Control District, Monsanto advised that the Aroclor compounds "are not particularly toxic by oral ingestion or skin absorption."[42]  Addressing reports of PCBs found along the West Coast, Monsanto claimed ignorance as to their origin, explaining that "very little [Aroclor] would normally be expected either in the air or in the liquid discharges from a using industry."[43]  A similar letter to the Regional Water Quality Control Board

_____

[40] *See* Press release (July 16, 1970), MCL000647-50 at MCL000648.
[41] *See* notes 42-46, *infra* (letters to governmental agencies).
[42] Letter from Monsanto to Los Angeles County Air Pollution Control District (March 24, 1969).
[43] *Id*.

TRIAL ATTORNEYS

18

PLAINTIFF'S FIRST AMENDED COMPLAINT

2:16-cv-03493-FMO-AS

explained that PCBs are associated with "no special health problems" and "no problems associated with the environment."[44]

76.     In May, 1969, Monsanto employee Elmer Wheeler spoke with a representative of the National Air Pollution Control Administration, who promised to relay to Congress the message that Monsanto "cannot conceive how the PCBs can be getting into the environment in a widespread fashion."[45]

77.     Monsanto delivered the same message to the New Jersey Department of Conservation in July, 1969, claiming first, "Based on available data, manufacturing and use experience, we do not believe the PCBs to be seriously toxic."[46]  The letter then reiterates Monsanto's position regarding environmental contamination:  "We are unable at this time to conceive of how the PCBs can become wide spread in the environment. It is certain that no applications to our knowledge have been made where the PCBs would be broadcast in the same fashion as the chlorinated hydrocarbon pesticides have been."[47]

### E.     Monsanto's PCBs Create a Continuing Tort

78.      Monsanto's wrongful conduct has created an environmental problem whereby PCBs continue to emanate out of Monsanto's PCB-containing products, causing new deposits of toxic PCBs into Long Beach's storm water every day.

79.     Every day, Monsanto's PCB-containing products cause PCB contamination of Long Beach's storm water, creating new, continuous, and ongoing contamination.

80.     Monsanto PCBs continue to volatilize, vaporize, leach, and leak from Monsanto's PCB-containing products and their intended applications as described above on a daily basis.  These Monsanto PCB chemicals enter into the environment, streets, roadways, sidewalks, parks, gutters, storm inlets, and storm drains, and then into the Long Beach storm water on a daily basis.

---

[44] Letter from Monsanto to State of California Resources Agency (March 27, 1969).
[45] Monsanto Memorandum to W.R. Richard (May 26, 1969).
[46] Letter from Monsanto to Department of Conservation and Economic Development (July 23, 1969).
[47] Id.

PLAINTIFF'S FIRST AMENDED COMPLAINT

81.      Monsanto PCBs, emanating from Monsanto's PCB-containing products, continue to travel through Long Beach's storm water on a daily basis and are deposited into the Port of Long Beach on a daily basis.  New PCBs contaminate the Port of Long Beach on a daily basis.

82.      Monsanto's PCBs, emanating from Monsanto's PCB-containing products, will continue to contaminate Long Beach's storm water and Port on a daily basis in the future and for years to come if no remediation occurs.

**FIRST CAUSE OF ACTION**

**PUBLIC NUISANCE**

83.      Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

84.      Monsanto manufactured, distributed, marketed, and promoted PCBs in a manner that created or participated in creating a public nuisance that is harmful to health and obstructs the free use of Long Beach Waters.

85.      The presence of PCBs interferes with the comfortable enjoyment of Long Beach Waters for customary uses for fishing, swimming, and other water activities.

86.      The presence of PCBs interferes with the free use of Long Beach Waters for the promotion of commerce, navigation, and fisheries.

87.      The presence of PCBs interferes with the free use of Long Beach Waters for ecological preservation and habitat restoration.

88.      The Los Angeles Regional Water Quality Control Board, pursuant to the NPDES under the Clean Water Act, requires the Plaintiffs to reduce their discharge of and monitor PCBs into to prevent further contamination of the already impaired body of water.

