1 | **BARON & BUDD, P.C.**
Scott Summy (*Pro Hac Vice,* TX Bar No. 19507500)
2 | SSummy@baronbudd.com
Carla Burke Pickrel (*Pro Hac Vice,* TX Bar No. 24012490)
3 | cburkepickrel@baronbudd.com
3102 Oak Lawn Ave, #1100
4 | Dallas, Texas 75219
Telephone: (214) 521-3605
5 |
6 | **BARON & BUDD, P.C.**
John P. Fiske (SBN 249256)
7 | Fiske@baronbudd.com
11440 W. Bernardo Court, Suite 265
8 | San Diego, California 92127
Telephone: (858) 251-7424
9 | *Proposed Lead Class Counsel*
*Additional counsel listed on signature page*
10 |

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION**

| | |
|---|---|
| CITY OF LONG BEACH, a municipal corporation; COUNTY OF LOS ANGELES, a political subdivision; CITY OF CHULA VISTA, a municipal corporation; CITY OF SAN DIEGO, a municipal corporation; CITY OF SAN JOSE, a municipal corporation; CITY OF OAKLAND, a municipal corporation; CITY OF BERKELEY, a municipal corporation; CITY OF SPOKANE, a municipal corporation; CITY OF TACOMA, a municipal corporation; CITY OF PORTLAND, a municipal corporation; PORT OF PORTLAND, a port district of the State of Oregon; BALTIMORE COUNTY, a political subdivision; MAYOR AND CITY COUNCIL OF BALTIMORE; all individually and on behalf of all others similarly situated,<br><br>                              Plaintiffs,<br><br>v.<br><br>MONSANTO COMPANY; SOLUTIA INC., and PHARMACIA LLC, and DOES 1 through 100,<br><br>                              Defendants. | CASE NO.: 2:16-cv-03493-FMO-AS<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF RENEWED MOTION FOR CERTIFICATION OF SETTLEMENT CLASS, PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT, APPROVAL OF NOTICE PLAN, APPOINTMENT OF CLASS ACTION SETTLEMENT ADMINISTRATOR, AND APPOINTMENT OF CLASS COUNSEL**<br><br>*[Filed Concurrently with Notice Motion and Motion; Proposed Order]*<br><br>Time of Hearing: 10:00 a.m.<br>Date of Hearing: September 17, 2020<br>Courtroom: 6D<br>Honorable Fernando M. Olguin<br><br>File Date:      May 19, 2016<br>Trial Date:    May 11, 2021 |

# **TABLE OF CONTENTS**

I. STATEMENT OF THE CASE ........................................................................1

II. TERMS OF THE SETTLEMENT .................................................................4

    A. The Settlement Class .........................................................................4

        1. Settlement Class Allocation ...........................................6

        2. Monitoring Fund ...........................................................6

        3. TMDL Fund...................................................................7

        4. Sediment Sites Fund .....................................................8

        5. Special Needs Funds....................................................11

    B. Additional Terms of the Settlement Agreement .....................................16

        1. Effect of Future State Attorney General Action ...........16

        2. Settlement Administration and Class Notice ................17

        3. Exclusion and Objection Rights...................................18

        4. Cancellation.................................................................20

        5. Attorneys' Fees and Litigation Costs and Expenses.....................20

        6. Mutual Releases...........................................................21

III. STANDARD OF REVIEW ..........................................................................22

IV. THE COURT SHOULD CERTIFY THE SETTLEMENT CLASS AS
FAIR, ADEQUATE AND REASONABLE. ..................................................24

    A. Rule 23(a) Is Satisfied for Purposes of Certifying the Settlement
Classes...........................................................................................25

        1. The Settlement Class is Numerous...............................25

        2. The Settlement Class Members Share Common Questions of
Law and Fact ...............................................................25

        3. The Claims of the Class Representatives Are Typical of those
of the Proposed Classes ...............................................26

        4. The Class Representatives are Adequate.......................26

i

**B.**  Rule 23(b) Is Satisfied for Purposes of Certifying the Settlement Class. ................................................................................27

**V.**  THE COURT SHOULD GRANT PRELIMINARY APPROVAL OF THE PROPOSED SETTLEMENT ................................................................30

    **A.**  Class Representatives and Class Counsel Have and Will Continue to Zealously Represent the Class ................................................32

    **B.**  The Settlement Is the Product of Good Faith, Informed, and Arm's-Length Negotiations, and It Is Fair ........................................33

    **C.**  The Settlement Provides Significant Benefits in Exchange for the Compromise of Strong Claims. ...............................................35

        1.  The Risk, Expense, Complexity, and Duration of Further Litigation Weighs in Favor of Approval .....................................35

        2.  The Amount Offered in Settlement Supports Approval ................37

        3.  The Effectiveness of the Proposed Method of Distributing Relief to Class Members, Including the Method of Processing Class-Member Claims Supports Approval ..................................38

        4.  Extent of Discovery Completed and the Stage of Proceedings Weigh in Favor of Approval .......................................................39

        5.  The Experience and Views of Counsel Weigh in Favor of Approval ................................................................................40

        6.  The Presence of a Governmental Participant Weighs in Favor of Approval ................................................................................41

**VI.**  COMPLIANCE WITH THE COURT'S ORDER REGARDING CLASS ACTION SETTLEMENTS ................................................................41

    **A.**  Declarations from proposed class representatives as to the adequacy of their representation of the class; and any differences between the settlement class and the class proposed in the operative complaint. .......41

**B.** Whether the settlement is within a range of possible judicial approval, including (i) the fairness of its terms; (ii) the anticipated class recovery under the settlement, (iii) the potential class recovery if plaintiffs had fully prepared on each of the claims that are the subject of the settlement, and (iv) an explanation of the factors bearing on the amount of the compromise. The proposed allocation plan for the settlement fund, and why such allocation is fair, and treats class members equitably relative to each other. .............................................42

**C.** The arms-length negotiation of the settlement discussion(s), including and to what extent, the proposed class representatives were involved in the negotiation(s). ..............................................................................56

**D.** Incentive Payments and the standard set forth in *Radcliffe v. Experian Info Solutions Inc.*, 715 F.3d 1157 (9th Cir. 2013), including declarations from the proposed class representative regarding (i) the time, risk, and burden incurred by the class representative(s), the assistance he or she provided to class counsel throughout the case; and (ii) whether the incentive payment is conditioned on the class representative's approval of the settlement. ...........................................57

**E.** If the settlement contemplates a *cy pres* award, the parties shall identify the proposed *cy pres* recipient, and explain how the recipient's mission or goals are related to the interests of the class members. ..............................................................................................57

**F.** Adequacy of the Class Notice, including whether and how it fairly apprises the putative class members of the terms of the proposed settlement, and the options available to them in connection with the settlement and court proceedings. ...........................................57

**G.** How the settlement will be administered, including the proposed amount and cap to be paid to the settlement administrator. ...................58

iii

**H.** The parties shall carefully evaluate the scope of the release of claims.
. . Counsel shall address any differences between the claims to be
released and the claims in the operative complaint . . . and an
explanation as to why the differences are appropriate in the instant
case.....................................................................................................58

**I.** The parties shall address whether notice under the Class Action
Fairness Act ("CAFA") is required and, if so, when it will be given.
In addition, the parties should address substantive compliance with
CAFA. ...............................................................................................59

**J.** Identification of any agreement made in connection with the
settlement............................................................................................59

**VII.** THE COURT SHOULD APPROVE THE CONTENT AND
DISTRIBUTION OF THE PROPOSED NOTICE TO THE SETTLEMENT
CLASS MEMBERS .........................................................................59

**VIII.** THE COURT SHOULD APPOINT CLASS COUNSEL................................60

**IX.** ESTABLISHMENT OF FINAL APPROVAL AND FAIRNESS HEARING
AND ASSOCIATED DEADLINES .................................................60

**X.** CONCLUSION .........................................................................................61

EXHIBIT INDEX ...................................................................................62

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Amchem Prods. Inc. v. Windsor*,
    521 U.S. 591 (1997)..........................................................................................23

*Byrne v. Santa Barbara Hospitality Services, Inc.*,
    2017 WL 5035366 (C.D. Cal. 2017) ...............................................................32

*Chambers v. Whirlpool Corp.*,
    214 F. Supp. 3d 877 (C.D. Cal. 2016) .............................................................39

*Cheng Jiangchen v. Rentech, Inc.*,
    2019 WL 5173771 (C.D. Cal. 2019) ...............................................................31

*Churchill Vill., L.L.C. v. Gen. Elec.*,
    361 F.3d 566 (9th Cir. 2004)......................................................................30, 31

*City of Berkeley v. Monsanto Co.*,
    Case No. 5:16-cv00071-EJD (N.D. Ca.) .......................................................2, 3

*City of Chula Vista v. Monsanto Co.*,
    Case No. 3:18-CV-01942-BEN-JMA (S.D. Ca.)................................................2

*City of Long Beach v. Monsanto Co.*,
    Case No. 2:16-CV-03493-FMO-AS (C.D. Ca.).................................................2

*City of Oakland v. Monsanto Co.*,
    Case No. 5:15-cv-5152-EJD (N.D. Ca.) .......................................................2, 3

*City of San Diego v. Monsanto Co.*,
    Case No. 3:15-CV-00578-WQH-AGS (S.D. Ca.) ..........................................2, 3

*City of San Jose v. Monsanto Co.*,
    Case No. 5:15-cv-03178-EJD (N.D. Ca.).......................................................2, 3

*City of Spokane v. Monsanto Co.*,
    Case No. 2:15-CV-00201-SMJ (E.D. Wa.) ...............................................2, 3, 34

*Feller v. Transamerica Life Ins. Co.*,
    2019 WL 6605886 (C.D. Cal. 2019) ...............................................................31

*Hanlon v. Chrysler Corp.*,
   150 F.3d 1011 (9th Cir. 1998)..................................................................*passim*

*Hanon v. Dataproducts Corp.*,
   976 F.2d 497 (9th Cir. 1992)...................................................................26

*Harris v. Vector Marketing Corp.*,
   2011 WL 1627973 (N.D. Cal. Apr. 29, 2011) ....................................34

*Hartranft v. TVI, Inc.*,
   2019 WL 7195324 (C.D. Cal. 2019) ....................................................31

*Hefler v. Wells Fargo & Co.*,
   2018 WL 6619983 (N.D. Cal. Dec. 18, 2018), *aff'd,* 802 Fed. App'x
   285 (9th Cir. 2020)...............................................................................42

*Hesse v. Sprint Corp.*,
   598 F.3d 581 (9th Cir. 2010)................................................................58

*In re Hyundai and Kia Fuel Economy Litig.*,
   926 F.3d 539 (9th Cir. 2019) (en banc) ...............................................29

*Jabbari v. Farmer*,
   --F.3d--, 2020 WL 4046029 (9th Cir. July 20, 2020)..........................29

*Kenneth Glover, et al. v. City of Laguna Beach, et al.*,
   2018 WL 6131601 (C.D. Cal. 2018) ....................................................31

*L.A. County Flood Control District v. Monsanto Co.*,
   Case No. 2:19-CV-0464-GW-AFM (C.D. Ca. ) ....................................2

*Linney v. Cellular Alaska P'ship*,
   151 F.3d 1234 (9th Cir. 1998)..............................................................39

*Lowdermilk v. United States Bank National Assoc.*,
   479 F.3d 994 (9th Cir. 2007)................................................................25

*In re Mego Fin. Corp. Sec. Litig.*,
   213 F.3d 454 (9th Cir. 2000)..........................................................32, 39

*Molski v. Gleich*,
   318 F.3d 937 (9th Cir. 2003)..........................................................26, 27

vi

*National Rural Telecommunications Cooperative v. DIRECTV, Inc. ("NRTC"),*
    221 F.R.D. 523 (C.D. Cal. 2004) ............................................................*passim*

*of TMT Trailer Ferry, Inc. v. Anderson,*
    390 U.S. 414 (1968) .........................................................................23

*Officers for Justice v. Civil Serv. Comm'n of City & County of San Francisco,*
    688 F.2d 615 (9th Cir. 1982) ................................................23, 35, 37

*In re Pac. Enters. Sec. Litig.,*
    47 F.3d 373 (9th Cir. 1995) ...............................................................40

*Port of Portland v. Monsanto Co.,*
    Case No. 3:17-cv-00015-PK (D. Ore.) ..................................................2

*Radcliffe v. Experian Info Solutions Inc.,*
    715 F.3d 1157 (9th Cir. 2013) .............................................................56

*Rodriguez v. W. Publ'g Corp.,*
    563 F.3d 948 (9th Cir. 2009) ..............................................................35

*San Diego Unified Port District v. Monsanto Company,*
    --F.Supp.3d--2020 WL 1468532 (S.D. Cal. March 26, 2020) ..................36

*San Diego Unified Port District v. Monsanto Company,*
    --F.Supp.3d--2020 WL 1479071 (S.D. Cal. March 26, 2020) ..................36

*Span v. J.C. Penny Corp.,*
    312 F.R.D. 312 (C.D. Cal. 2016) .........................................................24

*Staton v. Boeing Co.,*
    327 F.3d 938 (9th Cir. 2003) ........................................................24, 26

*In re Tableware Antitrust Litig.,*
    484 F.Supp.2d 1078 (N.D. Cal. 2007) ..................................................24

*Taylor v. Shippers Transp. Express, Inc.,*
    No. CV1302092BROPLAX, 2015 WL 12658458 (C.D. Cal. 2015) ...............40

*Torrisi v. Tucson Elec. Power Co.,*
    8 F.3d 1370 (9th Cir. 1993) ...............................................................31

*Touhey v. U.S.*,
   No. EDCV 08-01418-VAP, 2011 WL 3179036 (C.D. Cal. 2011) ...................40

*Valentino v. Carter-Wallace, Inc.*,
   97 F.3d 1227 (9th Cir. 1996)...............................................................29

*Vargas v. Ford Motor Co.*,
   2020 WL 1164066 (C.D. Cal. Mar. 5, 2020)...................................42

*In re Veritas Software Corp. Sec. Litig.*,
   2005 WL 3096079 (N.D. Cal. Nov. 15, 2005), *vacated in part on other grounds*, 496 F.3d 962 (9th Cir. 2007) ...........................................42

*In re Volkswagen "Clean Diesel" Mktg., Sales Prac., & Prods. Liab. Litig.*,
   MDL No. 2672, 2016 WL 6091259 (N.D. Cal. Oct. 18, 2016).........................34

*In re Volkswagen "Clean Diesel" Mktg., Sales Prac., & Prods. Liab. Litig.*,
   MDL No. 2672, 2017 WL 672727 (N.D. Cal. Feb. 16, 2017) .........................34

*Wal-Mart Stores, Inc. v. Dukes*,
   131 S. Ct. 2541 (2011) ...............................................................25, 26

*Woodard v. Labrada*,
   No. EDCV1600189JGBSPX, 2019 WL 6998775 (C.D. Cal. 2019) ...........35, 39

*Zinser v. Accufix Research Inst. Inc.*,
   253 F.3d 1180, 1190 (9th Cir. 2001).   .............................................29

**Other State Cases**

*City of Portland v. Monsanto Co.*,
   Case No.3:16-cv-01418-MO (D. Ore.)...............................................2

*Mayor and City Council of Baltimore v. Monsanto Co.*,
   Case No. 1:19-cv-00483-RDB .....................................................2, 3

*In Re: National Prescription Opiate Litigation*,
   Case No. 1:17-MD-2804...............................................................55

**Federal Statutes**

28 U.S.C.
   § 1715.......................................................................................59

CAFA .........................................................................................58, 59

1

CERCLA ................................................................................................49

2

Class Action Fairness Act ....................................................................58

3

Clean Water Act .............................................................................43, 49

4

Comprehensive Response, Compensation and Liability Act .................22

5

6

Pursuant to the Class Action Fairness Act of 2005, 28 U.S.C.
§ 1715(b) ......................................................................................*passim*

7

**Other Authorities**

8

(2) USGS HUC 12 .........................................................................*passim*

9

10

Fed. R. Civ. P. 23............................................................................*passim*

11

Fed. R. Civ. P. 23(a) and (b)(3)...........................................................23

12

Fed. R. Civ. P. 23(e)(2)(A) ..................................................................32

13

Fed. R. Civ. P. 23(e)(2)(B)...................................................................33

14

Fed. R. Civ. P. 23(e)(2)(D)...................................................................42

15

16

Fed. R. Civ. P. 23(e), 2003..................................................................59

17

Fed. R. Civ. P. 23(g)...........................................................................59

18

Federal Rule of Evidence 408 .............................................................15

19

Federal Rule of Evidence § 408 .....................................................10, 13

20

Joseph M. McLaughlin, 2 *McLaughlin on Class Actions* § 6.6 (3d ed. 2006)........24

21

*Manual for Complex Litigation* § 21.633 ............................................23

22

23

Rule 23(a) ...............................................................................23, 24, 27

24

Rule 23(a)(1) ......................................................................................25

25

Rule 23(a)(2) ......................................................................................25

26

Rule 23(a)(3) ......................................................................................26

27

Rule 23(a)(4) ......................................................................................26

28

Rule 23(b) ................................................................................................23, 27

Rule 23(b)(3) ...........................................................................................27, 29

Rule 23(b)(3)'s .............................................................................................28

Rule 23(e) ...........................................................................................1, 22, 23

Rule 23(e)(2) ...........................................................................................30, 31

Rule 23(e)(2)(A)-(D) ....................................................................................31

Rule 23(e)(2)(c)(iv) ......................................................................................59

Rule 23(e)(3) .................................................................................................30

Rule 23's .......................................................................................................60

U.S. EPA 303(d) .............................................................................................5

Pursuant to the Court's July 13, 2020 Order, Plaintiffs respectfully submit this renewed motion for preliminary approval. ECF 206. Plaintiffs address the specific requirements under Rule 23(e) the Court requested below, in Section VI.