89.      The presence of PCBs causes significant costs, inconvenience and annoyance to Plaintiffs, who are charged with reducing and monitoring PCB discharge toward TMDL levels, in order to protect plant and animal life, and the quality of water in Long Beach Waters.

GOMEZ
TRIAL ATTORNEYS

PLAINTIFF'S FIRST AMENDED COMPLAINT

2:16-cv-03493-FMO-AS

90.     The condition affects a substantial number of people who use Long Beach Waters for commercial and recreational purposes and interferes with the rights of the public at large to clean and safe resources and environment.

91.     An ordinary person would be reasonably annoyed or disturbed by the presence of toxic PCBs that endanger the health of fish, animals, and humans and degrade water quality and destroy marine habitats.

92.     The seriousness of the environmental and human health risk far outweighs any social utility of Monsanto's conduct in manufacturing PCBs and concealing the dangers posed to human health and the environment.

93.     The Plaintiffs have suffered and will continue to suffer harm that is different from the type of harm suffered by the general public, and the Plaintiffs have incurred substantial costs deriving from state-mandated PCB TMDLs.

94.     Plaintiff did not consent to the conduct that resulted in the contamination of Long Beach Waters.

95.     Monsanto's conduct was a substantial factor in causing the harm to the Plaintiffs.

96.     Monsanto knew or, in the exercise of reasonable care, should have known that the manufacture and sale of PCBs was causing the type of contamination now found in Long Beach Waters.  Monsanto knew that PCBs would contaminate water supplies, would degrade marine habitats, would kill fish species, and would endanger birds and animals.  In addition, Monsanto knew that PCBs are associated with serious illnesses and cancers in humans and that humans may be exposed to PCBs through ingestion and dermal contact.  As a result, it was foreseeable to Monsanto that humans may be exposed to PCBs through swimming in contaminated waters or by eating fish from those waters.  Monsanto thus knew, or should have known, that PCB contamination would seriously and unreasonably interfere with the ordinary comfort, use, and enjoyment of any coastal marine areas.

97.     As a direct and proximate result of Monsanto's creation of a public nuisance, Plaintiffs have suffered, and continues to suffer, monetary damages to be proven at trial.

98.     Monsanto's conduct was malicious, oppressive, wanton, willful, intentional, and shocks the conscience, warranting punitive and exemplary damages, because Monsanto callously decided to increase sales and develop new ways to promote PCBs, knowing PCBs are toxic, cannot be contained, and last for centuries.

## SECOND CAUSE OF ACTION
## EQUITABLE INDEMNITY

99.     Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

100.    Monsanto is responsible for creating the public nuisance by manufacturing, distributing, and promoting PCBs, resulting in contamination in and around Long Beach Waters.

101.    Monsanto's creation of the public nuisance contributed as a substantial factor in causing Plaintiffs' injury and damages.

102.    The conduct of Plaintiff did not contribute in any way to the creation of the public nuisance.

103.    Plaintiff did not consent to the PCB contamination of Long Beach Waters.

## THIRD CAUSE OF ACTION
## STRICT LIABILITY- DESIGN DEFECT- CONSUMER EXPECTATION TEST

104.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

105.    Long Beach was harmed by Aroclors and other PCB-containing products ("Monsanto's PCB Products") which were designed, manufactured, sold, and distributed by Monsanto, and which were defectively designed, did not include sufficient instructions, and did not include sufficient warning of potential safety hazards.

GOMEZ
TRIAL ATTORNEYS

PLAINTIFF'S FIRST AMENDED COMPLAINT

2:16-cv-03493-FMO-AS

106.    The design of Monsanto's PCB products were defective because Monsanto's PCB Products did not perform as safely as an ordinary consumer would have expected them to perform.

107.    Monsanto designed, manufactured, sold, and distributed Monsanto's PCB Products.

108.    Monsanto's PCB Products did not perform as safely as an ordinary consumer would have expected it to perform when used or misused in an intended or reasonably foreseeable way.