Plaintiffs and Defendants Monsanto Company, Solutia Inc., and Pharmacia LLC (collectively, "Monsanto" or "Defendant") have reached a proposed nationwide class action settlement (the "Settlement") to resolve allegations that Defendant's design, manufacture, sale, promotion, and supply of chemicals known as polychlorinated biphenyls ("PCBs") resulted in the contamination of Plaintiffs' stormwater and other resources, necessitating treatment and/or remediation to remove PCBs. Defendant has agreed to pay as a net class benefit $550 million into a common fund to be distributed to 2,528 class members across the United States. Defendant also has agreed to separately pay class counsel attorneys' fees and expenses, and class administration and notice costs.

This Settlement is the result of contentious, prolonged, arm's length negotiations during in-person meetings and numerous telephone conference mediation sessions between early to mid-2019 and March 2020 when a confidential term sheet was executed. The mediation process was led by JAMS mediator Judge (Ret.) Jay Gandhi. The Parties negotiated a resolution to litigation that has been pending since early 2015 in several jurisdictions across the United States. The Settlement confers substantial relief for Settlement Class Members who will automatically receive a minimum payment and may provide additional payments upon application.

The Parties move this Court for an Order pursuant to Fed. R. Civ. P. 23 that would: (1) certify the Settlement Class; (2) preliminarily approve the terms of the proposed Settlement Agreement; (3) approve and direct the proposed Notice Plan; (4) appoint the Class Action Settlement Administrator; and (5) appoint Lead and Co-Class Counsel.

# I.  STATEMENT OF THE CASE

Monsanto Company (now known as Pharmacia LLC) manufactured a class of industrial chemicals called polychlorinated biphenyls ("PCBs") between the 1930s and 1977. Ex. A, Settlement Agreement at 4. Plaintiffs allege that, while Monsanto was

promoting the widespread use of PCBs, the company also knew that PCBs were toxic and foresaw the type of environmental/stormwater contamination alleged in these cases. *See generally* ECF 201. Specifically, Plaintiffs allege that Monsanto internally acknowledged that PCBs would escape end use applications and migrate into the surrounding air or onto nearby surfaces and contaminate natural resources. *E.g.,* ECF 201 ¶¶ 71-79. Defendant vigorously denies these allegations.

*The Litigation.*  Plaintiffs' Counsel filed the following actions, including the instant Action, against Monsanto in federal district courts around the country related to Defendant's manufacture, sale, testing, disposal, release, marketing, promotion, or management of PCBs:  *City of Long Beach v. Monsanto Co.*, Case No. 2:16-CV-03493-FMO-AS (C.D. Ca.); *City of Berkeley v. Monsanto Co.*, Case No. 5:16-cv00071-EJD (N.D. Ca.); *City of San Diego v. Monsanto Co.*, Case No. 3:15-CV-00578-WQH-AGS (S.D. Ca.); *City of Oakland v. Monsanto Co.*, Case No. 5:15-cv-5152-EJD (N.D. Ca.); *City of San Jose v. Monsanto Co.*, Case No. 5:15-cv-03178-EJD (N.D. Ca.); *Mayor and City Council of Baltimore v. Monsanto Co.*, Case No. 1:19-cv-00483-RDB); *City of Chula Vista v. Monsanto Co.*, Case No. 3:18-CV-01942-BEN-JMA (S.D. Ca.); *County of Los Angeles; L.A. County Flood Control District v. Monsanto Co.*, Case No. 2:19-CV-0464-GW-AFM (C.D. Ca. ); *Port of Portland v. Monsanto Co.*, Case No. 3:17-cv-00015-PK (D. Ore.); *City of Portland v. Monsanto Co.*, Case No.3:16-cv-01418-MO (D. Ore.); *City of Spokane v. Monsanto Co.*, Case No. 2:15-CV-00201-SMJ (E.D. Wa.) collectively referred to as "the Public Entity Cases."

In these lawsuits, Plaintiffs asserted various claims against Defendant for alleged PCB-related impairments to water bodies and stormwater systems. Plaintiffs alleged that PCBs are present at sites and public properties, including in stormwater, stormwater systems, waterbodies, sediment, natural resources, fish and wildlife. Exhibit A, Settlement Agreement at 4. Plaintiffs sought compensatory damages and injunctive and equitable relief. *Id.* Defendant contested the allegations as well as the application of Plaintiffs' asserted causes of action. In addition, Defendant filed counterclaims against

several Plaintiffs, seeking to impose liability on Plaintiffs under various environmental statutes. Over the course of five years, the Parties argued dozens of motions and engaged in exhaustive discovery, including several dozen terabytes of documents and electronic information. *See* Exhibit C, Declaration of Scott Summy, at ¶¶ 15, 16, 19. Some cases, such as the *Spokane* and *San Diego* actions, advanced beyond summary judgment motions and/or pre-trial and in limine motions. The *Spokane* trial date was extended to accommodate the execution and administration of this Settlement. Additionally, continuances have been entered or requested in the *City of San Jose, City of Oakland, City of Berkeley, and City of Baltimore* cases. Continuances will be requested in other cases as well.

*The Harm Alleged*. Each Plaintiff generally alleges PCB contamination of its stormwater, stormwater system, waterbodies, and/or sediments that requires some corrective action. *E.g.*, ECF 201. Though the precise measures required may vary, Plaintiffs seek damages for one or more of the following types of compensation: (1) costs of testing and monitoring water resources; (2) costs of removing PCBs from sediment areas; (3) costs of reducing PCB levels in stormwater; and (4) costs of complying with any applicable regulations requiring additional measures. *See id.* The harms alleged range from mere hundreds of dollars for testing to millions of dollars for sophisticated sediment dredging and removal. As discussed below, on a class wide basis, the damages sought could exceed several billions of dollars.

*The Mediation*. While discovery and dispositive motions were being litigated in the Public Entity Cases, preliminary and exploratory discussions commenced in early to mid-2019. In late 2019, settlement discussions progressed to the point where the Parties decided to participate in non-binding mediation, which occurred in early 2020. The Parties, through their counsel, attended and participated in several mediation sessions conducted by retired Magistrate Judge Jay C. Gandhi ("the Mediator"), who is an experienced, independent mediator, and further engaged in additional extensive communications with the Mediator and each other.

*The Settlement Agreement.* The Parties reached the material terms of this nationwide Settlement with respect to "As of June 24, 2020 only, but not later, all NPDES Phase I and II city, town, village, borough, township, and independent port district MS4 permittees with jurisdictional boundaries within a HUC 12 Watershed that contains and/or is immediately adjoining a 303(d) water body impaired by PCBs and all NPDES Phase I and II county MS4 permittees with urbanized, unincorporated boundaries within a HUC 12 Watershed that contains and/or is immediately adjoining a 303(d) water body impaired by PCBs," which is now the proposed Class Definition. Exhibit A, Settlement Agreement at 5.

As described in detail below, the Settlement provides direct and significant benefits to the Settlement Class, while avoiding the risks and delay associated with further litigation.

## II.     TERMS OF THE SETTLEMENT

### A.     The Settlement Class

The Settlement Class is defined as follows: "As of June 24, 2020 only, but not later, all NPDES Phase I and II city, town, village, borough, township, and independent port district MS4 permittees with jurisdictional boundaries within a HUC 12 Watershed that contains and/or is immediately adjoining a 303(d) water body impaired by PCBs and all NPDES Phase I and II county MS4 permittees with urbanized, unincorporated boundaries within a HUC 12 Watershed that contains and/or is immediately adjoining a 303(d) water body impaired by PCBs." Exhibit A, Settlement Agreement at 5.

These limitations define a class of permitted stormwater system operators located within a watershed that discharges into a body of water impaired for PCBs. The term "MS4 Permittees" describe those cities, towns, villages, boroughs, townships, counties, and independent port districts permitted under the Clean Water Act's National Pollutant Discharge and Elimination System ("NPDES") permit process. MS4 stands for municipal separate stormwater system. A "303(d) water body" is a body of water identified as "impaired" by the concentration of PCBs found in that water body.  Limiting the Class to

4

those MS4 permittees located in watersheds that discharge into impaired water bodies identifies those particular MS4 permittees own stormwater systems that do or could contribute PCBs into 303(d) water bodies impaired by PCBs.

Initial Settlement Class Members are identified in accordance with the Class Definition using three publicly maintained and available databases, as follows: (1) the U.S. EPA 303(d) list of bodies of water impaired by PCBs; (2) USGS HUC 12 Watersheds; (3) U.S. Census Bureau. Exhibit A, Settlement Agreement ¶ 75.

The following geospatial and data overlay analyses reveal the total, finite list of Initial Settlement Class Members: First, all 303(d) water bodies impaired by PCBs were identified. *Id.* Then, all USGS HUC 12 Watersheds, which contain and/or are immediately adjoining all 303(d) water bodies impaired by PCBs, were identified. *Id.* Thirdly, as of June 24, 2020 only, but not later, the NPDES Phase I and II city, town, village, borough, township, and independent port district MS4 permittees with jurisdictional boundaries within a HUC 12 Watershed that contains and/or is immediately adjoining a 303(d) water body impaired by PCBs and all NPDES Phase I and II county MS4 permittees with urbanized, unincorporated boundaries within a HUC 12 Watershed that contains and/or is immediately adjoining a 303(d) water body impaired by PCBs, were identified. *Id.* The U.S. Census Bureau database was used to identify all class members except townships, which were originally identified as MS4 permittees by EPA and then confirmed using the U.S. Census Bureau database. *Id.*

The total number of Initial Settlement Class Members is 2,528. *Id.* Generally, class members may be affected in one or more of three main ways: (1) monitoring PCBs in stormwater, (2) complying with a regulatory Total Maximum Daily Load (TMDL) under the NPDES program, or (3) complying with sediment remediation costs under a regulatory Superfund or Category 4(b) clean up order. Thus, three main funds have been created to compensate those three main harms. A fourth fund has been created to compensate legal costs of litigating entities and to compensate special needs and costs of class members.

### 1.  Settlement Class Allocation

The Settlement Funds of five hundred and fifty million dollars ($550,000,000) will be allocated into four separate Allocation Funds as follows:

| | |
|---|---|
| Monitoring Fund: | $42,895,000 |
| TMDL Fund: | $250,000,000 |
| Sediments Fund: | $150,000,000 |
| Special Needs Fund: | $107,105,000 |

Each Allocation Fund will be allocated as described in each corresponding section, below. *Id.* ¶ 76.

### 2.  Monitoring Fund

The Monitoring Fund will provide a minimum payment to <u>all</u> Settlement Class Members as consideration for a class release. *Id.* ¶ 77. The funds are intended to pay for PCB sampling and/or any other mitigation efforts in the Settlement Class Member's sole discretion, as part of compliance with applicable law. *Id.* The total number of nationwide class members is 2,528, each of which will receive payment from the Monitoring Fund as follows:

The Monitoring Fund provides payment at four levels based on whether the Initial Settlement Class Member is a Phase I or Phase II NPDES Permittee, and whether the Initial Settlement Class Member contains a population of at least 100,000. *Id.* Independent port districts are excluded from the population consideration and therefore included in levels at or above 100,000. *Id.* Phase I Permittees are generally larger than Phase II Permittees, generally with larger impervious surface areas and more stormwater system to manage. Generally, larger populations have more PCB producing industry or urban activity, requiring more management and monitoring. *Id.* There are two hundred and seventy-three (273) Phase I Initial Settlement Class Members, and there are two thousand two hundred and fifty-five (2,255) Phase II Initial Settlement Class Members. *Id.* Notwithstanding of any other payment made within the Allocation, Phase I Initial Settlement Class Members with populations at or greater than 100,000 and Phase I

independent port districts each will receive thirty thousand dollars ($30,000); Phase I Initial Settlement Class Members with populations less than 100,000 each will receive twenty thousand dollars ($20,000); Phase II Initial Settlement Class Members with populations at or greater than 100,000 and Phase II independent port districts each will receive twenty-five thousand dollars ($25,000); Phase II Initial Settlement Class Members with populations less than 100,000 each will receive fifteen thousand dollars ($15,000). *Id.*

> Phase I $\geq$ 100,000 pop. and Phase I independent port districts: 124 x $30,000 = $3,720,000
>
> Phase I < 100,000 pop.: 149 x $20,000 = $2,980,000
>
> Phase II $\geq$ 100,000 pop. and Phase II independent port districts: 237 x $25,000 = $5,925,000
>
> Phase II < 100,000 pop.: 2018 x $15,000 = $30,270,000

### 3. TMDL Fund

The TMDL Fund is allocated two hundred and fifty million dollars ($250,000,000) and includes only those Initial Settlement Class Members that are subject to and/or responsible for, as of June 24, 2020 only, but not later, a TMDL, TMDL Alternative, or TMDL Direct-to-Implementation regulation, promulgated or updated after January 1, 2010, wherein PCB is a named constituent. *Id.* ¶ 78. Where a class member is subject to a TMDL, it must expend funds to comply with the requirements of that TMDL. There are two hundred and forty-two (242) TMDL Fund Entities, as of June 24, 2020 only, but not later, as listed in and attached hereto as Exhibit D. TMDL funds are intended to compensate Settlement Class Members for restitution and remediation including mitigation of contaminated property, stormwater, and/or stormwater systems, including compliance with a TMDL. *Id.*

The TMDL Funds of $250,000,000 are further allocated among all 242 TMDL Fund Entities using the following TMDL Allocation Calculation: for all TMDL Fund Entities, multiply (1) the total jurisdictional area within any HUC 12 Watershed that

7

contains a 303(d) water body impaired by PCBs, by (2) the USGS Geodatabase Imperviousness of such jurisdictional area (known as "Weighted Imperviousness"). *Id.* Then, proportionally normalize[1] all Weighted Imperviousness values to calculate a weighted, relative percentage for each TMDL Fund Entity. Lastly, multiply (1) the weighted, relative percentage for each TMDL Fund Entity, by (2) the total fund less Population Factor Awards. A 0.7 multiplier is applied to any TMDL Fund Entity with a population of less than one hundred thousand (100,000). *Id.* Generally, population is a contributing factor and thus indicator of industrial and urban activity that causes PCBs to enter stormwater, including but not limited to development, demolition, renovation, remodel, manufacturing, production, utility operation, and other urbanized activities.

To account for population as a factor in the equitable allocation of the TMDL Fund, each TMDL Fund Entity town, city, village, borough, or township with a population of more than 1 million, and each TMDL Fund Entity county with a population of more than 2 million, will receive a Population Factor Award of $2 million. *Id.*

No TMDL Fund Entity shall recover more than seven million five hundred thousand dollars ($7,500,000) as an absolute maximum recovery under the TMDL Fund, regardless of whether a Population Factor Award would otherwise have provided for an amount greater than $7,500,000. *Id.*

### 4. Sediment Sites Fund

The Sediment Sites Fund is allocated $150,000,000 and includes those Initial Settlement Class Members that, as of June 24, 2020 only, but not later, are a named

---

[1] TMDL fund class member portion =

$$\left( \frac{\text{Class member's impervious TMDL land area}}{\Sigma \text{ Impervious TMDL land areas of all TMDL fund class members}} \right) x \text{ (Total TMDL fund – } \Sigma \text{ population bonus)}^*$$

*TMDL fund class member exceeding 3% of total TMDL fund will be capped at 3% of the total TMDL fund. These TMDL fund class members will be subtracted from the proportional calculation of the TMDL fund. A 0.7 multiplier is applied to any TMDL Fund Entity with a population of less than 100,000.