109.    Long Beach was, is and will be harmed by Monsanto's PCB Products.

110.    Monsanto's PCB Products failure to perform safely was a substantial factor in causing Long Beach's harm.

111.    Monsanto had actual knowledge that its PCB Products were causing the type of harm suffered by Long Beach.  Monsanto also knew or should have known that these products caused harm even when used as intended, instructed, and normally expected and that no third-party could prevent such harm.

112.    Monsanto's conduct lacked any care and was an extreme departure from what a reasonably careful company would do in the same situation to prevent harm to others and the environment, and thus Monsanto was grossly negligent.

113.    Monsanto, its officers, directors, and managing agents, engaged in despicable conduct and acted or failed to act with malice, oppression, and fraud, warranting punitive or exemplary damages.

## FOURTH CAUSE OF ACTION

### STRICT LIABILITY- DESIGN DEFECT- RISK-BENEFIT TEST

114.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

115.    Long Beach was harmed by Aroclor and other PCB-containing products ("Monsanto's PCB Products") which were designed, manufactured, sold, and distributed by Monsanto, and which were defectively designed, did not include

GOMEZ
TRIAL ATTORNEYS

sufficient instructions, and did not include sufficient warning of potential safety hazards.

116.    The design of Monsanto's PCB Products design caused harm to Long Beach.

117.    Long Beach was, is, and will be harmed by Monsanto's PCB Products.

118.    The design of Monsanto's PCB Products was a substantial factor in causing harm to Long Beach.

119.    The gravity of the huge environmental harm resulting from the use of Monsanto's PCB Products was, is, and will be enormous because Monsanto's PCB Products created a global contaminant as one of the largest man-made water contaminants in the world.

120.    The likelihood that this harm would occur was, is, and will be very high because Monsanto knew and/or should have known Monsanto's PCB Products were toxic, could not be contained, and do not readily degrade in the environment.

121.  In fact, Monsanto foresaw the enormity of the environmental harm but consciously chose to keep producing PCB Products.

122.    At the time of manufacture, there were alternative safer designs that were feasible, cost effective, and advantageous, including not using PCBs at all in Monsanto's products.

123.    Monsanto's conduct lacked any care and was an extreme departure from what a reasonably careful company would do in the same situation to prevent harm to others and the environment, and thus Monsanto was grossly negligent.

124.    Monsanto, its officers, directors, and managing agents, engaged in despicable conduct and acted or failed to act with malice, oppression, and fraud, warranting punitive or exemplary damages.

## **FIFTH CAUSE OF ACTION**
## **STRICT LIABILITY- FAILURE TO WARN**

125.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

GOMEZ
TRIAL ATTORNEYS

126.    Long Beach was harmed by Aroclor and other PCB-containing products ("Monsanto's PCB Products") which were designed, manufactured, sold, and distributed by Monsanto, and which were defectively designed, did not include sufficient instructions, and did not include sufficient warning of potential safety hazards.

127.    Monsanto's PCB Products lacked sufficient instructions or warning of potential environmental hazard and toxicity.

128.    Monsanto designed, manufactured, sold, and distributed Monsanto's PCB Products.

129.    Monsanto's PCB Products had potential environmental hazard and toxicity risks that were known and/or knowable in light of the scientific and medical knowledge that was generally accepted in the scientific community and/or in light of Monsanto's superior knowledge about its products at the time of design, manufacture, sale, distribution of Monsanto's PCB Products.

130.    The potential environmental hazard and toxicity risks presented a substantial danger when Monsanto's PCB Products were and are used or misused in an intended or reasonably foreseeable way.

131.    Ordinary consumers and third-parties would not have recognized the potential risks.

132.    Monsanto failed to adequately warn or instruct of the potential risks.

133.    Long Beach was, is, and will be harmed.

134.    The lack of sufficient instructions or warnings was a substantial factor in causing Long Beach's harm.

135.    Monsanto's conduct lacked any care and was an extreme departure from what a reasonably careful company would do in the same situation to prevent harm to others and the environment, and thus Monsanto was grossly negligent.