Responsible Party in at least one of three types of regulated Sediment Sites wherein PCBs have contaminated sediments due to stormwater contribution. *Id.* ¶ 79. For each site, the Settlement Class Member is responsible for paying a portion of the costs of remediation PCBs from sediments. The three types of Sediments Sites include only the following: (1) U.S. EPA Superfund Sites, (2) U.S. EPA Large Sediment Sites, and/or (3) Clean Water Act Category 4b Sites/Waters. Sediment Site funds are intended to compensate Class Members for restitution and remediation, including mitigation of contaminated property, stormwater and/or stormwater systems, and including compliance with a regulatory process. *Id.*

The following is the list of the nine (9) Sediment Sites wherein at least one Initial Settlement Class Member, as of June 24, 2020 only, but not later, is a named Responsible Party due to stormwater contribution of PCBs: Diamond Alkali-Lower Passaic River (Newark, New Jersey); Newtown Creek (New York, New York); Gowanus Canal (New York, New York); Lower Duwamish Waterway (Seattle, Washington); Portland Harbor (Portland, Oregon); Commencement Bay, Near Shore/Tide Flats (Tacoma, Washington); Harbor Island (Lead) (Seattle, Washington); Pacific Sound Resources (Seattle, Washington); San Diego Bay (San Diego, California). *Id.*

The following is the list of the twelve (12) Initial Settlement Class Members that, as of June 24, 2020 only but not later, are named Responsible Parties, due to stormwater contribution of PCBs, in at least one Sediment Site: City of Newark, New Jersey; City of New York, New York; City of Seattle, Washington; King County, Washington; Port of Seattle, Washington; City of Tukwila, Washington; City of Tacoma, Washington; Port of Tacoma, Washington; City of Portland, Oregon; Port of Portland, Oregon; City of San Diego, California; Port of San Diego, California. *Id.*

The Sediment Fund will be further allocated among the twelve (12) Qualifying Sediment Site Entities pursuant to a court-appointed Special Master, who will equitably allocate Sediment Site funds, upon application, based on the totality and relativity of the following PCB-caused factors: past costs and expenses spent as of the date of the

9

application for Sediment Site remediation; past costs and expenses spent as of the date of the application for other mitigation required due to the Sediment Site; documented and evidenced future costs and expenses that will be spent for Sediment Site remediation; documented and evidenced future costs and expenses that will be spent for mitigation required due to the Sediment Site; and any other important factors or information deemed relevant by the Special Master. *Id.* ¶ 79(d). The Special Master will rely solely on the application and documents submitted and will not include oral advocacy, presentation, interview, or interactive process. *Id.* All applications and documents submitted to the Special Master for the Allocation will be and will remain confidential, and subject to Federal Rule of Evidence section 408 and state law equivalent code sections, to this Settlement Allocation process and shall not be disclosed or shared beyond the review of the following: the Special Master, the Allocation Experts, Lead Class Counsel, the Class Action Settlement Administrator, and the Court. *Id.* At the discretion of the Special Master, Defendant may have access to the information for business purposes only, such as insurance or other business needs, provided however that such materials are maintained by Defendant as confidential to the extent legally allowable. *Id.* The Class Action Settlement Administrator shall also provide Monsanto with a quarterly accounting of the Settlement Funds and any distributions made as part of the Allocation. Documents related to the Portland Harbor Superfund Site shall remain confidential in any event during the pendency of the Portland Harbor Superfund Site action. The standard for any judicial oversight or review, if any, of the Special Master will be an "abuse of discretion" standard. *Id.*

The Sediment Sites Application is attached hereto as Exhibit F. *Id.* ¶ 79(e). To the extent a Qualifying Sediment Site Entity Opts Out of the Settlement Class, or a Qualifying Sediment Site Entity does not Opt Out but fails to submit an Application, the Special Master will rely on the Allocation Experts to determine, upon application completed by the Allocation Experts, the allocation amount that could have been otherwise allocated to the Qualifying Sediment Site Entity that did not submit an application. *Id.* Settlement

Class Members that do not return a completed application or that return a late application will forfeit the right to appeal as described in Paragraph 79 subsection (f) of the Settlement Agreement, but will not forfeit the receipt of Reserve Funds, distributed pro-rata after all appeals are exhausted. *Id.* Funds allocated to any non-Opt-Out Qualifying Sediment Entities shall be disbursed in accordance with this Agreement. *Id.* Funds allocated to any non-Litigating Entity Qualifying Sediment Site Entity Opt-Outs shall be disbursed to all non-Opt-Out Qualifying Sediment Site Entities on a pro-rata basis as determined by the Special Master. *Id.* Funds allocated to any Opt-Out Litigating Entity Qualifying Sediment Site Entity shall be refunded to Defendant. *Id.*

The Special Master shall use the Sediment Sites Application to inform, guide, and design an equitable allocation among all eligible applicants. *Id.* ¶ 79(f). The Special Master may, but is not required to, create an appeals process by utilizing a Sediment Sites Appeals Reserve Fund of up to ten percent (10%) of the $150,000,000 fund. *Id.* If created by the Special Master, the appeals process will allow for one (1) *de novo* appeal from each eligible applicant, and any decisions will be at the discretion of the Special Master. *Id.* The appeals process, if any, shall be conducted within an efficient time-frame so as not to hinder the progress of the overall Allocation. *Id.* The appeals process, if any, shall include only a two (2) page written appeal explaining the basis for the appeal, referring only to the original application as evidence of such basis. *Id.* Any Sediment Sites Appeals Reserve Funds remaining after all appeals have been decided by the Special Master shall be redistributed to all Sediment Site Settlement Class Members on a pro-rata basis. *Id.* All final decisions of the Special Master, after any appeals process, if any, will be final, binding, and unappealable. *Id.*

### 5. Special Needs Funds

The Special Needs Fund is allocated $107,270,000, and further allocated into two separate parts known as Special Needs Fund, Part A ($57,320,000), and Special Needs Fund, Part B ($50,000,000). *Id.* ¶ 80.

Special Needs Fund, Part A is allocated fifty seven million three hundred and twenty thousand ($57,320,000) to compensate and accommodate those Litigating Entities whose time, energy, effort, attorney work product, costs, expenses, and risk of litigation helped to cause the entire Settlement, for the benefit of all 2,528 Initial Settlement Class Members. *Id.* ¶ 80(b).

Special Needs Fund, Part A is available only to those Initial Settlement Class Members that are Litigating Entities. *Id.* ¶ 80(c). Litigating Entities are Initial Settlement Class Members that, as of June 24, 2020 only, but not later, (1) have filed tort, public nuisance, and/or product liability lawsuits against Defendants for PCB contamination of stormwater and sediment, and/or (2) that are Named Class Members. *Id.* Litigating Entities include only the following fifteen (15) Initial Settlement Class Members: City of Chula Vista, City of San Diego, Unified Port District of San Diego, City of Long Beach, County of Los Angeles, City of San Jose, City of Berkeley, City of Oakland, City of Portland, Port of Portland, City of Seattle, City of Tacoma, City of Spokane, City of Baltimore, and Baltimore County. *Id.*

Special Needs Fund, Part A, will be further allocated pursuant to a court-appointed Special Master, who will equitably and reasonably allocate Part A funds, upon application, based on the totality and relativity of the following factors: whether outside counsel was retained; whether a lawsuit was filed; how long the lawsuit was filed at the time of Preliminary Class Approval; the case posture and procedure of any lawsuit; the amount, time, energy, cost, and productivity during discovery with Defendants; the retention of experts; the development of expert testimony and reports; the preparation and presentation of experts for deposition; the litigation of significant motions, including but not limited to motions to dismiss, discovery motions, motions for summary judgment or adjudication, in limine motions, and other motions; and any other important factors or information deemed relevant by the Special Master as having a significant impact on, or catalyst for, this Settlement. *Id.* ¶ 80(d). The Special Master will rely solely on the

application and documents submitted and will not include oral advocacy, presentation, interview, or interactive process. *Id.*

All applications and documents submitted to the Special Master for the Allocation will be and will remain confidential, and subject to Federal Rule of Evidence section 408 and state law equivalent code sections, to this Settlement Allocation process and shall not be disclosed or shared beyond the review of the following: the Special Master, the Allocation Experts, Lead Class Counsel, the Class Action Settlement Administrator, and the Court. *Id.* The Class Action Settlement Administrator shall also provide Monsanto with a quarterly accounting of the Settlement Funds and any distributions made as part of the Allocation. *Id.* The standard for any judicial oversight or review, if any, of the Special Master will be an "abuse of discretion" standard. *Id.* The Special Master will give attention and consideration to any Litigating Entity that has incurred attorneys' fees to outside counsel, other than Lead or Co-Class Counsel. *Id.* The Special Master will reasonably and equitably prioritize and reimburse any Litigating Entity that, through outside counsel other than Lead or Co-Class Counsel, incurred reasonable, documented out-of-pocket litigation costs. *Id.*

Litigating Entities, which as of October 2019, were under contract for representation by Lead or Co-Class Counsel shall not recover for outside counsel fees in the Special Needs Fund, Part A. Litigating Entities that retained outside counsel, and that were not under contract for representation by Lead or Co-Class Counsel, may apply for and receive, subject to Special Master Allocation, an equitable and reasonable allocation for such outside counsel, including attorneys' fees and costs. *Id.* ¶ 80(e). Nothing herein shall prevent any Litigating Entity from applying for and receiving, subject to Special Master Allocation, an equitable allocation for in-house or general counsel fees, overhead, salaries, time, energy, costs, resources, and/or attention, including but not limited to city attorneys, county counsel, and/or general counsel. *Id.*

The Special Needs Fund, Part A Application is attached hereto as Exhibit G. *Id.* ¶ 80(f). The Special Master shall use the Special Needs Fund, Part A Application to inform,

guide, and design an equitable allocation among all eligible applicants. Litigating Entities that do not timely return a completed application forfeit any right to Part A Funds. *Id.*

The Special Master may, but is not required to, create an appeals process by utilizing a Part A Appeals Reserve Fund of up to ten percent (10%) of the $57,105,000 fund. *Id.* ¶ 80(g). If created by the Special Master, the appeals process will allow for one (1) *de novo* appeal from each eligible applicant, and any decisions will be the discretion of the Special Master. *Id.* The appeals process, if any, shall be conducted within an efficient time-frame so as not to hinder the progress of the overall Allocation. *Id.* The appeals process, if any, shall include only a two (2) page written appeal explaining the basis for the appeal, referring only to the original application as evidence of such basis. *Id.* Any Part A Appeals Reserve Funds remaining after all appeals have been decided by the Special Master shall be redistributed to all Litigating Entities on a pro-rata basis. *Id.* All final decisions of the Special Master, after any appeals process, if any, will be final, binding, and unappealable. *Id.*

Special Needs Fund, Part B, is allocated fifty million dollars ($50,000,000) and available to all Settlement Class Members who apply and make a showing, in the discretion of the Special Master, of a significant regional, state, or national benefit, cost, or contribution regarding 303(d) bodies of water impaired by PCBs through stormwater and/or dry weather runoff, and such benefit, cost, or contribution is not otherwise encompassed within any other part of this Allocation. *Id.* ¶ 80(h).

The Special Needs Fund, Part B Application is attached hereto as Exhibit H. *Id.* ¶ 80(i). The Special Master shall use the Special Needs Fund, Part B Application to equitably allocate Part B Funds among only those who apply. *Id.* Settlement Class Members who do not apply will receive no Part B Funds. *Id.* Application does not guarantee that the Special Master will allocate Part B Funds to the applicant. *Id.* Some Part B applicants may not receive any Part B Funds. *Id.* The Special Master shall use the Special Needs Fund, Part B Application to inform, guide, and design an equitable allocation among all eligible applicants. *Id.* The Special Master will rely solely on the

14

application and documents submitted and will not include oral advocacy, presentation, interview, or interactive process. *Id.*

All applications and documents submitted to the Special Master for the Allocation will be and will remain confidential, and subject to Federal Rule of Evidence 408 and state law equivalent code sections, to this Settlement Allocation process and shall not be disclosed or shared beyond the review of the following: the Special Master, the Allocation Experts, Lead Class Counsel, the Class Action Settlement Administrator, and the Court. *Id.* At the discretion of the Special Master, Defendant may have access to the information for business purposes only, such as insurance or other business needs, provided however that such materials are maintained by Defendant as confidential to the extent legally allowable. *Id.* The Class Action Settlement Administrator shall also provide Monsanto with a quarterly accounting of the Settlement Funds and any distributions made as part of the Allocation. *Id.* Documents related to the Portland Harbor Superfund Site shall remain confidential in any event during the pendency of the Portland Harbor Superfund Site action. *Id.* Settlement Class Members that do not timely return a completed application forfeit any right to Part B Funds. *Id.*

The Special Master may, but is not required to, create an appeals process by utilizing a Part B Appeals Reserve Fund of up to ten percent (10%) of the $50,000,000 fund. *Id.* ¶ 80(j). If created by the Special Master, the appeals process will allow for one (1) *de novo* appeal from each eligible applicant, and any decisions, including regarding eligibility, will be the discretion of the Special Master. *Id.* The appeals process, if any, shall be conducted within an efficient time-frame so as not to hinder the progress of the overall Allocation. *Id.* The appeals process, if any, shall include only a two (2) page written appeal explaining the basis for the appeal, referring only to the original application as evidence of such basis. *Id.* Any Part B Appeals Reserve Funds remaining after all appeals have been decided by the Special Master shall be redistributed to all Part B awarded applicants only on a pro-rata basis. *Id.* Part B applicants who did not receive an award under either an initial application or an appeal will not receive any pro-rata

distribution after all appeals are exhausted. *Id.* All final decisions of the Special Master, after any appeals process, if any, will be final, binding, and unappealable. *Id.*

The Special Master may, in his sole discretion, fairly and reasonably, and consistent with the intention and general structure of the terms of the Allocation, equitably balance monetary allocations to Settlement Class Members to the extent that any did not receive a proper and appropriate Allocation in accordance with the terms herein. *Id.* ¶ 80(k).

## B. Additional Terms of the Settlement Agreement

### 1. Effect of Future State Attorney General Action

Because PCB-related impairments can affect environmental resources, attorney generals may pursue claims for natural resource or other legal claims involved in the class identification. It is possible that the remedial measures to resolve claims alleged by an attorney general could include some costs contemplated in this class. The Settlement includes a compromise structure to help avoid double payment by Monsanto—that is, payment to class members and attorneys general for the same contemplated remediation or mitigation costs.

In the event that a State Attorney General or any other entity acting on behalf of a State or a State-controlled entity files a future action (on or after March 27, 2020) against Defendant related to PCBs for which one or more Settlement Class Members were or are compensated under this settlement, then Settlement Class Members, within that same state, that are permitted and discharge or release PCBs into the 303(d) body of water impaired by PCBs that is the subject of the newly filed suit, shall have only their future payments reduced by twenty percent (20%). *Id.* ¶ 81. The 20% reduction of future payments shall occur evenly across all remaining payments in the payment schedule. *Id.* In the event an Attorney General files a PCB suit that attempts to address PCBs across the entire state, then all Settlement Class Members in that state will have their future payments reduced by 20%. *Id.* This Settlement shall not preclude nor waive any defenses Defendant may have with respect to such subsequently-filed action. *Id.* This section

requires that future payments to each entity be determined and notice of same be provided to Defendant prior to submitting the Settlement for Final Approval. *Id.*

### 2. Settlement Administration and Class Notice

The Settlement Agreement provides for the engagement, subject to Court approval, of Steven Weisbrot of Angeion Group, LLC as the Class Action Settlement Administrator to advise them with respect to the providing of Notice and administering the Notice to all Settlement Class Members. *Id.* ¶ 70.