136.    Monsanto, its officers, directors, and managing agents, engaged in despicable conduct and acted or failed to act with malice, oppression, and fraud, warranting punitive or exemplary damages.

**SIXTH CAUSE OF ACTION**

**NEGLIGENCE- MANUFACTURER OR SUPPLIER- DUTY TO WARN**

137.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

138.    Long Beach was harmed by Aroclor and other PCB-containing products ("Monsanto's PCB Products") which were designed, manufactured, sold, and distributed by Monsanto, and which were defectively designed, did not include sufficient instructions, and did not include sufficient warning of potential safety hazards.

139.     Monsanto was negligent by not using reasonable care to warn or instruct about Monsanto's PCB Products' dangerous condition or about the facts that made Monsanto's PCB Products likely to be dangerous.

140.    Monsanto designed, manufactured, sold, and distributed Monsanto's PCB Products.

141.    Monsanto knew or reasonably should have known that Monsanto's PCB Products were dangerous or likely to be dangerous when used or misused in a reasonably foreseeable manner.

142.    Monsanto knew or reasonably should have known that users and third parties would not realize the danger.

143.    Monsanto failed to adequately warn of the danger or instruct on the safe use of the Monsanto's PCB Products.

144.    A reasonable chemical manufacturer, seller, distributor, under the same or similar circumstances would have warned of the danger or instructed on the safe use of the Monsanto's PCB Products.

145.    Long Beach was, is, and will be harmed.

146.    Monsanto's failure to warn or instruct was a substantial factor in causing Long Beach's harm.

///

///

GOMEZ
TRIAL ATTORNEYS

26

PLAINTIFF'S FIRST AMENDED COMPLAINT

2:16-cv-03493-FMO-AS

## SEVENTH CAUSE OF ACTION

### NEGLIGENCE- RECALL

147.    Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

148.    Long Beach was harmed by Aroclor and other PCB-containing products ("Monsanto's PCB Products") which were designed, manufactured, sold, and distributed by Monsanto, and which were defectively designed, did not include sufficient instructions, and did not include sufficient warning of potential safety hazards.

149.    Monsanto was negligent because it failed to recall Monsanto's PCB Products.

150.    Monsanto designed, manufactured, sold, and distributed Monsanto's PCB Products.

151.    Monsanto knew or reasonably should have known that Monsanto's PCB Products were dangerous or likely to be dangerous when used in a reasonably foreseeable manner.

152.    Monsanto became aware of this defect soon after Monsanto began selling its Monsanto PCB Products and certainly before the time it ceased sales in the late 1970s.

153.    Monsanto failed to recall or warn of the danger of Monsanto's PCB Products.

154.    A reasonable designer, manufacturer, distributor, or seller under the same or similar circumstances would have recalled Monsanto's PCB Products.

155.    Rather than recall the products, Monsanto actually increased production despite its knowledge of the dangers.

156.    Long Beach was, is, and will be harmed.

157.    Monsanto's failure to recall the product was a substantial factor in causing Long Beach's harm.

GOMEZ
TRIAL ATTORNEYS

PLAINTIFF'S FIRST AMENDED COMPLAINT

2:16-cv-03493-FMO-AS

158.   Monsanto's conduct lacked any care and was an extreme departure from what a reasonably careful company would do in the same situation to prevent harm to others and the environment, and thus Monsanto was grossly negligent.

159.   Monsanto, its officers, directors, and managing agents, engaged in despicable conduct and acted or failed to act with malice, oppression, and fraud, warranting punitive or exemplary damages.

## EIGHTH CAUSE OF ACTION

### TRESPASS

160.   Plaintiff realleges and reaffirms each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

161.   Long Beach controls the tidelands of the Port of Long Beach and other Long Beach Waters within the City of Long Beach, including Long Beach storm water.

162.   Monsanto intentionally, recklessly, and negligently caused its PCBs to enter the Port of Long Beach and other Long Beach Waters within the City of Long Beach, including Long Beach storm water.