The Settlement provides that the Class Action Settlement Administrator shall send the Direct Notices by U.S. Mail, to each member of the Settlement Class identified by the Parties through reasonable efforts as set forth above. *Id.* ¶ 85. The Notice will advise Settlement Class Members of the following:

(a)   General Terms: The Notice shall contain a plain and concise description of the nature of the Action; the fact of preliminary certification of the Settlement Class for settlement purposes; and the proposed Settlement itself, including a description of the Settlement Class Members, the benefits under the proposed Settlement, and what claims are released under the proposed Settlement.

(b)   Requests for Exclusion: The Notice shall inform Settlement Class Members that they have the right to exclude themselves from (opt out of) the Settlement.  The Notice shall provide the deadlines and procedures for exercising this right.

(c)   Objections:  The Notice shall inform Settlement Class Members of their right to object to the proposed Settlement and appear at the Final Approval Hearing.  The Notice shall provide the deadlines and procedures for exercising these rights.

(d)   The Notice shall inform Settlement Class Members about the amounts being sought by Class Counsel as Attorneys' Fees and Expenses. *Id.*

All reasonable efforts will be made to notify each Settlement Class Member's in-house counsel or managing executive of each Settlement Class Member. Lead Class Counsel shall promptly provide this information to the Class Action Settlement Administrator. *Id.* ¶¶ 84-88.

The Class Action Settlement Administrator will give Notice pursuant to the deadlines set forth in the Court's Preliminary Approval Order. The Class Action Settlement Administrator will promptly log each Direct Notice that is returned as undeliverable and shall provide copies of the log to Class Counsel and Defense Counsel. *Id.* ¶¶86-88. The Class Action Settlement Administrator shall take reasonable steps to re-mail all undeliverable Direct Notices to updated addresses provided by the National Change of Address Database maintained by the United States Post Office or by other means. *Id.*; *See* Ex. B, Declaration of Steve Weisbrot, at ¶¶ 17-19. In the event that any Direct Notice mailed to a Settlement Class Member is returned as undeliverable a second time, then no further mailing shall be required. Ex. A Settlement Agreement ¶ 84. The Notice Program will also implement the creation of a case-specific website, where Settlement Class Members can easily view general information about this Settlement, review relevant Court documents, and view important dates and deadlines. Ex. B, Declaration of Steve Weisbrot ¶ 20. The website is www.pcbclassaction.com. *Id.* The website will be designed to be user-friendly and make it easy for Settlement Class Members to find information about the case. *Id.* The website will also have a "Contact Us" page where Settlement Class Members can send an email with any additional questions to a dedicated email address. *Id.* Likewise, Settlement Class Members who want to apply to receive additional payments from the TMDL Fund, Sediment Sites Fund, or the Special Needs Fund will be able to submit those applications and supporting documentation directly on the website via a secure portal. *Id.*

Pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1715(b), Defendant served notice of the Settlement via First Class Mail on the appropriate federal and state officials on July 2, 2020. *Id*. ¶ 87.

### 3. Exclusion and Objection Rights

Any Member of the Settlement Class wishing to do so may opt out of the Settlement Class during the opt-out period. Ex. A Settlement Agreement ¶¶ 94-97. The opt-out period shall expire sixty (60) days after the date Notice is mailed. Those who wish to opt out can

do so by providing a written request for exclusion which includes the potential Settlement Class Member's name, address, telephone number, an email address (if available) and an express statement of desire to be excluded from the Settlement Class. *Id.* The request must be sent by certified or first-class mail to the Class Action Settlement Administrator. *Id.* Exclusions sent by any Settlement Class Member to incorrect locations shall not be valid. *Id.* The Class Action Settlement Administrator shall promptly forward within five (5) days copies of any written requests for exclusion to Lead Class Counsel and Defendant's Counsel. *Id.* A list reflecting all requests for exclusion shall be filed with the Court by the Class Action Settlement Administrator no later than twenty-one (21) days before the Final Approval Hearing. *Id.* If a potential Settlement Class Member files a request for exclusion, it may not file an objection. *Id.*

Any Settlement Class Member who elects to opt out of the Settlement Class pursuant to this Agreement shall not be entitled to relief under or affected by the Agreement. *Id*. Settlement Class Members who have elected to opt out of the Settlement Class may withdraw their opt out requests prior to the Effective Date, but only if they accept the benefits and terms of this Settlement and dismiss with prejudice any other pending action against Defendant arising out of PCB-related impairments to water bodies. *Id*. The Court shall determine whether any of the contested opt-outs are valid.

Settlement Class Members may object to the Settlement. Ex. A, Settlement Agreement, ¶¶ 98-101. The Parties propose that Settlement Class Members who wish to object must file a notice of intent with the Clerk of the Court and the Class Action Settlement Administrator no later than sixty (60) days after the date the Notice is mailed. *Id.* The objection must bear the signature of the Settlement Class Member (even if represented by counsel), the Settlement Class Member's current address and telephone number, and state the exact nature of the objection including any legal support the Settlement Class Member wishes to introduce in support of the objection, and whether or not the Settlement Class Member intends to appear at the final approval hearing. *Id.* If the Class Member is represented by counsel, the objection shall also be signed by the attorney

who represents the Settlement Class Member. *Id.* Objections sent by any Settlement Class Member to incorrect locations shall not be valid. *Id.*

The Class Action Settlement Administrator shall forward any objection(s) to Class Counsel and Defendant's Counsel within five (5) days of receipt. *Id.* Any Settlement Class Member who fails to comply with this procedure shall waive and forfeit any and all rights to appear separately and/or to object, and shall be bound by all the terms of this Settlement Agreement and by all subsequent proceedings, orders and judgments, including, but not limited to, the Release, the Final Order and the Final Judgment in the Actions. *Id.*

Any Settlement Class Member who objects to the Settlement shall be entitled to all of the benefits of the Settlement if the Settlement Agreement and the terms contained herein are approved, as long as the objecting Settlement Class Member complies with all requirements of the Settlement Agreement applicable to Settlement Class Members, including the timely submission of an Application and other requirements herein. *Id.*

### 4. Cancellation

The Settlement Agreement provides that before the Parties move the Court for Final Approval of the Settlement, Defendant has the option to withdraw from the Settlement if any Named Class Action Plaintiff listed in Paragraph 27 of the Settlement Agreement or more than two percent (2%) of the Settlement Class Members opt out of the Settlement. Ex. A Settlement Agreement ¶ 102. If any Party that has filed a lawsuit against Defendant as of the issuance of the Final Order approving the Settlement opts out of the Settlement, then the total settlement amount to be paid by Defendant under Paragraph 73 of the Settlement Agreement will be reduced by each opting out Plaintiff's allocated share of the Settlement Funds. *Id.*

### 5. Attorneys' Fees and Litigation Costs and Expenses

After negotiating the terms of the Settlement Agreement, the Parties agreed that Plaintiffs' Counsel may file a motion with the Court for an award of Attorneys' Fees and Expenses not to exceed $98,000,000. Ex. A Settlement Agreement ¶ 103. This award shall include all fees, costs, and expenses for all Plaintiffs' Counsel (and their employees,

consultants, experts, and other agents) who may have performed work in connection with this Action. *Id.*

### 6. Mutual Releases

Upon entry of the Final Approval Order, Defendant and Released Persons will have released any and all claims arising from PCB contamination that they have alleged or could allege against any Named Class Plaintiffs, Settlement Class Members, and/or Releasing Persons. Ex. A Settlement Agreement ¶ 106. Upon entry of the Final Approval Order, the Releasing Persons will have released the Released Persons from the Released Claims. *Id.* Additionally, Defendant is entitled to protection from contribution and/or indemnity claims or actions asserted against Defendant by any person or persons who are not parties to this Settlement Agreement for all Released Claims and all matters alleged in the Action or the Underlying Actions. Nothing in this section shall create a duty on the part of Named Class Plaintiffs, Settlement Class Members, and/or Releasing Persons to defend and/or indemnify Defendant or Released Persons in any contribution and/or indemnity claim. *Id.* All Releases provided herein shall be mutual between Plaintiffs, Class Members, and Releasing Persons, on the one hand, and Defendant and Released Persons on the other hand. *Id.*

Each Settlement Class Member agrees to be responsible for any liens, interests, actions, or derivative claims made by any third party for or as against Settlement Funds and/or the consideration that is the subject to this Agreement, to the extent allocated to each Settlement Class Member. *Id.* ¶ 107. Settlement Class Members further agree to defend, indemnify, and hold harmless Defendant against any claim, demand, action, cost, expense, attorneys' fee, loss, judgment, or liability it may be subjected to by any person or entity who may claim through the Settlement, for the portion of the Settlement allocated to each Settlement Class Member, in a derivative manner against Defendant, including without limitation, any insurers, agents, representatives, successors, predecessors, assigns, and attorneys, bankruptcy trustees, and any and all other persons, firms,

corporations, associations, and other legal entities who may claim through them in a derivative manner. *Id.*

"Released Claims" means all claims, demands, rights, damages, obligations, suits, debts, liens, contracts, agreements, and causes of action of every nature and description whatsoever, ascertained or unascertained, suspected or unsuspected, existing now or arising in the future, whether known or unknown, both at law and in equity which were or could have been alleged related to the manufacture, sale, testing, disposal, release, marketing, or management of PCBs, including but not limited to any claims based upon or related in any way to the subjects of the Action, the Underlying Actions, or this Settlement Agreement or any component parts thereof, and regardless of the legal theory or type or nature of damages claimed; provided, however, that nothing in this Settlement Agreement will preclude or affect any action brought by governmental entities seeking response costs, penalties, or other remedies, under the Comprehensive Response, Compensation and Liability Act ("CERCLA") or similar state Superfund statutes and applicable regulations, or under any other laws or regulations, related to Defendant's or a Released Person's discharge or disposal of PCBs. *Id.* ¶ 41. The Settlement Agreement in no way affects any administrative test claims related to the California Water Board. *Id.* Released Claims also include any claim for attorneys' fees, expenses, costs, and catalyst fees under any state's law or under federal law. *Id.*

## III.   <u>STANDARD OF REVIEW</u>

Rule 23(e) of the Federal Rules of Civil Procedure governs settlements of class action lawsuits. It provides that a "class may be settled, voluntarily dismissed, or compromised only with the court's approval." Fed. R. Civ. P. 23(e). Although the procedure for approval of a class action is not delineated in Rule 23, approval under Rule 23(e) involves a two-step process "in which the [c]ourt first determines whether a proposed class action settlement deserves preliminary approval and then, after notice is given to class members, whether final approval is warranted." *National Rural Telecommunications Cooperative v. DIRECTV, Inc. ("NRTC")*, 221 F.R.D. 523, 525

(C.D. Cal. 2004) (citing *Manual for Complex Litigation, Third*, § 30.14, at 236–37 (1995)).

For a settlement class to be certified, all four requirements of Rule 23(a) must be satisfied, along with one of the three requirements of Rule 23(b). Fed. R. Civ. P. 23; *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 620 (1997). In certifying a class for settlement purposes only, the Court need not determine "whether the case, if tried, would present intractable management problems . . . for the proposal is that there be no trial." *Amchem*, 521 U.S. at 620. Further, the practical purpose of provisional certification is to facilitate dissemination of notice to the class of the terms of the proposed settlement and the date and time of the final settlement approval hearing. *See Manual for Complex Litigation* § 21.633. For the purposes of settlement, the requirements of Fed. R. Civ. P. 23(a) and (b)(3) have been met.

A court considering a motion for preliminary approval neither decides the merits of the underlying case, resolves unsettled legal questions, nor crafts a settlement for the parties. Fed. R. Civ. P. 23(e); *Officers for Justice v. Civil Serv. Comm'n of City & County of San Francisco*, 688 F.2d 615 (9th Cir. 1982) ("In determining whether class action settlement should be approved, neither trial court nor Court of Appeals is to reach any ultimate conclusion on contested issues of fact and law which underlie merits of dispute, for it is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements; proposed settlement is not to be judged against hypothetical or speculative measure of what might have been achieved by negotiators."). The ultimate determination of whether a proposed class action settlement warrants approval resides in the Court's discretion. *Protective Comm. for Indep. S' holders of TMT Trailer Ferry, Inc. v. Anderson,* 390 U.S. 414, 424-25 (1968).

To determine the preliminary fairness of an agreement, the Court balances "the strength of plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed, and the stage of the proceedings;

23

the experience and views of counsel; [and] the presence of a governmental participant."
*Staton v. Boeing Co.*, 327 F.3d 938, 959 (9th Cir. 2003) (quoting *Molski v. Gleich*, 318
F.3d 937, 953 (9th Cir. 2003)); *see also Ching*, 2013 U.S. Dist. LEXIS 169279, at * 17
(applying these factors to a preliminary approval of class settlement). Preliminary
approval is appropriate if "the proposed settlement appears to be the product of serious,
informed, non-collusive negotiations, has no obvious deficiencies, does not improperly
grant preferential treatment to class representatives or segments of the class, and falls
within the range of possible approval." *In re Tableware Antitrust Litig.*, 484 F.Supp.2d
1078, 1079 (N.D. Cal. 2007) (citing *Manual for Complex Litigation, Second* § 30.44
(1985)); *see also Span v. J.C. Penny Corp.*, 312 F.R.D. 312, 319 (C.D. Cal. 2016) (same).

Certification of settlement classes is routine, and the certification hearing and
preliminary fairness evaluation are usually combined. *See Manual for Complex* Litigation
§ 21.632. Neither formal notice nor a hearing is required for the court to grant preliminary
approval or provisional certification; instead, the court may grant such relief upon an
informal presentation by the settling parties, and may conduct any necessary hearing in
court or in chambers, at the court's discretion. *Id.*; *accord* Joseph M. McLaughlin, 2
*McLaughlin on Class Actions* § 6.6 (3d ed. 2006).

**IV.    THE COURT SHOULD CERTIFY THE SETTLEMENT CLASS AS FAIR,
ADEQUATE AND REASONABLE.**

Here, the Settlement Class meets the requirements of Rule 23.[2]

---

[2] Defendant maintains that there remain substantial obstacles to certification of any
litigation class and that any certification of the final Settlement Class is for settlement
purposes only. Nothing in the Motion or these Suggestions in Support shall constitute,
or be construed as, an admission on the part of Defendant that this action, or any other
proposed or certified class action, is appropriate for treatment as a class for any other
purpose, including for trial class treatment.

24

**A.**    **Rule 23(a) Is Satisfied for Purposes of Certifying the Settlement Classes**

**1.  The Settlement Class is Numerous**

Rule 23(a)(1) requires that a class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). This action meets that requirement. Class Counsel, through the extensive work product of experts, has identified 2,528 Settlement Class Members. *See* Exhibit D-1 to Declaration of John Fiske. *See* Appendix F to the Declaration of Michael Trapp. These Settlement Class Members are geographically dispersed across the United States and cannot be practicably joined in a single litigation. The numerosity requirement for class certification of a Settlement Class is satisfied. *See Lowdermilk v. United States Bank National Assoc.,* 479 F.3d 994, 997 (9th Cir. 2007) (numerosity criteria satisfied where class size "exceeds 30 persons.").

**2.  The Settlement Class Members Share Common Questions of Law and Fact**

Under Rule 23(a)(2), a district court may certify a class only when "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). The key inquiry for the commonality analysis is whether a common question can be answered in a class-wide proceeding, such that the answer will "drive the resolution of the litigation." *Wal-Mart Stores, Inc. v. Dukes,* 131 S. Ct. 2541, 2551 (2011). The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class. *Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1019 (9th Cir. 1998).

Applying these principles, the commonality requirement of Rule 23(a)(2) is satisfied here for purposes of Settlement. The claims of the putative Settlement Class Members arise from the same allegations in the Third Amended Class Action Complaint,

namely, claims against Defendant for alleged PCB-related impairments to stormwater, stormwater systems, sediments, and water bodies.[3]

### 3. The Claims of the Class Representatives Are Typical of those of the Proposed Classes

Typicality under Rule 23(a)(3) requires that the "claims or defenses of the representative parties [be] typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3); *see also Dukes,* 131 S. Ct. at 2548. The "purpose of the typicality requirement is to assure that the interest of the named representative aligns with the interests of the class." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992). "Typicality does not mean that the claims of the class representative[s] must be identical or substantially identical to those of the absent class members." *Staton*, 327 F.3d at 957 (internal quotation mark omitted). Rather, they only need to be "reasonably co-extensive with those of absent class members[.]" *Hanlon*, 150 F.3d at 1020.