163.   Long Beach did not give permission for the entry.

164.   Long Beach was, is, and will be actually harmed.

165.   Monsanto's conduct was a substantial factor in causing Long Beach's harm.

166.   Monsanto's conduct lacked any care and was an extreme departure from what a reasonably careful company would do in the same situation to prevent harm to others and the environment, and thus Monsanto was grossly negligent.

167.   Monsanto, its officers, directors, and managing agents, engaged in despicable conduct and acted or failed to act with malice, oppression, and fraud, warranting punitive or exemplary damages.

///

///

///

GOMEZ
TRIAL ATTORNEYS

PLAINTIFF'S FIRST AMENDED COMPLAINT

2:16-cv-03493-FMO-AS

## **PRAYER FOR RELIEF**

Plaintiffs pray for judgment against Defendants, jointly and severally, as follows:

1.  Compensatory damages according to proof;

2.  Punitive damages;

3.  Litigation costs and attorney's fees as provided by law;

4.  Pre-judgment and post-judgment interest;

5.  Any other and further relief as the Court deems just, proper, and equitable.

## **DEMAND FOR JURY TRIAL**

Plaintiffs demand a jury trial.

Dated:  June 9, 2016                    By: /s/ John P. Fiske
                                              John P. Fiske

                                        **GOMEZ TRIAL ATTORNEYS**
                                        John H. Gomez (SBN 171485)
                                        john@gomeztrialattorneys.com
                                        John P. Fiske (SBN 249256)
                                        fiske@gomeztrialattorneys.com
                                        655 W. Broadway, #1700
                                        San Diego, CA 92101
                                        Telephone: (619) 237-3490

                                        **OFFICE OF THE CITY ATTORNEY**
                                        **City of Long Beach**
                                        Charles Parkin, City Attorney (SBN 159162)
                                        Charles.Parkin@longbeach.gov
                                        Amy Webber, Deputy City Attorney (SBN 132174)
                                        Amy.Webber@longbeach.gov
                                        Dawn McIntosh, Deputy City Attorney (SBN 162173)
                                        Dawn.McIntosh@longbeach.gov
                                        333 W. Ocean Blvd, 11th Floor
                                        Long Beach, CA 90802
                                        Telephone: (562) 570-2200

                                        **BARON & BUDD, P.C.**
                                        Scott Summy (*pending Pro Hac Vice,* Texas Bar

No. 19507500)
SSummy@baronbudd.com
Carla Burke *(pending Pro Hac Vice,* Texas Bar
No. 24012490)
cburkepickrel@baronbudd.com
Celeste Evangelisti (SBN 225232)
cevangelisti@baronbudd.com
3102 Oak Lawn Ave, #1100
Dallas, TX 75219
Telephone: (214) 521-3605

PLAINTIFF'S FIRST AMENDED COMPLAINT

2:16-cv-03493-FMO-AS

## CERTIFICATE OF SERVICE

I hereby certify that on June 9, 2016, I caused the **PLAINTIFF'S FIRST AMENDED COMPLAINT** to be electronically filed with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the Electronic Mail Notice List, and I hereby certify that I caused the foregoing document or paper to be personally served to the non-CM/ECF participants indicated below.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED:  June 9, 2016                    **GOMEZ TRIAL ATTORNEYS**

By:  /s/ John P. Fiske
John P. Fiske (SBN 249256)

| | |
|---|---|
| Monsanto Company, Registered Agent:<br>CORPORATION SERVICE COMPANY<br>2711 CENTERVILLE RD SUITE 400,<br>WILMINGTON, DE 19808<br><br>Pharmacia LLC, Registered agent:<br>THE CORPORATION TRUST COMPANY,<br>1209 ORANGE ST,<br>WILMINGTON, DE 19801<br><br>Solutia Inc. Registered Agent:<br>CORPORATION SERVICE COMPANY<br>2711 CENTERVILLE RD SUITE 400,<br>WILMINGTON, DE 19808 | Defendants |