The typicality criteria are satisfied here. All Named Class Plaintiffs asserted identical facts describing Monsanto's design, manufacture, sale, and distribution of PCBs. They likewise similarly allege that Monsanto is liable for resulting PCB-related impairments to water bodies. Plaintiffs alleged that PCBs are present at sites and public properties, including in stormwater, stormwater and wastewater systems, waterbodies, sediment, natural resources, fish and wildlife. Plaintiffs sought compensatory damages and injunctive and equitable relief. Because Plaintiffs are members of the proposed Settlement Class and assert the same or similar causes of action on behalf of themselves and absent class members, their claims are typical.

### 4. The Class Representatives are Adequate

Rule 23(a)(4) requires that the "representative Parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Adequacy involves analysis of

---

[3] Because the requirements for commonality and predominance overlap, Plaintiffs identify the facts and law that satisfy commonality and predominance below.

two inquiries: (1) whether the named plaintiff and his or her counsel have any conflicts of interest with other class members and (2) whether the named plaintiff and his or her counsel will act vigorously on behalf of the class. *Hanlon*, 150 F.3d at 1020; *See also Molski*, 318 F.3d at 955 (quoting *Crawford v. Honig*, 37 F.3d 485, 487 (9th Cir.1995)).

There exist no conflicts of interest between any named Plaintiffs or proposed Settlement Class Members. All Plaintiffs and proposed Settlement Class Members are equally interested in demonstrating PCBs caused damages to their public properties and sites. The Named Class Plaintiffs stand in the same factual and legal shoes, and seek the same form of relief, as other Settlement Class Members: receiving economic damages for PCB-related impairments their public properties and sites.  In addition, the Named Class Plaintiffs have demonstrated a commitment to prosecuting this matter by supplying essential factual information concerning legal claims, conducting discovery, and being willing to testify at depositions and trial if necessary. *See* Exs. C, D, Declarations of Scott Summy and John Fiske.

Finally, the requirement of vigorous advocacy is also met. Class Counsel have extensive experience handling complex class actions and have demonstrated a willingness to vigorously prosecute the class claims, as outlined in the accompanying Declarations of Scott Summy and John Fiske. As evidenced by the terms of the Settlement Agreement, Plaintiffs, through qualified counsel, have vigorously prosecuted the case in interests of the Settlement Classes.  The terms of the Settlement provide substantial benefits to the Settlement Class. *See id.*

**B.      Rule 23(b) Is Satisfied for Purposes of Certifying the Settlement Class.**

In addition to satisfying the requirements of Rule 23(a), a party seeking class certification pursuant to Rule 23(b)(3) must also demonstrate that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3); *Hanlon*, 150 F.3d at 1022.

Predominance "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Hanlon*, 150 F.3d at 1022 (quoting *Amchem*, 521 U.S. at 623). Predominance requires more than proof of common issues of law or fact. *Hanlon*, 150 F.3d at 1022. Rather, the common questions must present a significant aspect of the case that can be resolved for all members of the class in a single adjudication. *Id.* (quoting 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Fed. Prac. & Proc.* § 1778 (2d ed.1986)).

Here, common questions predominate over any issues individual members of the proposed class may have. As stated above, Plaintiffs allege a common course of conduct by Monsanto that resulted in similar injury to each class member. Issues of liability are likewise the same with respect to each Settlement Class Member. Although individual issues may exist, the nature and scope of the common questions in this case satisfy Rule 23(b)(3)'s predominance requirement. In particular, the common legal and factual questions include:

- Whether PCBs, when used as intended, are unreasonably dangerous;
- Whether PCBs, when used as intended, contaminate stormwater and/or dry-weather runoff systems;
- Whether Monsanto could have reasonably foreseen that its PCBs, when used as intended, would contaminate stormwater and/or dry-weather runoff systems;
- Whether Monsanto could have reasonably foreseen that its PCBs, when used as intended, would contaminate waterbodies through stormwater;
- Whether the presence of PCBs in contaminated storrmwater and/or dry-weather runoff systems constitute a public nuisance;
- Whether Monsanto owed Settlement Class Members a duty to ensure that its PCBs, when used as intended, did not contaminate stormwater and/or dry-weather runoff systems;

28

- Whether Monsanto owed to Settlement Class Members a duty to warn about PCBs, when used as intended, escaping applications;

- Whether Monsanto owed Settlement Class Members a duty to warn about PCBs propensity to contaminate trough stormwater contribution natural resources including waterbodies such as lakes, streams, rivers, and bays;

- Whether Monsanto breached its duties;

- Whether Monsanto's actions directly and proximately caused Settlement Class Members' injuries and damages;

- Whether Monsanto's conduct supports and award of punitive damages.

ECF 201 ¶ 96. The Ninth Circuit has held that differences in state law "do not necessarily, or even often, make a class unmanageable." *Jabbari v. Farmer*, --F.3d--, 2020 WL 4046029, at *4 (9th Cir. July 20, 2020). Indeed, the Ninth Circuit noted that its *en banc* decision in *Hyundai* reaffirmed that "common issues like whether the fuel economy statements were inaccurate and whether the automakers knew about the inaccuracy were the sort of "common course of conduct by [a] defendant" that can establish predominance." *Id.* (quoting *In re Hyundai and Kia Fuel Economy Litig.*, 926 F.3d 539, 559 (9th Cir. 2019) (en banc). Thus, even if state law varies, predominance is easily met here because the alleged conduct by Defendant is the "common course of conduct by [a] defendant that can establish predominance.'" *Id.*

The superiority inquiry under Rule 23(b)(3) requires determination of whether the objectives of the particular class action procedure will be achieved in the particular case. *Hanlon*, 150 F.3d at 1023 (quoting Wright, Miller & Kane, *Fed. Prac. & Proc.* § 1779). This determination necessarily involves a comparative evaluation of alternative mechanisms of dispute resolution. *Id.* A class action is superior to other methods of litigation where, "classwide litigation of common issues will reduce litigation costs and promote greater efficiency" and "no realistic alternative [to classwide treatment] exists." *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234-35 (9th Cir. 1996). In considering whether a class action is superior, the Court must focus on whether "efficiency and

29

economy" would be advanced by class treatment. *See Zinser v. Accufix Research Inst.*, Inc., 253 F.3d. 1180, 1190 (9th Cir. 2001).

Here, the expense and burden of individual litigation makes it impracticable for members of the proposed class to seek redress individually. Moreover, seeking redress through individual litigation is highly uncertain and may not occur before a lengthy trial and appellate proceedings are complete.  The proposed settlement provides Settlement Class Members with real benefits under a straightforward claims framework, while fully preserving their due process rights. And it benefits Defendant by allowing for full resolution of all similar litigation in a single action.

## V.   THE COURT SHOULD GRANT PRELIMINARY APPROVAL OF THE PROPOSED SETTLEMENT

Under Rule 23(e)(2), the Court may approve a proposed settlement only after finding that the settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). The recent amendments to Rule 23, effective December 1, 2018, require a court, in making a determination about the adequacy of a proposed settlement, to consider whether:

(A) the class representatives and class counsel have adequately represented the class;

(B) the proposal was negotiated at arm's length;

(C) the relief provided for the class is adequate, taking into account:

(i) the costs, risks, and delay of trial and appeal;

(ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;

(iii) the terms of any proposed award of attorney's fees, including timing of payment; and

(iv) any agreement required to be identified under Rule 23(e)(3); and

(D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2).

The Ninth Circuit has often used the following "*Churchill* factors" when determining whether to approve a class action settlement: (1) the strength of the plaintiff's case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant, and (8) the reaction of the class members of the proposed settlement. *Churchill Vill., L.L.C. v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004); *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1375 (9th Cir. 1993).[4]

There is substantial overlap between the factors in Fed. R. Civ. P. 23(e)(2) and the *Churchill* factors that the Ninth Circuit has often considered when determining whether to approve a class action settlement. *Hartranft v. TVI, Inc.*, 2019 WL 7195324 at *6 (C.D. Cal. 2019). To the extent possible, courts in the Ninth Circuit apply the factors listed in Fed. R. Civ. P. 23(e)(2) through the lens of the Circuit's *Churchill* factors and existing relevant precedent. *Cheng Jiangchen v. Rentech, Inc.*, 2019 WL 5173771 at *4 (C.D. Cal. 2019). As such, courts in the Ninth Circuit have found that the factors in Fed. R. Civ. P. 23(e)(2) are satisfied if the *Churchill* factors are satisfied. *Hartranft v. TVI, Inc.*, 2019 WL 7195324 at *6 (C.D. Cal. 2019); *Feller v. Transamerica Life Ins. Co.*, 2019 WL 6605886 at *10 (C.D. Cal. 2019).

Preliminary approval is warranted here. "If the proposed settlement 'appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class, and falls within the range of possible approval,' the court should grant preliminary approval of the class and direct notice of the proposed settlement to the class." *Kenneth Glover, et al. v. City of Laguna Beach, et al.*, 2018 WL 6131601, at *2 (C.D.

---

[4] The "*Churchill* factors" are also known as the "*Hanlon* factors." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998).

Cal. 2018) (*quoting In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1079-80 (N.D. Cal. 2007) (citation omitted). The relevant factors set forth by the Ninth Circuit and recently revised Rule 23(e)(2)(A)-(D) for evaluating the fairness of a settlement weigh in favor of preliminary approval, and there can be no doubt that the Settlement was accomplished in a procedurally fair manner. As detailed below, the Settlement passes both procedural and substantive muster and merits preliminary approval.

> **A.** **Class Representatives and Class Counsel Have and Will Continue to Zealously Represent the Class**

The Named Class Plaintiffs and Lead Class Counsel have prosecuted their individual actions for over five years. *See* Fed. R. Civ. P. 23(e)(2)(A). For a court to approve a proposed settlement, "[t]he parties must . . .have engaged in sufficient investigation of the facts to enable the court to intelligently make an appraisal of the settlement." *Byrne v. Santa Barbara Hospitality Services, Inc.*, 2017 WL 5035366, at *8 (C.D. Cal. 2017) (citation omitted). Here, Class Counsel engaged in extensive written discovery. As part of that process, Class Counsel responded to 36 sets of written discovery; obtained and reviewed well in excess of 300,000 Monsanto documents; gathered, coded and reviewed over 9 million of its own clients documents and produced a large subset of those documents; and obtained additional documents produced by third-parties subpoenaed by Monsanto. Ex. C, Declaration of Scott Summy, at ¶¶ 15-16. In addition, Class Counsel took and/or defended 82 depositions; 31 of which were expert witnesses. *Id.* at ¶ 17.

Class Counsel's analysis of the vast volume of discovery material, much of which had never before been produced in litigation, publicly available data, and deposition testimony establishes that Class Counsel has gathered sufficient information to enter into a reasoned and well-informed settlement. *See, e.g., In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000) (holding "significant investigation, discovery and research" supported "district court's conclusion that the Plaintiffs had sufficient information to make an informed decision about the Settlement"). Class Counsel briefed dozens of

motions for summary judgment, motions to exclude experts, and motions in limine. In all, Class Counsel was involved in filing and/or responding to over 100 motions in the Public Entity Cases. Ex. C, Declaration of Scott Summy, at ¶ 12. This gives Class Counsel a thorough understanding of the strengths and weaknesses of the legal claims and positions.

The case-specific experience must be considered against Class Counsel's expertise in representing public entities in environmental litigation. Baron & Budd's Environmental Litigation Group has litigated similar cases for close to twenty years. Many of the lawyers in the Group have 20+ years of practice experience and have spent their careers prosecuting these types of cases. *See* Ex. C, Declaration of Scott Summy, at ¶¶ 2, 4, 14, 18, 24, 25.

The Named Class Plaintiffs were likewise actively engaged and understand the demands and risks of litigation. As explained in the attached Declarations of 13 Class Representatives, they produced numerous documents, assisted Class Counsel with fact development, answered several dozen sets of discovery requests, and regularly communicated with counsel to remain up to date on the litigation. *See* Ex. D, Declaration of John Fiske, at ¶13; *see also* (Declarations of 13 Class Representatives, attached as Exhibit J). Their interests are aligned with those of the Settlement Class Members, and they will continue to represent those interests in consummating the proposed Settlement.

## B.     The Settlement Is the Product of Good Faith, Informed, and Arm's-Length Negotiations, and It Is Fair

Rule 23 instructs the Court to consider whether the "proposal was negotiated at arm's length." Fed. R. Civ. P. 23(e)(2)(B). The proposed Settlement Agreement arises out of serious, informed, and non-collusive negotiations facilitated by a JAMS neutral, Hon. Jay Gandhi, retired. Class Counsel vigorously prosecuted this action for many years before entering into any settlement talks; once the Parties began to contemplate settlement, the negotiations were difficult, protracted, and often spirited. Judge Gandhi, an unbiased experienced mediator, aided the parties' attempts and played a crucial role in supervising the negotiations and helping the parties bridge their differences and evaluate

the strengths and weaknesses of their respective positions.  *See* Exhibit E, Declaration of Hon. (Ret.) Jay Gandhi, at ¶¶ 10-16.

The Settlement was not achieved without difficulty or uncertainty. The Parties began discussions in 2019 but could not reach an accord. Ex. C, Declaration of Scott Summy, at ¶ 20. They then retained Judge Gandhi, who oversaw multiple separate telephone and video-conference mediation sessions through Spring 2020. Ex. C, Declaration of Scott Summy, at ¶ 21; Ex. E, Declaration of Judge Gandhi, at ¶¶ 10-14. Because the mediation sessions were not fruitful for some time, the Parties continued to prepare for trial in the *City of Spokane* matter, which was moved only to accommodate these settlement mediations and would have commenced on June 24, 2020.  *Id*. at ¶ 20.

On March 27, 2020, the Parties reached agreement on material terms for a settlement and executed a non-binding term sheet. Ex. C, Declaration of Scott Summy, at ¶ 21. Subsequently, the Parties spent weeks finalizing the release and settlement agreement as well as the related exhibits. The Parties continued to work with Judge Gandhi through numerous calls to finalize all of the details. A final Settlement Agreement was reached in June 2020. *See id.* The adversarial nature of the litigation and the aid provided by Judge Gandhi are factors that weigh in favor of preliminary approval. *See Rosales*, 2015 WL 4460918, at *16 (quoting *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011) ("Notably, the Ninth Circuit has determined the 'presence of a neutral mediator [is] a factor weighing in favor of a finding of non-collusiveness.'")); *See, e.g., In re Volkswagen "Clean Diesel" Mktg., Sales Prac., & Prods. Liab. Litig.*, MDL No. 2672, 2017 WL 672727, at *16 (N.D. Cal. Feb. 16, 2017) (finding approval appropriate where "the parties negotiated the Settlement under the supervision of a court-appointed Settlement Master"); *In re Volkswagen "Clean Diesel" Mktg., Sales Prac., & Prods. Liab. Litig.*, MDL No. 2672, 2016 WL 6091259, at *10 (N.D. Cal. Oct. 18, 2016) (same, where the "Court-appointed Settlement Master . . . indicated the Settlement should be submitted to the Court for approval"); *Harris v. Vector Marketing Corp.*, 2011 WL 1627973, at *8 (N.D. Cal. Apr. 29, 2011) (finding the fact

34

that the settlement was negotiated with an experienced mediator "suggests that the parties reached the settlement in a procedurally sound manner and that it was not the result of collusion or bad faith by the parties or counsel"). The proposed Settlement is the product of arm's length negotiations by Class Counsel.

**C.   The Settlement Provides Significant Benefits in Exchange for the Compromise of Strong Claims.**

**1. The Risk, Expense, Complexity, and Duration of Further Litigation Weighs in Favor of Approval**

In assessing the risk, expense, complexity, and likely duration of further litigation, "the Court will consider the vagaries of litigation and compare the significance of immediate recovery by way of the compromise to the mere possibility of relief in the future, after protracted and expensive litigation." *DIRECTV, Inc.*, 221 F.R.D. at 526 (quoting *Oppenlander v. Standard Oil Co. (Indiana)*, 64 F.R.D. 597, 624 (D. Colo. 1974)). In addition, the Court evaluates the time and cost of further litigation. *Woodard v. Labrada*, No. EDCV1600189JGBSPX, 2019 WL 6998775 at *5 (C.D. Cal. 2019). As such, "unless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results." *DIRECTV, Inc.*, 221 F.R.D. at 526 (quoting 3 *Newberg on Class Actions* § 11:50 (4th ed. 2012)).

"An important consideration in judging the reasonableness of a settlement is the strength of the plaintiffs' case on the merits balanced against the amount offered in the settlement." *DIRECTV, Inc.*, 221 F.R.D. at 526 (quoting 5 *Moore Federal Practice*, § 23.85[2][b] (Matthew Bender 3d. ed.)). In determining the probability of plaintiffs' success on the merits, there is no "particular formula by which that outcome must be tested." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009). However, in balancing, "a proposed settlement is not to be judged against a speculative measure of what might have been awarded in a judgment in favor of the class." *DIRECTV, Inc.*, 221 F.R.D. at 526 (quoting 5 *Moore Federal Practice*, § 23.85[2][b]). In assessing the strength of the case, a district court need not "reach any ultimate conclusions on the contested

issues of fact and law which underlie the merits of the dispute, for it is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive litigation that induce consensual settlements." *Officers for Justice*, 688 F.2d at 625.

Here, the Parties recognize the risks of continued litigation and an adverse outcome. Although Plaintiffs and Defendant believe in the merits of their claims and defenses, they are cognizant of the risks of proceeding to trial. Class Counsel is informed by a successful motion for summary judgment in favor of Monsanto in one matter. *See San Diego Unified Port District v. Monsanto Company*, --F.Supp.3d--2020 WL 1479071 (S.D. Cal. March 26, 2020); *San Diego Unified Port District v. Monsanto Company*, --F.Supp.3d--2020 WL 1468532 (S.D. Cal. March 26, 2020). Although Class Counsel can distinguish the one particular ruling from the Third Amended Class Complaint and those of the other Named Class Plaintiffs and Settlement Class Members, the ruling demonstrates the very real risk faced by the Plaintiffs in these cases. *See* Ex. C, Declaration of Scott Summy, at ¶25. Other courts could potentially make similar rulings to the detriment of other Plaintiffs and Settlement Class Members. The legal and factual issues in this lawsuit are both complex and disputed, as evidenced by the numerous dispositive motions that have been filed. *See, e.g.* ECF 30.

There can be little doubt that resolving the Settlement Class Members' claims through a single class action is superior to nearly 2,500 individual lawsuits. "From either a judicial or litigant viewpoint, there is no advantage in individual members controlling the prosecution of separate actions. There would be less litigation or settlement leverage, significantly reduced resources and no greater prospect for recovery." *Hanlon*, 150 F.3d at 1023. The time required for each putative Settlement Class Member to initiate litigation and conduct discovery weighed against the risks to each public entity favors the Settlement. The time it would take for Settlement Class Members to engage in and complete similar litigation would likely take up to a decade to complete. *See* Ex. C, Declaration of Scott Summy, at ¶ 24.

In addition, the potential costs of going to trial would be substantial. The Parties have expended enormous sums to date in the course of ordinary litigation. Litigating against Monsanto in the Public Entity Cases heavily taxed Lead Class Counsel and their firm. Over a five to six year period, 35 attorneys, 3 paralegals, 6 legal staff and IT personnel were used to address all aspects of these cases. Ex. C, Declaration of Scott Summy, at ¶ 14. Lead Class Counsel's firm funded all of these cases, which included out-of-pocket costs for experts, depositions, filing fees, travel and voluminous electronic discovery performed in-house. These expenses totaled approximately $10 million. *Id.* at ¶ 19. Under such circumstances, the avoidance of further risks and costs conserves the Parties' and the Court's resources. Moreover, any judgment would likely be subject to lengthy appeals, whereas the Settlement provides more immediate results and benefits to Settlement Class Members. This factor weighs in favor of the preliminary approval of the proposed Settlement Agreement.

## 2.  The Amount Offered in Settlement Supports Approval

In assessing the consideration obtained by the class members in a class action settlement, "[i]t is the complete package taken as a whole, rather than the individual component parts, that must be examined for overall fairness." *Officers for Justice*, 688 F.2d at 628. Because courts examine the complete settlement package, "it is well-settled law that a proposed settlement may be acceptable even though it amounts to only a fraction of the potential recovery that might be available to the class members at trial." *DIRECTV, Inc.*, 221 F.R.D. at 527.

The Settlement reflects the range of possible harms and remedies that Settlement Class Members could suffer and allege.  If a Settlement Class Member were to litigate its claims and prevail upon all causes of action so that a jury could award full damages sought, a Settlement Class Member could potentially recover damages ranging from mere hundreds of dollars for testing to millions of dollars for sophisticated sediment dredging and removal.  On a class wide basis, without the friction of *any* defensive arguments, the damages sought by Plaintiffs could exceed several billions of dollars. *See* Exhibit K,

37

Supplemental Declaration of Michael Trapp, and Exhibit L, Supplemental Declaration of Rob Hesse. That aspirational figure is not a realistic guide because (1) it overestimates the PCB-only damages by ignoring contaminants other than PCBs that may be present in water and sediment and either (a) drive a portion of the remediation costs and/or (b) should cause an allocation of costs;  (2) it does not acknowledge the legal and factual difficulties that would face litigants including the potential for summary judgment rulings against plaintiffs as in the City of San Diego;  (3) it does not value the benefit of certain settlement recovery against the risk, expense, time, and uncertainty of litigation and the possibility of zero recovery at trial.  *See* Exhibits K and L, Supplemental Declarations of Michael Trapp and Rob Hesse, respectively.

Here, $550,000,000 is being offered collectively to cities, towns, villages, boroughs, townships, counties, and independent port districts that have incurred or will incur costs associated with PCBs in stormwater, stormwater systems, sediment, and water bodies. As discussed in detail below, these funds will provide real-world relief and restitution for public funds spent and those that will be spent on PCB monitoring, remediation, and mitigation. For example, each Settlement Class Member will receive sufficient funds to pay to sample and test its water for PCBs.  Some Settlement Class Members will also receive funds to compensate them for TMDL compliance and the costs of reducing PCBs in storm water discharges and/or Superfund compliance and the costs of remediating PCBs from certain sediments. Additionally, it may be pointed out that the Settlement Class Members have not released any claims that they may still have against third-parties that may have released PCBs. *See* Ex. C, Declaration of Scott Summy, at ¶ 24.

### 3. The Effectiveness of the Proposed Method of Distributing Relief to Class Members, Including the Method of Processing Class-Member Claims Supports Approval

Class Counsel, working with experts, have gone through extensive and exhaustive efforts to identify all Settlement Class Members from publicly-available government data

— a research project never before completed. Ex. D, Declaration of John Fiske, at ¶ 16.
The extensive and exhaustive class member identification and allocation structure
research project took many months and was very expensive. No other setting or process
could identify, allocate, and deliver to over 2,000 cities, towns, villages, boroughs,
townships, counties, and independent port districts a $550,000,000 class benefit. The
proposed method of distribution of proceeds is likewise streamlined by having a known
set of putative Settlement Class Members at this time.

### 4. Extent of Discovery Completed and the Stage of Proceedings Weigh in Favor of Approval

"A court is more likely to approve a settlement if most of the discovery is
completed because it suggests that the parties arrived at a compromise based on a full
understanding of the legal and factual issues surrounding the case." *DIRECTV, Inc*., 221
F.R.D. at 527 (quoting 5 *Moore's Federal Practice* § 23.85[2][e]). As such, "[a]
settlement following sufficient discovery and genuine arms-length negotiation is
presumed fair." *Chambers v. Whirlpool Corp.*, 214 F. Supp. 3d 877, 889 (C.D. Cal. 2016).
However, formal discovery is not required where the "parties have sufficient information
to make an informed decision about settlement," this factor weighs in favor of approving
the settlement. *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1239 (9th Cir. 1998); *see
In re Mego Fin. Corp. Sec. Litig.,* 213 F.3d at 459.

As discussed above, the Parties undertook full discovery and planned to litigate
each case individually. As this Settlement came together, the general liability discovery
as to Monsanto was substantially complete and available for use in all of the Public Entity
Cases. *See* Ex. C, Declaration of Scott Summy, at ¶ 18. Accordingly, both sides along
with the Mediator were armed with a significant amount of information to make a well
informed and intelligent decision regarding the Settlement reached in this matter. This
factor weighs in favor of the preliminary approval of the proposed Settlement Agreement.

**5.  The Experience and Views of Counsel Weigh in Favor of Approval**

"Great weight is accorded to the recommendation of counsel, who are most closely acquainted with the facts of the underlying litigation." *DIRECTV, Inc*., 221 F.R.D. at 527 (quoting *In re Painewebber Ltd. P'ships Litig*., 171 F.R.D. 104, 125 (S.D.N.Y.1997)). Therefore, in considering the adequacy of the terms of a settlement, the Court should rely upon the judgment of experienced counsel for the parties. *Woodard v. Labrada*, No. EDCV1600189JGBSPX, 2019 WL 6998775 at *7 (C.D. Cal. 2019). This reliance is predicated on the fact that "[p]arties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in the litigation." *In re Pac. Enters. Sec. Litig*., 47 F.3d 373, 378 (9th Cir. 1995). Thus, "the trial judge, absent fraud, collusion, or the like, should be hesitant to substitute its own judgment for that of counsel." *DIRECTV, Inc*., 221 F.R.D. at 527 (quoting *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977); *Hanrahan v. Britt*, 174 F.R.D. 356, 366–368 (E.D.Pa. 1997)).

Plaintiffs' Counsel involved in this case have extensive experience serving as lead counsel and/or class counsel in complex environmental cases and have litigated individual PCB-related cases. Plaintiffs' Counsel and their firms have served as lead or co-lead counsel in numerous class actions in the environmental arena. *See* Declarations of Scott Summy and John Fiske. Based on the experience and the specific facts of this case, Plaintiffs' Counsel have concluded that the Settlement is fair, reasonable, and adequate. Experienced counsel is also of the opinion that this class settlement maximizes the recovery for these Settlement Class Members considering the substantial risks involved. *See* Ex. C, Declaration of Scott Summy, at ¶ 24. Defendant's Counsel are also highly skilled and well adept at defending class actions, having defended class actions in nearly every state for dozens of companies. Thus, counsel for each of the Parties–who are experienced plaintiffs' class action and defense attorneys–have fully evaluated the strengths, weaknesses, and equities of the parties' respective positions and have done so in light of similar litigation with which they were involved.

**6.  The Presence of a Governmental Participant Weighs in Favor of Approval**

Courts presume that governmental participants and government officials put on notice of class action settlement proceedings will raise any concerns that they may have during the normal course of such proceedings. *Taylor v. Shippers Transp. Express, Inc.*, No. CV1302092BROPLAX, 2015 WL 12658458 at *11 (C.D. Cal. 2015). Thus, a governmental entity or governmental official being involved in class action settlement proceedings weighs in favor of approval. *Touhey v. U.S.*, No. EDCV 08-01418-VAP, 2011 WL 3179036 at *8 (C.D. Cal. 2011).

The Named Class Plaintiffs and Settlement Class Members are all sophisticated governmental subdivisions. Most are represented by their own in-house attorneys and have extensive experience with litigation. *See* Exhibit J, Declarations of the 13 Named Class Representatives. The participation of the Named Class Plaintiffs in full discovery and their participation at every stage of the case favors approval.

**VI.  COMPLIANCE WITH THE COURT'S ORDER REGARDING CLASS ACTION SETTLEMENTS**

**A.  Declarations from proposed class representatives as to the adequacy of their representation of the class; and any differences between the settlement class and the class proposed in the operative complaint.**

Attached as Exhibit J are declarations from in-house attorneys of record for each Named Class Plaintiff. In each declaration, the in-house attorneys for the public entities describe the lengthy five plus year litigation; the time, energy, documents produced, motions, and other litigation efforts; their involvement in the litigation and in the resolution; and their role first as litigating entities and then as proposed class representatives. There are no differences between the Settlement Class and the class in the operative Complaint.

Described in detail in the Third Amended Class Action Complaint, the proposed 13 class representatives are the best suited to serve as class representatives because of

41

their collective five plus year involvement in the litigation. Moreover, the 13 Named Class Plaintiffs collectively represent a wide array of the 2,528 class members, including the following: cities, counties, ports, Phase I permittees, Phase II permittees, permittees with TMDLs, permittees without TMDLs, permittees with sediment cleanup responsibilities, permittees without sediment cleanup responsibilities, permittees who recover under only the monitoring fund, meaning they recover under neither the TMDL nor the sediment fund, permittees with population bonus awards, and permittees without population bonus awards. The Named Class Plaintiffs range from small cities to the largest county in the nation to ports with no "population" at all. As those that have litigated the case for over 5 years, this collection of class representatives is not only best suited to represent the class from a subject matter perspective, but the collection also truly represents the class.

**B.      Whether the settlement is within a range of possible judicial approval, including (i) the fairness of its terms; (ii) the anticipated class recovery under the settlement, (iii) the potential class recovery if plaintiffs had fully prepared on each of the claims that are the subject of the settlement, and (iv) an explanation of the factors bearing on the amount of the compromise. The proposed allocation plan for the settlement fund, and why such allocation is fair, and treats class members equitably relative to each other.**

Fed. R. Civ. P. 23(e)(2)(D) requires the Court to consider whether the Settlement Agreement "treats class members equitably relative to each other." In doing so, "the Court considers whether the Settlement improperly grants preferential treatment to class representatives or segments of the class." *Hefler v. Wells Fargo & Co.*, 2018 WL 6619983, at *7 (N.D. Cal. Dec. 18, 2018), *aff'd,* 802 Fed. App'x 285 (9th Cir. 2020) (internal quotation marks and alteration omitted). The relief need not be identical—just equitable and rationally apportioned. *See, e.g., In re Veritas Software Corp. Sec. Litig.*, 2005 WL 3096079, at *9 (N.D. Cal. Nov. 15, 2005), *vacated in part on other grounds*, 496 F.3d 962 (9th Cir. 2007) (options trader class members were sufficiently different

42

from in-and-out traders "to justify their differential treatment in the plan of allocation of settlement proceeds"); *Vargas v. Ford Motor Co.*, 2020 WL 1164066, at *10 (C.D. Cal. Mar. 5, 2020) ("[W]hile the Settlement was structured to deliver the most complete relief to those Class Members that experienced persistent defects (e.g., those with more service visits will receive a greater cash payment), this is an objective and logical explanation for the variations in monetary recovery.").

Here, the Settlement treats all Settlement Class Members equitably according to need and other factors as set forth below.

<u>The Class and the Monitoring Fund</u>

Settlement Class Members are identified using a broad method. In its essence, Settlement Class Members are those public entity storm water permittees that have jurisdictional boundaries within a watershed that drains into an impaired body of water. This broad methodology of class identification includes Settlement Class Members that know about PCB contamination in their storm water systems and includes Settlement Class Members that may not know about PCB contamination in their storm water systems. Of the 2,528 class members, many may not be aware of the presence of PCBs in their storm water system at all. This is due to the reality that only 242 of the 2,528 Settlement Class Members are subject to a regulatory TMDL, required under the Clean Water Act, which requires costs to be spent to limit contaminant effluent into an impaired water body. The Clean Water Act requires the imposition of a TMDL when a permittee discharges a contaminant into a 303(d) water body. This process regularly and customarily requires water sampling to gauge contamination levels. *See* Declaration of Michael Trapp, Exhibit D-1.

However, in practice, permittees are not regulated uniformly across the country since discretion lies with state regulators. As such, 2,286 Settlement Class Members have no TMDL regulation at all, which would otherwise likely require water sampling and contaminant monitoring.

Thus, many Settlement Class Members may not or likely do not sample or monitor their storm water for PCBs if they are not required to by a regulatory agency. Many Settlement Class Members' claims may be limited to water sampling and monitoring. It is impractical and a waste of judicial resources for over 2,000 public entities to bring claims only for water sampling and monitoring, especially when compensation in this class resolution will compensate for nearly 100% of the cost for a round of water sampling, described further below.

The intention of the Monitoring Fund, which applies to all 2,528 Settlement Class Members, is to provide Settlement Class Members with enough funds to sample and monitor storm water for PCBs. The tiered monetary levels (e.g., $15,000, $20,000, $25,000, or $30,000) correspond to the size of the entity receiving those funds. The smaller entities, with smaller populations, smaller urbanized development, and smaller storm water systems to sample, receive slightly less funding than those larger entities, with larger populations, larger urbanized development, and larger storm water systems to sample. *See* Supplemental Declaration of Michael Trapp, Exhibit K. Whether receiving $15,000, $20,000, $25,000, or $30,000 dollars, each of the 2,528 Settlement Class Members can use these funds to take and analyze several water samples to learn whether PCBs are present in a storm water system. Water sampling costs can range from a few hundred to a couple thousand dollars depending upon the type, method, and location of testing.

A class member receiving $15,000 can use the settlement funds to pay for ten water samples to detect and analyze PCBs. *See* Exhibit K, Supplemental Declaration of Michael Trapp. A class member receiving $30,000 can use the settlement funds to pay for 20 water samples to detect and analyze PCBs. *See* Exhibit K, Supplemental Declaration of Michael Trapp.

The benefit to all Settlement Class Members is 100% compensation to complete at least one round of PCB sampling to learn whether PCBs are in their storm water systems. *See* Exhibit K, Supplemental Declaration of Michael Trapp. For those who know PCBs

44

are present in their storm water system, they can test in another location or pay for continued monitoring and analysis. Since all but 242 Settlement Class Members have no TMDL regulation requiring storm water retrofitting or other mitigation measures (discussed below), compensation for 100% of at least one round of water sampling costs is a real-world benefit and solution that will shed light on current and ongoing PCB contamination of the country's water bodies. *See* Exhibit K, Supplemental Declaration of Michael Trapp.

The calculation of the Monitoring Fund is relatively simple because it is a bottom-up fund that uses simple arithmetic, and the sum of that arithmetic totals $42,895,000.

The TMDL Fund

The TMDL Fund includes the 242 Settlement Class Members regulated under a TMDL. *See* Exhibit D-1, Declaration of Michael Trapp. The essential purpose of Total Maximum Daily Loads is to reduce contaminants from entering impaired water bodies via storm water systems. *See* Exhibit D-1, Declaration of Michael Trapp.

TMDLs that reduce PCBs may also reduce other contaminants. *See* Exhibit K, Supplemental Declaration of Michael Trapp. Thus, the cost to implement "best management practices," or BMPs, to reduce PCBs can be allocated among several contaminants concurrently.

TMDLs prescribe or require BMPs to remove or reduce PCBs and other contaminants from storm water. *See* Exhibit D-1, Declaration of Michael Trapp. Some examples of BMPs include the following: special street sweeping, bioswales, catch basins, "green street" infrastructure, bioretention and bioinfiltration. *See* Exhibit K, Supplemental Declaration of Michael Trapp. And, storm water systems vary in size and complexity. A storm water system can include pipes, culverts, curbs, drains, outlets, inlets, sidewalks, and several other impervious surfaces meant to redirect storm water, largely for purposes of flood control and urban development. *See* Exhibit K, Supplemental Declaration of Michael Trapp. BMPs are applied to different storm water systems in different ways, according to the size, characteristic, and nature of the system and the

45

contamination. *See* Exhibit K, Supplemental Declaration of Michael Trapp. BMPs can cost tens of thousands to several millions of dollars depending upon the BMP, its scale, its location, and other site-specific environmental and civil engineering factors. *See* Exhibit K, Supplemental Declaration of Michael Trapp. The costs specific to PCBs only for any one TMDL permittee would thereby be a fraction of that. *See* Exhibit K, Supplemental Declaration of Michael Trapp. This nationwide settlement seeks to compensate funds at that scale. In litigation, the funds recovered in litigation likely would be something less than 100% of the claimed damages based on the myriad of viable defenses raised by Defendant.

Expert Michael Trapp engaged in a case study analysis to estimate possible scenarios for the aggregate cost to comply with TMDLs that involve PCBs, across all 242 class members in the TMDL Fund. *See* Exhibit K, Supplemental Declaration of Michael Trapp. Michael Trapp reviewed six case studies that estimated the total cost to comply, on a per acre basis, with TMDLs involving PCBs. The TMDLs studied involve contaminants in addition to PCBs, so such costs cannot be contributed solely to PCBs. *Id.* In his review, Dr. Trapp found the cost to comply with the six-case study TMDLs ranged from $4,000 per acre on the low end to $35,000 per acre on the high end, with an average of $18,245 per acre. *Id.* Based on his review of the case studies and his professional experience and education, the lower to middle range costs of $4,000 to $18,245 per acre is likely much more common than the high end of the range. *Id.*

Among the 242 TMDL entities, there are 761,587 acres of impervious surface. *Id.* When multiplied by all 761,587 acres, the total aggregate cost in the more common lower to middle ranges equals $3,046,346,664 to $13,894,871,905. *Id.*

Thus, the allocation of the TMDL Fund is designed to provide Settlement Class Members with funds to help employ BMPs and meet regulatory requirements. Settlement Class Members vary in size—including total land area and population—and so too do their storm water systems and corresponding TMDL associated costs.

Therefore, the TMDL Fund uses two factors, imperviousness and population, to rank the relative size of the Settlement Class Members' storm water systems and indicate the potential PCB contamination. *See* Exhibit D-1, Declaration of Michael Trapp. These factors are used to calculate corresponding monetary awards that would proportionately indicate BMP costs. *See* Exhibit D-1, Declaration of Michael Trapp. Both imperviousness and population indicate potential PCB contamination since PCBs were used largely in commercial development and construction, and industrial applications and uses— population and imperviousness generally indicate industrial and urbanized activities such as development, demolition, renovation, production, manufacturing, utilities, and similar PCB releasing uses and activities. *See* Exhibit K, Supplemental Declaration of Michael Trapp.

When rain or storm water runoff contacts PCBs in the environment, PCBs can be picked up by the storm water runoff and discharged into receiving water bodies. *See* Exhibit D-1, Declaration of Michael Trapp. The greater the imperviousness within a subject watershed, the less storm water infiltrates to soils and consequently the more the volume of stormwater is generated. The greater the area of impervious surfaces, the greater the sources of PCBs, and the greater potential for PCBs traveling from their original sources and application to impaired water bodies. *See* Exhibit K, Supplemental Declaration of Michael Trapp.

The greater the imperviousness, the greater the potential cost of TMDL compliance for a Settlement Class Member. The more impervious infrastructure, the greater the potential cost. *See* Exhibit K, Supplemental Declaration of Michael Trapp. Settlement Class Members with more impervious surface area have "more ground to cover."

Population indicates building, development, demolition, reconstruction, renovation, employment of industrial jobs, utility use, and industrial activity generally, all of which indicate infrastructure containing PCBs. *See* Exhibit K, Supplemental Declaration of Michael Trapp. Population indicates commercial activity and

47

infrastructure agitation, both of which contribute to PCB contamination. *See* Exhibit K, Supplemental Declaration of Michael Trapp.

The allocation of $250 million uses Settlement Class Members' imperviousness, publicly available from U.S. Geological Survey data. *See* Exhibit D-1, Declaration of Michael Trapp. A Settlement Class Member's impervious area within a subject watershed is weighted relative to all other Settlement Class Members' impervious area within all other subject watersheds. *See* Exhibit D-1, Declaration of Michael Trapp. The 242 entities each receive corresponding weighted monetary recoveries. *See* Exhibit D-1, Declaration of Michael Trapp. For those entities with very high populations (cities over 1 million and counties over 2 million) a population bonus is added. *See* Exhibit D-1, Declaration of Michael Trapp. Thus, imperviousness and population determine the allocation of the $250 million. Those entities with only small sections of impervious surfaces within subject watersheds receive relatively smaller recoveries from the fund. *See* Exhibit D-1, Declaration of Michael Trapp. And, those entities with larger sections of impervious surfaces, and those with very large populations, receive more funds. *See* Exhibit D-1, Declaration of Michael Trapp.

The imperviousness of a few very large entities resulted in a large concentration of funds in those few entities. So, to "smoothen the curve," no one TMDL Settlement Class Member receives more than three percent (3%), or $7.5 million inclusive of the population bonus, of the $250 million. *See* Exhibit D-1, Declaration of Michael Trapp.

The scale of the TMDL Fund, collectively as $250 million for 242 entities, or as each allocated award, is appropriate relative to (1) the actual cost of PCB BMPs, (2) the allocation of BMP costs to other contaminants, and (3) the nature of a vigorously contested adversarial process. *See* Exhibit K, Supplemental Declaration of Michael Trapp.

As noted above, a BMP can remove multiple contaminants. Thus, when "costing" a BMP project—for example a $250,000 BMP—PCBs may be only one of several contaminants removed from storm water. *See* Exhibit K, Supplemental Declaration of

Michael Trapp. Thus, in the example of a $250,000 BMP, perhaps only $50,000, $100,000, or $150,000 might be attributable to PCB contamination. *See* Exhibit K, Supplemental Declaration of Michael Trapp. Multiple contaminants may necessitate higher costs which would not be legally attributable to Defendant's PCBs. *See* Exhibit K, Supplemental Declaration of Michael Trapp.

This resolution does not seek to provide 100% recovery of all PCB BMP costs. Defendant vigorously asserted legal defenses to liability, causation, efficacy of remedy, and adequacy of scientific persuasion, among others. Defendant attacked TMDLs themselves, arguing that TMDL regulatory requirements have no impact on legal liability, that PCBs in small diffuse quantities harm neither animals nor humans, and that spending millions of dollars on TMDL requirements is a wasteful and ineffective way to address PCBs when dilution alone reduces PCBs over time.

This TMDL allocation reconciles the tension among regulatory costs, legal liability, and availability of funds in resolution. Nevertheless, TMDL class members will receive up to $7.5 million each intended to fund all or part of PCB-reducing BMPs. *See* Exhibit D-1, Declaration of Michael Trapp. The $250 million fund is an unprecedent direction of funds to public entities to comply with PCB-reducing TMDLs.

The Sediment Fund

The Sediment Fund resolves a separate set of challenges imposed by another type of PCB regulation—sediment remediation. Sediments—those soils submerged within impaired water bodies—receive and collect PCBs. *See* Exhibit D-2, Declaration of Rob Hesse. Sediment remediation costs can be significant but can vary from site to site depending upon site and contamination characteristics. *See* Exhibit L, Supplemental Declaration of Rob Hesse.

In a Superfund Site, or in Category 4b clean-up site, the US EPA or State regulator uses authority under federal law, such as CERCLA or the Clean Water Act, to require multiple Potentially Responsible Parties (PRP) to remediate a sediment site. This initiates a complex "allocation" process whereby the many PRPs engage with each other to

49

determine how much each PRP must contribute to the remediation prescribed by the EPA. *See* Exhibit L, Supplemental Declaration of Rob Hesse. Therefore, a Superfund Site includes multiple PRPs sharing the overall cost and responsibility for cleanup. *See* Exhibit L, Supplemental Declaration of Rob Hesse. The number of PRPs can be in the hundreds. *See* Exhibit L, Supplemental Declaration of Rob Hesse.  Of the nine Sediment Sites in the Fund, the number of PRPs at any one particular site ranges from two to 345. *See* Exhibit L, Supplemental Declaration of Rob Hesse. Through the CERCLA allocation process, the list of actively involved parties becomes further refined. Upon review of the refined list of actively involved PRPs, expert Rob Hesse found that the Fund's nine Sediment Sites includes anywhere from one to 55 actively involved PRPs per site. *See* Exhibit L, Supplemental Declaration of Rob Hesse.

Settlement Class Members may be included as PRPs by the EPA for reasons other than storm water and other than PCBs. A Settlement Class Member's inclusion as a PRP does not necessarily mean that its liability includes only PCB Contribution through storm water. Moreover, due to multiple PRPs named at a site where PCBs are contributed through storm water, a Settlement Class Member's inclusion because of PCBs and storm water does not mean it is the sole PRP for PCBs and storm water. *Id.*

PCBs are not the only contaminant in these nine Sediment Sites. Collectively among the nine sites in the Sediment Fund, the following is a list of primary contaminants of concern: PCBs, PAHs (Polycyclic Aromatic Hydrocarbons), Dioxins/Furans, Pesticides, Mercury, Lead, Other Metals, Copper, VOCs (Volatile Organic Compounds), Arsenic, Hexachlorobenzene, Zinc, Cadmium, and TBT (Tributyltin). *See* Exhibit L, Supplemental Declaration of Rob Hesse. While PCBs may be one of several primary contaminants of concern, other primary contaminants of concern also drive health risks and remediation costs. *See* Exhibit L, Supplemental Declaration of Rob Hesse. Thus, as with the TMDL Fund, regulatory costs in a Sediment Site cleanup cannot be attributed only to Defendant's PCBs. Therefore, the overall Superfund costs to remediate sediment are neither attributed solely to Settlement Class Members nor solely to PCBs. *Id.*

Some information about remediation costs at Superfund Sites may be non-public or confidential due to confidential allocation proceedings for Sites. The Sediment Fund includes an allocation by a Special Master to fairly and equitably allocate $150 million among the twelve class members. Ex. A, Settlement Agreement ¶¶ 79(a)-(f). A Settlement Class Member's disclosure in a confidential application to a Special Master will facilitate this fair and equitable allocation by allowing class members to share information otherwise non-public and/or confidential. *See generally* Exhibit L, Supplemental Declaration of Rob Hesse.

The Settlement Funds will not be allocated evenly, but rather equitably. If the $150 million fund was divided evenly among the twelve class members, each of the 12 qualifying Class Member would receive $12.5 million.

Research of publicly available information reveals that two Settlement Class Members may have spent only $500,000 and one may not spend more due to regulatory completion. *See* Exhibit L, Supplemental Declaration of Rob Hesse. If, for example, two entities spent only $1 million collectively, there could be $149 million remaining for ten Settlement Class Members—an average of $14.9 million per entity.

The cost to any one PRP can cost hundreds of thousands to many tens of millions of dollars depending upon the cleanup required, its scale, its location, and other site-specific environmental and civil engineering factors. *See* Exhibit L, Supplemental Declaration of Rob Hesse. The costs specific to PCBs and storm water only for any one PRP would thereby be a fraction of that. *See* Exhibit L, Supplemental Declaration of Rob Hesse. This Settlement seeks to compensate funds at that scale. In litigation, the funds recovered in litigation likely would be something less than 100% of the claimed damages based on the myriad defenses raised by Defendant.

Expert Rob Hesse researched publicly available information he considers to be helpful in understanding the appropriate size of the Sediment Fund. *Id.* During his review of publicly available information, Mr. Hesse estimated a possible range for the total Superfund/Category 4(b) costs to the 12 qualifying Class Members. *Id.* In the aggregate,

the cost to comply with the Superfund/Category 4(b) orders, across all twelve qualifying Settlement Class Members may range from $440 million to $700 million or more. *Id.* However, this total liability does not necessarily discount for other contaminants nor does it necessarily discount for PCB contributions through sources other than storm water. *Id.*

As one just one example of the appropriateness of the scale and size of the Fund, based on publicly available information, one Settlement Class Member spent approximately $15 million at its site (although not necessarily exclusively for PCBs and storm water). *See* Exhibit L, Supplemental Declaration of Rob Hesse. As another example of the appropriateness of the scale and size of the fund, based on publicly available information, one Settlement Class Member spent $5 million and another spent somewhere between $10 million and $15 million at a site (although not necessarily exclusively for PCBs and storm water). *See* Exhibit L, Supplemental Declaration of Rob Hesse. Other Settlement Class Members have spent or may expect to spend more or less. Some award applications from class members may include damages the Special Master considers more speculative than others. The allocation is the purview of the Special Master, a retired federal magistrate judge. Ex. A, Settlement Agreement ¶ 79.

The $150 million fund provides ample opportunity and flexibility for the Special Master to provide significant awards, which are meaningful when considering the actual costs to remediate, the allocation among several parties, the allocation among several contaminants, and the significant and complex legal defenses charged in this case. Settlement Class Members will not receive 100% of their sediment remediation costs, even when considering those costs related only to PCBs and only to storm water. The Settlement Class Members will receive significant compensation for a portion of those costs amidst a vigorously contested adversarial process.

<u>Special Needs Fund—Part A and Part B</u>

This case did not start as a class action, but rather as one lawsuit brought by one city on behalf of itself over five years ago. In March 2015, the City of San Diego sued Defendants to recover costs spent remediating PCBs from San Diego Bay. One by one

cities, counties, and ports filed suit. In total, 13 lawsuits were filed in four states, seven federal districts, before eight federal courts, over a period of five plus years. An additional two entities had engaged outside counsel, investigated their cases, prepared a complaint, and were prepared to file when serious settlement discussions gave reason to delay filing to allow for a successful resolution process. *See* Exhibit J, Declaration of 13 Named Class Plaintiffs. In total, 15 public entities chose to become Litigating Entities in this case.

As described in the declarations of the 13 class representatives, and of proposed Class Counsel Scott Summy and John Fiske, the litigants engaged in significant and costly litigation on a case by case basis. The cases were not coordinated but rather fought across the western United States and then on the east coast, too. The litigants assumed significant risk that their five-year campaign could result in no recovery at all—a serious risk for a public entity choosing to devote public resources to tort litigation.

Prior to the filing of these lawsuits, the litigants and their outside counsel were unaware of any lawsuits ever filed in America wherein storm water was the subject of an environmental lawsuit against a product manufacturer. While environmental lawsuits had been filed against product manufacturers for water contamination, the litigants were unaware of lawsuits filed for contamination of storm water—a point that Defendant seized on early, attacking standing and other issues. In fact, so novel were these storm water cases, and so effective were Defendant's standing arguments, the Litigating Entities (specifically San Diego, San Jose, Oakland, and Berkeley) lost the first round of motions to dismiss. At that time, those four Litigating Entities, plus the other Litigating Entities that had cases on file with their own motions to dismiss pending, chose to continue their cases. They believed in the importance of the cases and chose to continue to devote public resources to the matters despite the risk of losing.

Those four Litigating Entities filed amended complaints, opposed another round of motions to dismiss, and defeated the motions to dismiss the second time, but only in part as one court granted Defendant's alternative request for relief. Nevertheless, the Litigating Entities continued the litigation for years, facing enormous document requests

through discovery and through public records act requests. *See* Exhibit J, Declaration of 13 Named Class Plaintiffs. Several entities engaged in deposition and expert discovery, and three Litigating Entities faced motions for summary judgment and pre-trial motions. The City of San Diego, the Port of San Diego, and the City of Spokane were/are on the heels of trial. The City of Spokane was so close to trial that the parties had to approach the court for a trial continuance in order to allow time to negotiate this class settlement—pre-trial motions and motions for summary judgment were fully briefed. *See* Exhibit J, Declaration of 13 Named Class Plaintiffs. The City of San Diego faced successful arguments on motion for summary judgment and the Port of San Diego fought through several arguments and faces still today a looming trial date. The other litigants, depending upon when they filed, also faced significant discovery efforts at various stages. In total, Defendant employed at least nine law firms across the nation to defend the actions, including several national law firms such as Shook Hardy & Bacon and Latham & Watkins, which effectively defended the actions throughout the litigation.

There would be no nationwide Settlement had it not been for the stalwart efforts of the 15 Litigating Entities over the five plus years of hard-fought litigation. In states like Washington and Oregon, the cases presented legal questions of first impression, including holding product manufacturers liable for environmental type damages. Now, 2,528 public entities will benefit from these efforts with monitoring costs. In the TMDL Fund, 242 public entities incurring TMDL regulation costs will receive up to $7.5 million each from a collective $250 million fund. Ex. A, Settlement Agreement ¶ 78. In the Sediment Fund, 12 public entities will collectively benefit from $150 million to help pay for expensive sediment remediation costs imposed by federal laws and regulators. *Id.* ¶ 79.

An additional $50 million is available to all 2,528 Settlement Class Members in Special Needs Fund Part B. *Id.* ¶ 80(h). On top of the $42 million plus monitoring fund, the $250 million TMDL fund, and the $150 million sediment fund, an additional $50 million is available to all Settlement Class Members upon application to the Special Master for compensation of certain costs that have provided or will provide a regional or

nationwide benefit. *Id.* Across the 2,528 class members, certain Settlement Class Members will have incurred costs not specifically covered in the Monitoring Fund, TMDL Fund, or Sediment Fund. Upon application, those costs will be compensated. This gives all Settlement Class Members ample and equal opportunity for compensation of costs incurred, including but not limited to the following: natural resource rehabilitation costs, where standing exists; costs to study, survey, or analyze PCBs in the environment or in consumer products as a source of PCBs; additional mitigation or remediation work not covered herein; any other costs incurred that provide a regional or national benefit regarding PCBs and storm water. *See* Exhibit A, Settlement Agreement. Through Part B, all 2,528 class members will have a robust opportunity to recover costs related to PCBs and storm water. *Id.*

Without the collective five plus year effort of the 15 Litigating Entities, which did not file as a class action, none of this nearly $650 million package would be available. Because the 15 Litigating Entities filed individually rather than as a class, incurring millions of dollars of in-house counsel time, fees, and costs, it would be unfair to place those that took the risk at such a significant disadvantage. Thus, those 15 Litigating Entities have an opportunity to receive compensation for some, but not necessarily all, of their in-house counsel time, fees, and costs. *See* Exhibit A, Settlement Agreement. Special Needs Part A simply attempts to make whole those 15 Litigating Entities that have incurred significant costs to get this case into a national resolution—Special Needs Part A attempts to reimburse those litigating entities so that, ultimately, they are treated as fairly as the rest of the 2,528 class members. *Id.* Otherwise, the 15 Settlement Class Members would be millions of dollars "in the hole" compared with their non-litigating fellow Settlement Class Members. Fifteen Litigating Entities will apply for $57,105,000.

A model structure was approved recently by Judge Dan Aaron Polster in the Northern District of Ohio in the nationwide Opioid Litigation—MDL No. 2804 *In Re: National Prescription Opiate Litigation*, Case No. 1:17-MD-2804. In the Opioid Litigation, certain litigating entities filed and litigated the case individually before a class

resolution structure was proposed. In Judge Polster's Order confirming within the class structure compensation to the individual litigating entities, the court states, "Finally, 15% is set aside for a 'Class Members' Special Needs Fund,' to cover the special needs and expenditures of any Class member that are not addressed by the class-wide allocation formula, including expenses associated with litigation." *Id.* Docket No. 2590 at page 6. In this class settlement structure, Special Needs Parts A and B comprises 16.5% of the total monetary resolution, and Part A alone comprises only 8.8% of the total monetary resolution. Comprehensive, nationwide settlements such as the opioid negotiation class approved by Judge Polster and this proposed PCB resolution require creativity within Rule 23 to achieve fairness and compensation across the country.

In a world without the adversarial process proffering legal and factual defenses, the totality of all PCB storm water cases from all class members could theoretically result in verdicts and judgments totaling several billions of dollars. However, this resolution provides realistic compensation in the context of our nation's adversarial judicial process—providing $550 million for 2,528 Settlement Class Members now, saving public resources and promoting judicial economy.

**C.**     **The arms-length negotiation of the settlement discussion(s), including and to what extent, the proposed class representatives were involved in the negotiation(s).**

The arms-length negotiations of the Settlement discussions are detailed above. The 13 Named Class Plaintiffs have submitted their declarations, attached hereto as Exhibit J. The 13 Named Class Plaintiffs participated in monthly, weekly, or more frequent, phone calls with counsel regarding the "back and forth" negotiations with defense counsel facilitated by JAMS Mediator Judge (Ret.) Jay Gandhi. *See* Declarations of Scott Summy and Declaration of John Fiske; *see* Exhibit J, Declarations of 13 Named Class Plaintiffs. Additionally, as counsel of record, and as in-house public entity attorneys engage in affirmative litigation, the Named Class Plaintiffs were intimately involved in the drafting and re-drafting of the language in the settlement agreement, focusing further on matters

such as release and contribution protection, among other matters. *See* Exhibit J, Declaration of 13 Named Class Plaintiffs.

Unlike some Named Class Plaintiffs, these Named Class Plaintiffs are (1) attorneys, (2) co-counsel of record in these cases, (3) public entities, and (4) engaged in affirmative litigation. They were engaged and involved in the settlement negotiations that took place throughout early to mid-2020. *See* Exhibit J, Declaration of 13 Named Class Plaintiffs.

**D.** **Incentive Payments and the standard set forth in *Radcliffe v. Experian Info Solutions Inc.*, 715 F.3d 1157 (9th Cir. 2013), including declarations from the proposed class representative regarding (i) the time, risk, and burden incurred by the class representative(s), the assistance he or she provided to class counsel throughout the case; and (ii) whether the incentive payment is conditioned on the class representative's approval of the settlement.**

The Parties respectfully direct the court's attention to Subsection B above, specifically the discussion regarding Special Needs Part A.

**E.** **If the settlement contemplates a *cy pres* award, the parties shall identify the proposed *cy pres* recipient, and explain how the recipient's mission or goals are related to the interests of the class members.**

The Settlement does not contemplate a *cy pres* award and therefore this item is not addressed.

**F.** **Adequacy of the Class Notice, including whether and how it fairly apprises the putative class members of the terms of the proposed settlement, and the options available to them in connection with the settlement and court proceedings.**

The Notice and Notice Plan are explained in Section II.B.2 above. The Settlement Agreement requires Settlement Class Members to submit their written objections to the Settlement directly to the Court, as required by the Court's Order regarding class action

settlements. Ex. A, Settlement Agreement ¶ 98. In addition, the Parties have prepared an opt-out or exclusion form that the Settlement Claims Administrator will post on the settlement website.

> **G.      How the settlement will be administered, including the proposed amount and cap to be paid to the settlement administrator.**

The Parties propose Steven Weisbrot of Angeion Group, LLC to be appointed as Class Action Settlement Administrator. Under the terms of the Settlement, the Class Action Settlement Administrator will be paid by Defendant; no costs and expenses for implementing the Notice Plan will be paid from the Settlement Fund. *See* Exhibit A, ¶ 93. The estimated cost for the Notice Plan is approximately $150,000. *See* Exhibit B, Declaration of Steve Weisbrot. There is no proposed cap on the amount paid to the Class Action Settlement Administrator. *See* ECF 206 at 4 (noting that the Parties should include the proposed amount and cap to be paid to the settlement administrator). The Court should approve and designate Steven Weisbrot of Angeion Group, LLC as Class Action Settlement Administrator. *See* Exhibit B, Declaration of Steve Weisbrot.

> **H.      The parties shall carefully evaluate the scope of the release of claims. . . Counsel shall address any differences between the claims to be released and the claims in the operative complaint . . . and an explanation as to why the differences are appropriate in the instant case.**

Under the Settlement Agreement, Settlement Class Members and Defendant release any and all claims and causes of action that were or could have been brought in in this litigation based on, relating to, concerning or arising out of the alleged PCB-related environmental impairments, including to water bodies. Ex. A, Settlement Agreement ¶ 106.  Settlement Class Members are only releasing claims based on the identical factual predicate, as required under Ninth Circuit precedent. *See Hesse v. Sprint Corp.*, 598 F.3d 581, 590 (9th Cir. 2010). Under controlling precedent, the Ninth Circuit has "held that federal district courts properly released claims not alleged in the underlying complaint where those claims depended on the same set of facts as the claims that gave rise to the

settlement." *Id*. There are not any material differences between the claims being released and the claims set out in the operative Third Amended Complaint. Defendant will also release Named Class Plaintiffs and Settlement Class Members from any claims arising out of or relating to PCB contamination they have alleged or could have alleged. *See* Exhibit A, Settlement Agreement ¶ 106.

**I.      The parties shall address whether notice under the Class Action Fairness Act ("CAFA") is required and, if so, when it will be given. In addition, the parties should address substantive compliance with CAFA.**

Notice under CAFA is required pursuant to 28 U.S.C. § 1715. Under the terms of Settlement Agreement, Monsanto will complete CAFA notice. *See* Exhibit A, ¶ 87. On July 2, 2020, Monsanto completed CAFA notice to the appropriate state and federal officials. No other substantive provisions of CAFA are implicated here.

**J.      Identification of any agreement made in connection with the settlement.**

No side agreements requiring scrutiny under Rule 23(e)(2)(c)(iv) exist. This provision is aimed at "related undertakings that, although seemingly separate, may have influenced the terms of the settlement by trading away possible advantages for the class in return for advantages for others." Fed. R. Civ. P. 23(e), 2003 Adv. Comm. Notes. The Parties have not entered into any such agreements. All relevant settlement agreements are contained in the Settlement Agreement.

**VII.   <u>THE COURT SHOULD APPROVE THE CONTENT AND DISTRIBUTION OF THE PROPOSED NOTICE TO THE SETTLEMENT CLASS MEMBERS</u>**

Here, the Parties propose that the Court require the Class Action Settlement Administrator to provide Notice of the proposed Settlement as described above and in the Settlement Agreement and Notice Plan. The proposed Class Action Settlement Administrator has also attested that implementation of the Notice Plan in the manner set forth in the Settlement Agreement is fair, appropriate and constitutes "the best notice

practicable" under the circumstances. *See* Ex. B, Declaration of Steve Weisbrot at ¶¶ 11, 23.

## VIII.  THE COURT SHOULD APPOINT CLASS COUNSEL

Pursuant to Fed. R. Civ. P. 23(g), a Court certifying a case as a class action "must appoint class counsel." Class Counsel respectfully request that the Court appoint them as Class Counsel. The experience and qualifications of the proposed Class Counsel are established, and the proposed Class Counsel will zealously prosecute the claims of the Settlement Class Members.[5] *See* Exs. C, D, Declarations of Scott Summy and John Fiske. The Court should appoint Scott Summy, John Fiske, and Carla Burke Pickrel of Baron & Budd, P.C. as Lead Class Counsel, and John Gomez of Gomez Trial Attorneys, John R. Wertz, Esq., and Richard Gordon and Martin Wolf of Gordon Carney & Wolf as Co-Class Counsel.

## IX.  ESTABLISHMENT OF FINAL APPROVAL AND FAIRNESS HEARING AND ASSOCIATED DEADLINES

The Parties propose the following schedule regarding Notice to the Settlement Classes and final approval of the Settlement Agreement:

| Event | Time For Compliance |
| --- | --- |
| Preliminary Approval Hearing | August __, 2020 |
| Entry of Preliminary Approval Order | TBD |
| Direct Notice Mailed to Settlement Class Members | 5 days from entry of Preliminary Approval Order. |
| Deadline for Opting Out or Objecting | 65 days from entry of Preliminary Approval Order. |
| Final Approval Hearing | May 2021 (proposed). |

---

[5] Defendant takes no position on the appointment of Class Counsel, except that certain Lead and Co-Class Counsel are contemplated and agreed to in the Settlement Agreement.

# X.   <u>CONCLUSION</u>

For the reasons stated above, the proposed Settlement Agreement is the product of serious, non-collusive, arm's-length negotiations, and is a fair, reasonable, and adequate resolution of Plaintiffs' claims. The proposed Notice and Notice Plan also satisfy Rule 23's due process requirements.  As a result, the Parties respectfully request that the Court grant their motion and enter the proposed order attached hereto which:  (1) grants certification of the Settlement Class; (2) grants preliminary approval of the Settlement Agreement; (3) approves the Notice and Notice Plan; (4) appoints Class Counsel; (5) and appoints Steven Weisbrot of Angeion Group, LLC as Class Action Settlement Administrator.

Dated August 7, 2020                    Respectfully submitted,

                                         /s/ John Fiske
                                        **BARON & BUDD, P.C.**
                                        11440 W. Bernardo Court, Suite 265
                                        San Diego, California 92127
                                        Telephone: (858) 251-7424

                                        **BARON & BUDD, P.C.**
                                        Scott Summy (admitted *Pro Hac Vice*, Texas Bar
                                        No. 19507500)
                                        SSummy@baronbudd.com
                                        Carla Burke Pickrel (admitted *Pro Hac Vice*,
                                        Texas Bar No. 24012490)
                                        cburkepickrel@baronbudd.com
                                        3102 Oak Lawn Ave, #1100
                                        Dallas, Texas 75219
                                        Telephone: (214) 521-3605

                                        ***Attorneys for Plaintiffs and the Class***

# EXHIBIT INDEX

| EX. | DESCRIPTION |
|-----|-------------|
| A | Settlement Agreement |
| B | Declaration of Steve Weisbrot |
| C | Declaration of Scott Summy |
| D | Declaration of John Fiske |
| D-1 | Declaration of Michael Trapp |
| D-2 | Declaration of Rob Hesse |
| E | Declaration of Hon. (Ret.) Jay Gandhi |
| F | Sediment Sites Application |
| G | Special Needs Fund, Part A Application |
| H | Special Needs Fund, Part B Application |
| I | Initial Settlement Class Members |
| J | Declarations of 13 Class Representatives |
| K | Supplemental Declaration of Michael Trapp |
| L | Supplemental Declaration of Rob Hesse |

CASE NO.: 2:16-cv-03493-FMO-AS
RENEWED MOTION FOR CERTIFICATION