**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| CITY OF LONG BEACH, et al., individually and on behalf of all others similarly situated,<br><br>                    Plaintiffs,<br><br>          v.<br><br>MONSANTO COMPANY, et al.,<br><br>                    Defendants. | Case No. CV 16-3493 FMO (ASx)<br><br>**ORDER RE: MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT** |

     Having reviewed and considered all the briefing filed with respect to plaintiffs' renewed Motion for Certification of Settlement Class, Preliminary Approval of Class Action Settlement, Approval of Notice Plan, Appointment of Class Action Settlement Administrator, and Appointment of Class Counsel (Dkt. 278, "Motion"), and the oral argument presented at the hearings on February 18, 2021, and May 19, 2021, the court concludes as follows.

## BACKGROUND

     The City of Long Beach ("City") filed the instant action against Monsanto Company, Solutia Inc., and Pharmacia LLC (collectively, "Monsanto" or "defendant") on May 19, 2016.  (See Dkt. 1, Complaint).  The City's lawsuit is one of several similar lawsuits against Monsanto filed in courts across the country by the County of Los Angeles, City of Chula Vista, City of San Diego, City of San Jose, City of Oakland, City of Berkeley, City of Spokane, City of Tacoma, City of Portland,

Port of Portland, Baltimore County, Mayor and City Council of Baltimore (together with the City, collectively "plaintiffs") (Dkt. 189-1, Memorandum of Points and Authorities in Support of Plaintiff's Motion for Leave to Amend Complaint at 2); (Dkt. 256-1, Memorandum of Points and Authorities in Support of [First] Renewed Motion for Certification of Settlement Class, Preliminary Approval of Class Action Settlement, Approval of Notice Plan, Appointment of Class Action Settlement Administrator, and Appointment of Class Counsel ("Memo I") at 10).[1]  Plaintiffs' claims revolve around allegations that Monsanto's design, manufacture, sale, promotion, and supply of chemicals known as polychlorinated biphenyls ("PCBs") resulted in the contamination of water bodies and stormwater systems with PCBs.  (See Dkt. 256-1, Memo I at 1, 10).

On July 8, 2020, plaintiffs collectively filed the operative class action complaint in this court against Monsanto asserting state law claims for public nuisance, strict liability (design defect), strict liability (failure to warn), negligence, and trespass.  (See Dkt. 201, Plaintiffs' Third Amended Complaint for Class Action ("TAC") at ¶¶ 13-28, 100-161).  Plaintiffs allege that PCB contamination of their stormwater, stormwater systems, waterbodies, and/or sediments requires corrective action.  (See Dkt. 256-1, Memo I at 11); (Dkt. 201, TAC at ¶¶ 1, 6-7, 10, 12, 85-89).  The relief plaintiffs seek consists of the costs of:  (1) testing and monitoring water resources; (2) removing PCBs from sediment areas; (3) reducing PCB levels in stormwater; and (4) complying with any applicable regulations requiring additional measures.  (See Dkt. 201, TAC at Prayer for Relief); (see Dkt. 256-1, Memo I at 11).

Over the course of several years, the parties heavily litigated the Public Entity Cases, and in some actions, such as the Spokane and San Diego actions, the cases advanced beyond the

---

[1]   The cases include:  City of Long Beach v. Monsanto Co., CV 16-3493 (C.D. Cal.); City of Berkeley v. Monsanto Co., CV 16-0071 (N.D. Cal.); City of San Diego v. Monsanto Co., CV 15-0578 (S.D. Cal.); City of Oakland v. Monsanto Co., CV 15-5152 (N.D. Cal.); City of San Jose v. Monsanto Co., CV 15-3178 (N.D. Cal.); Mayor and City Council of Baltimore v. Monsanto Co., CV 19-0483 (D. Md.); City of Chula Vista v. Monsanto Co., CV 18-1942 (S.D. Cal.); County of Los Angeles; L.A. County Flood Control District v. Monsanto Co., 19-0464 (C.D. Cal.); Port of Portland v. Monsanto Co., CV 17-0015 (D. Or.); City of Portland v. Monsanto Co., CV 16-1418 (D. Or.); and City of Spokane v. Monsanto Co., CV 15-0201 (E.D. WA.) (collectively, "Public Entity Cases") (Dkt. 256-1, Memo I at 10).

summary judgment stage.  (See 256-1, Memo I at 11).  In early 2019, the parties engaged in preliminary and exploratory discussions regarding settlement, and subsequently participated in several mediation sessions conducted by JAMS mediator, Judge Jay C. Gandhi (Ret.).  (Id.). Plaintiffs and Monsanto reached a proposed settlement to resolve all pending litigation and potential claims in June 2020.[2]  (See Dkt. 256-5, Declaration of Scott Summy ("Summy Decl.") at ¶ 21).  The parties have defined the settlement class as follows:

> As of June 24, 2020 only, but not later, all NPDES Phase I and II city, town, village, borough, township, and independent port district [Municipal Separate Storm Sewer System ("MS4")] permittees with jurisdictional boundaries within a HUC 12 Watershed that contains and/or is immediately adjoining a 303(d) water body impaired by PCBs and all NPDES Phase I and II county MS4 permittees with urbanized, unincorporated boundaries within a HUC 12 Watershed that contains and/or is immediately adjoining a 303(d) water body impaired by PCBs.[3]

(Dkt. 278-2, Class Action Settlement Agreement ("Settlement Agreement") at ¶¶ 51, 75); (Dkt. 256-1, Memo I at 12).  In other words, the class consists of "permitted stormwater system operators located within a watershed that discharges into a body of water impaired for PCBs." (Dkt. 256-1, Memo I at 12).

The Settlement Agreement identifies 2,528 Initial Settlement Class Members based on three publicly maintained databases:  (1) the EPA'S 303(d) list of bodies of water impaired by

---

[2]  As part of the settlement, the City sought leave to file an amended complaint to add class allegations and named plaintiffs.  (See Dkt. 189-1, Memorandum of Points and Authorities in Support of Plaintiff's Motion for Leave to Amend Complaint).

[3]  The term "MS4 permittees" "describes those cities, towns, villages, boroughs, townships, counties, and independent port districts permitted under the Clean Water Act's National Pollutant Discharge and Elimination System ('NPDES') permit process."  (Dkt. 256-1, Memo I at 12). NPDES "refers to the United States Environmental Protection Agency National Pollutant Discharge Elimination System, including its permit program, created by the Clean Water Act of 1972, 33 U.S.C. § 1251 et seq., as amended."  (Dkt. 278-2, Settlement Agreement at ¶ 30).  A "303(d) water body" is a body of water listed on the EPA "Clean Water Act Section 303(d) list of waters impaired or threatened by  [PCBs]."  (Id. at ¶ 2); (Dkt. 256-1, Memo I at 12).

PCBs; (2) the United States Geological Survey ("USGS") HUC 12 Watersheds;[4] and (3) the U.S. Census Bureau.  (See Dkt. 278-2, Settlement Agreement at ¶ 75); (id., Exh. A) (Initial Settlement Class Members).  According to the Settlement Agreement, the following geospatial and data overlay analyses reveal the total, finite list of Initial Settlement Class Members:

> First, all 303(d) water bodies impaired by PCBs were identified.  Then, all USGS HUC 12 Watersheds, which contain and/or are immediately adjoining all 303(d) water bodies impaired by PCBs were identified.  Thirdly, as of June 24, 2020 only, but not later, the NPDES Phase I and II city, town, village, borough, township, and  independent port district MS4 permittees with jurisdictional boundaries within a HUC 12 Watershed that contains and/or is immediately adjoining a 303(d) water body impaired by PCBs and all NPDES Phase I and II county MS4 permittees with urbanized, unincorporated boundaries within a HUC 12 Watershed that contains and/or is immediately adjoining a 303(d) water body impaired by PCBs, were identified.  The U.S. Census Bureau database was used to identify all class members except townships, which were originally identified as MS4 permittees by EPA and then confirmed using the U.S. Census Bureau database.

(Dkt. 278-2, Settlement Agreement at ¶ 75); (Dkt. 256-1, Memo I at 13).

According to plaintiffs, class members may have been affected by Monsanto's PCBs in one or more of the following ways:  (1) the need to monitor PCBs in stormwater; (2) the need to comply with a regulatory Total Maximum Daily Load ("TMDL") under the NPDES program; and/or (3) the need to comply with sediment remediation costs under a regulatory Superfund or Category 4(b) clean-up order.  (See Dkt. 256-1, Memo I at 13).  The Settlement Agreement creates three funds to compensate the three main identified harms, while a fourth fund was created "to compensate litigating entities for the time and expense of litigation and to compensate special needs and costs

---

[4] An HUC 12 Watershed is defined as a USGS "12-Digit Hydrologic Unit Code Watershed." (Dkt. 278-2, Settlement Agreement at ¶ 20).

of class members."  (Id.).  Pursuant to the settlement, defendant will  pay up to $550 million to be allocated among the four funds as follows:  (1) Monitoring Fund of $42,894,993; (2) TMDL Fund of $250,000,000; (3) Sediments Fund of $150,000,000; and (4) Special Needs Fund of $107,105,007.  (See Dkt. 278-2, Settlement Agreement at ¶¶ 73 & 76).

The Monitoring Fund will provide a minimum payment to 2,320 class members, "which excludes Settlement Class Members that receive over $100,000 from the TMDL Fund and Settlement Class Members that are also Sediment Site Entities."[5]  (Dkt. 278-2, Settlement Agreement at ¶ 77).  The Monitoring Fund

> provides payment at four general levels based on whether the Initial
> Settlement Class Member is a Phase I or Phase II NPDES Permittee, and
> whether the Initial Settlement Class Member contains a population of at least
> 100,000.   Independent port districts are excluded from the population
> consideration and therefore included in levels above 100,000.   Phase I
> Permittees are generally larger than Phase II Permittees.  Class Members
> that are also TMDL Entities receiving over one hundred thousand dollars
> ($100,000) from the TMDL Fund will not receive money from the Monitoring
> Fund.  Class Members that are also TMDL Entities receiving between fifty
> thousand dollars ($50,000) and one hundred thousand dollars ($100,000)
> from the TMDL Fund will receive partial payments ("Monitoring Fund Partial
> Payments") from the Monitoring Fund.   These Monitoring Fund Partial
> Payments are calculated on a sliding scale:  for every one thousand dollars
> ($1,000) above fifty thousand dollars ($50,000) received from the TMDL
> Fund, the Monitoring Fund Partial Payment will be reduced by two percent
> (2%) of a Base Payment.  Base Payments are as follows: thirty thousand
> dollars ($30,000) for Phase I permittees with a population greater than or

---

[5]  The Monitoring Fund class members include 2,306 class members receiving no money or less than $50,000 from the TMDL Fund and 14 class members receiving more than $50,000 but less than $100,000 from the TMDL Fund.  (Dkt. 278-2, Settlement Agreement at ¶ 77).

equal to one hundred thousand (100,000) and Phase I independent port districts; twenty thousand dollars ($20,000) for Phase I permittees with a population less than one hundred thousand (100,000); twenty five thousand dollars ($25,000) for Phase II permittees with a population greater than or equal to one hundred thousand (100,000) and Phase II independent port districts; fifteen thousand dollars ($15,000) for Phase II permittees with a population less than one hundred thousand (100,000).  Settlement Class Members that are also TMDL Entities receiving less than $50,000 from the TMDL Fund will receive the full Monitoring Fund payment.[6]

(Id. at ¶ 77).  Any amounts allocated to a Settlement Class Member under the Monitoring Fund that opts out will be reallocated to other class members utilizing the same formula.  (See id.).

The TMDL Fund "includes only those [242] Initial Settlement Class Members that are subject to and/or responsible for, as of June 24, 2020 only, but not later, a TMDL, TMDL Alternative, or TMDL Direct-to-Implement regulation, promulgated or updated after January 1, 2010, wherein PCB is a named constituent." (Dkt. 278-2, Settlement Agreement at ¶ 78(a)); (id. at Exh. D) (TMDL Fund Entities).  "TMDL funds are intended to compensate Settlement Class Members for restitution and remediation including mitigation of contaminated property, stormwater, and/or stormwater systems, including compliance with a TMDL."[7]  (Dkt. 278-2, Settlement

---

[6]  Notwithstanding any other payment made within the Allocation of the overall settlement, (see Dkt 278-2, Settlement Agreement at ¶ 4), Phase I Initial Settlement Class Members receiving no money or less than $50,000 from the TMDL Fund, with populations greater than or equal to 100,000, and Phase I independent port districts will each receive $32,024.47; Phase I Initial Settlement Class Members receiving no money or less than $50,000 from the TMDL Fund, with populations less than 100,000 will each receive $22,024.47; Phase II Initial Settlement Class Members receiving no money or less than $50,000 from the TMDL Fund, with populations greater than or equal to 100,000, and Phase II independent port districts each will receive $27,024.47; Phase II Initial Settlement Class Members receiving no money or less than $50,000 from the TMDL Fund, with populations less than 100,000 each will receive $17,024.47.  (See id. at ¶ 77).

[7]  "The TMDL Funds are further allocated among all 242 TMDL Fund Entities using the following TMDL Allocation Calculation: for all TMDL Fund Entities, multiply (1) the total jurisdictional area within any HUC 12 Watershed that contains and/or is immediately adjoining a 303(d) water body with a PCB TMDL, by (2) the USGS Geodatabase Imperviousness of such

Agreement at ¶ 78(a)).  "Any amounts allocated to a Settlement Class Member that opts out will be reallocated within the formula for the TMDL Fund." (Id.).  "To account for population in the equitable allocation of the TMDL Fund, each TMDL Fund Entity town, city, village, borough, or township with a population of more than 1 million, and each TMDL Fund Entity county with a population of more than 2 million, will receive a Population Factor Award of $2 million." (Id. at ¶ 78(c)).  No TMDL Fund Entity will receive more than $7,500,000 as an absolute maximum recovery under the TMDL Fund, regardless of whether a Population Factor Award would otherwise have provided for an amount greater than $7,500,000.  (See id. at ¶ 78(d)); (id. at Exh. D) (TMDL Fund Entities).

The Sediment Sites Fund includes "Initial Settlement Class Members that, as of June 24, 2020 only, but not later, are a Noticed Party or named Responsible Party in at least one of three types of regulated Sediment Sites wherein PCBs have contaminated sediments due to stormwater contribution." (Dkt. 278-2, Settlement Agreement at ¶ 79(a)).  The three types of Sediment Sites include the following: "(1) U.S. EPA Superfund Sites, (2) U.S. EPA Large Sediment Sites, and/or (3) Clean Water Act Category 4b Sites/Waters." (Id.).  The fund is "intended to compensate Class Members for restitution and remediation, including mitigation of contaminated property, stormwater and/or stormwater systems, and including compliance with a regulatory process."[8] (Id.).  The fund will be allocated among 12 "Qualifying Sediment Site Entities[,]" (id. at ¶ 79(c)-(d)); (id., Exh. E)

---

jurisdictional area (known as "Weighted Imperviousness").  Then, proportionally normalize all Weighted Imperviousness values to calculate a weighted, relative percentage for each TMDL Fund Entity.  Lastly, multiply (1) the weighted, relative percentage for each TMDL Fund Entity, by (2) the total fund less Population Factor Awards. A 0.7 multiplier is applied to any TMDL Fund Entity with a population of less than one hundred thousand (100,000)."  (Dkt. 278-2, Settlement Agreement at ¶ 78(b)) (footnote omitted).

[8]   The nine Sediment Sites where "at least one Initial Settlement Class Member, as of June 24, 2020 only, but not later, is a Noticed Party or named Responsible Party due to stormwater contribution of PCBs are: Diamond Alkali-Lower Passaic River (Newark, New Jersey); Newtown Creek (New York, New York); Gowanus Canal (New York, New York); Lower Duwamish Waterway (Seattle, Washington); Portland Harbor (Portland, Oregon); Commencement Bay, Near Shore/Tide Flats (Tacoma, Washington); Harbor Island (Lead) (Seattle, Washington); Pacific Sound Resources (Seattle, Washington); San Diego Bay (San Diego, California)."  (Dkt. 278-2, Settlement Agreement at ¶ 79(b)).

(Sediment Site Entities), "other than any Opt-Out Litigating Entity, pursuant to a Court-appointed Special Master, who will equitably allocate Sediment Site funds, upon application, based on the totality and relativity of the following PCB-caused factors:  past costs and expenses spent as of the date of the application for Sediment Site remediation; past costs and expenses spent as of the date of the application for other mitigation required due to the Sediment Site; as estimated, including with documents and evidence the future costs and expenses that will be spent for Sediment Site remediation; as estimated, including with documents and evidence the future costs and expenses that will be spent for mitigation required due to the Sediment Site; and any other important factors or information deemed relevant by the Special Master."[9]  (Id. at ¶ 79(d)); (see id. at ¶ 79(e) & Exh. F) (Sediment Sites Fund Application).  "For each Opt-Out Litigating Entity Qualifying Sediment Site Entity, the Sediment Sites Fund shall be reduced by $12,500,000 . . . and this amount shall be subtracted from the total Settlement Fund[,] with the balance of the Sediment Sites Fund being allocated to the Non-Opt-Out Qualifying Sediment Site Entities."[10]  (Id. at ¶ 79(e)).

The Special Needs Fund is comprised of two separate funds – Special Needs Fund, Part A and Special Needs Fund, Part B.  (See Dkt. 278-2, Settlement Agreement at ¶ 80(a)).  The Special Needs Fund, Part A is allocated $57,105,000 "to compensate and accommodate those

---

[9]  The Qualifying Sediment Site Entities include the 12 "Initial Settlement Class Members that, as of June 24, 2020 only but not later, are Noticed Parties or named Responsible Parties, due to stormwater contribution of PCBs, in at least one Sediment Site: City of Newark, New Jersey; City of New York, New York; City of Seattle, Washington; King County, Washington; Port of Seattle, Washington; City of Tukwila, Washington; City of Tacoma, Washington; Port of Tacoma, Washington; City of Portland, Oregon; Port of Portland, Oregon; City of San Diego, California; Port of San Diego, California."  (Dkt. 278-2, Settlement Agreement at ¶ 79(c)).

[10] According to plaintiffs, the adjustment in the Sediment Site Fund for an Opt-Out Litigating Entity "is necessary because Litigating Entities, particularly those eligible for the Sediment Sites Fund, . . . present a greater risk to Defendant [because that entity's] separate pending lawsuit would move forward [and] Defendant would need to continue to defend them, at a significant expense."  (Dkt. 267-1, Memorandum of Points and Authorities in Support of Renewed Motion for Certification of Settlement Class, Preliminary Approval of Class Action Settlement, Approval of Notice Plan, Appointment of Class Action Settlement Administrator, and Appointment of Class Counsel ("Memo II") at 5).

Litigating Entities[11] whose time, energy, effort, attorney work product, costs, expenses, and risk of litigation helped to cause the entire Class Settlement, for the benefit of all 2,528 Initial Settlement Class Members." (Id. at ¶ 80(b)) (footnote added).  It will be

> allocated pursuant to a Court-appointed Special Master, who will equitably and reasonably allocate . . . funds, upon application, based on the totality and relativity of the following factors: whether outside counsel was retained; whether a lawsuit was filed; how long the lawsuit was filed at the time of Preliminary Class Approval; the case posture and procedure of any lawsuit; the amount, time, energy, cost, and productivity during discovery with Defendants; the retention of experts; the development of expert testimony and reports; the preparation and presentation of experts for deposition; the litigation of significant motions, including but not limited to motions to dismiss, discovery motions, motions for summary judgment or adjudication, in limine motions, and other motions; and any other important factors or information deemed relevant by the Special Master as having a significant impact on, or catalyst for, th[e] Settlement. . . . The Special Master will give attention and consideration to any Litigating Entity that has incurred attorneys' fees to outside counsel, other than Lead or Co-Class Counsel.  The Special Master will reasonably and equitably prioritize and reimburse any Litigating Entity that, through outside counsel other than Lead or Co-Class Counsel, incurred

---

[11]  "Litigating Entities are Initial Settlement Class Members that, as of June 24, 2020 only, but not later, (1) have filed tort, public nuisance, and/or product liability lawsuits against Defendants for PCB contamination of stormwater and sediment, and/or (2) that are Named Class Members. Litigating Entities include only the following fifteen (15) Initial Settlement Class Members: City of Chula Vista, City of San Diego, Unified Port District of San Diego, City of Long Beach, County of Los Angeles, City of San Jose, City of Berkeley, City of Oakland, City of Portland, Port of Portland, City of Seattle, City of Tacoma, City of Spokane, City of Baltimore, and Baltimore County."  (Dkt. 278-2, Settlement Agreement at ¶ 80(c)).

reasonable, documented out-of-pocket litigation costs.[12]

(Id. at ¶ 80(d)); (see id. at ¶ 80(f) & Exh. G) (Part A Application).  However, "Litigating Entities, which as of October 2019, were under contract for representation by Lead or Co-Class Counsel shall not recover for outside counsel fees in the Special Needs Fund, Part A.  Litigating Entities that retained outside counsel prior to October 2019, and that were not under contract for representation by Lead or Co-Class Counsel, may apply for and receive, subject to Special Master Allocation, an equitable and reasonable allocation for such outside counsel, including attorneys' fees and costs.  Nothing . . . shall prevent any Litigating Entity from applying for and receiving, subject to Special Master Allocation, an equitable allocation for in-house or general counsel fees, overhead, salaries, time, energy, costs, resources, and/or attention, including but not limited to city attorneys, county counsel, and/or general counsel."  (Id. at ¶ 80(e)).

The Special Needs Fund, Part B is allocated $50,000,007 and will be "available to all Settlement Class Members who apply and make a showing, in the discretion of the Special Master, of a significant regional, state, or national benefit, cost, or contribution regarding 303(d) bodies of water impaired by PCBs through stormwater and/or dry weather runoff, and such benefit, cost, or contribution is not otherwise encompassed within any other part of th[e] Allocation." (Dkt. 278-2, Settlement Agreement at ¶ 80(h)); (see id. at ¶ 80(i) & Exh. H) (Part B Application).  However, submission of an "[a]pplication does not guarantee that the Special Master will allocate Part B Funds to the applicant." (Id. at ¶ 80(i)).  The Special Needs Fund, Part B Application must be submitted "within one [] year and fourteen [] days of the date of the Class Action Settlement Administrator's mailing of Monitoring Fund payments to Settlement Class Members." (Id.).

With respect to the Sediment Sites Fund and the Special Needs Funds, the settlement provides for an appeals process to be created by the Special Master.  (See Dkt. 278-2, Settlement Agreement at ¶¶ 79(f), 80(g), 80(j)).  As part of that process, the Special Master will establish reserve funds to be used to make payments as a result of successful appeals.  (See Dkt. 278-2,

---

[12] In addition, the Litigating Entities not represented by Lead or Co-Class Counsel shall be allowed to file a Special Needs Fund, Part A Application that exceeds 25 pages.  (See Dkt. 280, Response to San Diego Unified Port District's June 24, 2021 Response at 2).

Settlement Agreement at ¶¶ 79(f), 80(g)).  Moreover, "Settlement Class Members can seek de novo review by the Court with respect to each of the Special Master's determinations." (Id. at ¶ 81(b)).

In addition, defendant will be solely responsible for all costs and expenses necessary to implement the settlement.  (See Dkt. 278-1, Memorandum of Points and Authorities in Support of Renewed Motion for Certification of Settlement Class, Preliminary Approval of Class Action Settlement, Approval of Notice Plan, Appointment of Class Action Settlement Administrator, and Appointment of Class Counsel ("Memo III") at 3).  More specifically, defendant will pay "Claims Administration Expenses[,]" which includes the "costs and expenses incurred in (1) the notice process, which includes all costs incurred in connection with preparing, printing, publishing, and mailing the Direct Notice; and (2) the administration process, which includes all costs and expenses incurred to hire a Class Action Settlement Administrator and costs of processing claims and administering the Settlement Agreement[,]"[13] (Dkt. 278-2, Settlement Agreement at ¶ 10), as well as the costs of the Special Master.  (See id. at ¶¶ 58, 73); (Dkt. 278-1, Memo III at 2-3).  The parties propose Steven Weisbrot ("Weisbrot") of Angeion Group, LLC to serve as the Settlement Administrator.  (See Dkt. 278-2, Settlement Agreement at ¶ 11).

Finally, class counsel "agrees to request approval" of an award of attorney's fees and expenses not to exceed $98,000,000, (Dkt. 278-2, Settlement Agreement at ¶ 103), which will be paid separate and apart from the Settlement Fund.  (See id.).  Attorney's fees and expenses include "attorneys' fees, costs, litigation expenses, and fees and expenses of litigation experts." (Id. at ¶ 7).  They do not include "Claims Administration Expenses or costs and expenses for implementing the Allocation by the Special Master and/or Allocation Experts."  (Id.).  As noted above, the expenses of the Special Master "shall be paid by Defendant."  (Id. at ¶ 58).

In their Motion, plaintiffs seek an order:  (1) preliminarily approving the proposed settlement; (2) certifying the proposed settlement class; (3) appointing Scott Summy ("Summy"), John Fiske

---

[13]    Claims Administration Expenses does "not include the costs and expenses of the Special Master and any consulting experts assigned to assist the Special Master in developing the Allocation Process."  (Dkt. 278-2, Settlement Agreement at ¶ 10).

("Fiske") and Carla Burke Pickrel ("Pickrel") of Baron & Budd, P.C. as lead class counsel, and John Gomez ("Gomez") of Gomez Trial Attorneys, John R. Wertz ("Wertz"), and Richard Gordon ("Gordon") and Martin Wolf ("Wolf") of Gordon Carey & Wolf as co-class counsel; (4) appointing Weisbrot as settlement administrator; (5) approving and ordering dissemination of the proposed class notice and forms; and (6) scheduling a final approval hearing.  (See Dkt. 278, Motion at 2); (Dkt. 278-1, Memo III at 1-2, 7-8); (Dkt. 267-1, Memo II at 1-2, 14-16); (see also Dkt. 256-1, Memo I at 32) (discussing adequacy of proposed class representatives).

## **LEGAL STANDARDS**

### I.    CLASS CERTIFICATION.

At the preliminary approval stage, the court "may make either a preliminary determination that the proposed class action satisfies the criteria set out in Rule 23 . . . or render a final decision as to the appropriateness of class certification."[14]  Smith v. Wm. Wrigley Jr. Co., 2010 WL 2401149, *3 (S.D. Fla. 2010) (citation and footnote omitted); see also Sandoval v. Roadlink USA Pac., Inc., 2011 WL 5443777, *2 (C.D. Cal. 2011) (citing Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 620, 117 S.Ct. 2231, 2248 (1997) ("Amchem")) ("Parties seeking class certification for settlement purposes must satisfy the requirements of Federal Rule of Civil Procedure 23[.]").   In the settlement context, a court must pay "undiluted, even heightened, attention" to class certification requirements.  Amchem, 521 U.S. at 620, 117 S.Ct. at 2248; In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig., 895 F.3d 597, 606 (9th Cir. 2018) (same).  "Such attention is of vital importance, for a court asked to certify a settlement class will lack the opportunity, present when a case is litigated, to adjust the class, informed by the proceedings as they unfold."  Amchem, 521 U.S. at 620, 117 S.Ct. at 2248.

A party seeking class certification must first demonstrate that: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the

---

[14]  All "Rule" references are to the Federal Rules of Civil Procedure.

class."  Fed. R. Civ. P. 23(a).

"Second, the proposed class must satisfy at least one of the three requirements listed in Rule 23(b)."  Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 345, 131 S.Ct. 2541, 2548 (2011) ("Dukes").  Rule 23(b) is satisfied if:

> (1) prosecuting separate actions by or against individual class members would create a risk of:
>
>> (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or
>>
>> (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;
>
> (2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or
>
> (3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  The matters pertinent to these findings include:
>
>> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>>
>> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>>
>> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>>
>> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(1)-(3).

The party seeking class certification bears the burden of demonstrating that the proposed class meets the requirements of Rule 23.  See Dukes, 564 U.S. at 350, 131 S.Ct. at 2551 ("A party seeking class certification must affirmatively demonstrate his compliance with the Rule – that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc.") (emphasis in original).  However, courts need not consider the Rule 23(b)(3) issues regarding manageability of the class action, as settlement obviates the need for a manageable trial.  See In re Hyundai and Kia Fuel Econ. Litig., 926 F.3d 539, 556-57 (9th Cir. 2019) (en banc) ("In re Hyundai") ("The criteria for class certification are applied differently in litigation classes and settlement classes.  In deciding whether to certify a litigation class, a district court must be concerned with manageability at trial.  However, such manageability is not a concern in certifying a settlement class where, by definition, there will be no trial.").

II.     FAIRNESS OF CLASS ACTION SETTLEMENT.

Rule 23 provides that "[t]he claims, issues, or defenses of a certified class – or a class proposed to be certified for purposes of settlement – may be settled . . . only with the court's approval."  Fed. R. Civ. P. 23(e).  "The primary concern of [Rule 23(e)] is the protection of th[e] class members, including the named plaintiffs, whose rights may not have been given due regard by the negotiating parties."  Officers for Just. v. Civ. Serv. Comm'n of the City & Cty. of S.F., 688 F.2d 615, 624 (9th Cir. 1982).  Whether to approve a class action settlement is "committed to the sound discretion of the trial judge."  Class Plaintiffs v. City of Seattle, 955 F.2d 1268, 1276 (9th Cir. 1992).

Approval of a class action settlement requires a two-step process – preliminary approval and the dissemination of notice to the class, followed by a later final approval.  See Spann v. J.C. Penney Corp., 314 F.R.D. 312, 319 (C.D. Cal. 2016).  Although "[c]loser scrutiny is reserved for the final approval hearing[,]" Harris v. Vector Mktg. Corp., 2011 WL 1627973, *7 (N.D. Cal. 2011), "the showing at the preliminary approval stage – given the amount of time, money, and resources involved in, for example, sending out . . . class notice[] – should be good enough for final approval."  Spann, 314 F.R.D. at 319; see 4 Newberg on Class Actions § 13:10 (5th ed.) (Supp. 2021) ("[S]ending notice to the class costs money and triggers the need for class members to

14

consider the settlement, actions which are wasteful if the proposed settlement [is] obviously deficient from the outset.").   The court may grant preliminary approval and direct notice in a reasonable manner to all class members who would be bound by the settlement if the parties provide sufficient information to the court to show that the court will likely be able to: (1) "approve the proposal under Rule 23(e)(2)"; and (2) "certify the class for purposes of judgment on the [settlement] proposal." Fed. R. Civ. P. 23(e)(1)(B); see Macy v. GC Services Limited Partnership, 2019 WL 6684522, *1 (W.D. Ky. 2019) ("The standard for preliminary approval was codified in 2018, with Rule 23 now providing for notice to the class upon the parties showing that the court will likely be able to approve the proposed settlement under the final-approval standard contained in Rule 23(e)(2)."); 4 Newberg on Class Actions § 13:10 (5th ed.) ("In 2018, Congress codified this approach into Rule 23.  Rule 23(e)(1)(B) now sets forth the grounds for the initial decision to send notice of the proposed settlement to the class[.]").

"At this stage, the court may grant preliminary approval of a settlement and direct notice to the class if the settlement:  (1) appears to be the product of serious, informed, non-collusive negotiations; (2) has no obvious deficiencies; (3) does not improperly grant preferential treatment to class representatives or segments of the class; and (4) falls within the range of possible approval." Spann, 314 F.R.D. at 319 (internal quotation marks omitted); see Bronson v. Samsung Elecs. Am., Inc., 2019 WL 5684526, *7 (N.D. Cal. 2019) ("Preliminary approval is appropriate if the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class, and falls within the range of possible approval.") (internal quotation marks omitted); see also 2018 Adv. Comm. Notes to Amendments to Rule 23(e)(1) (The types of information that should be provided to the court in deciding whether to send notice – i.e., that it will likely approve the settlement under Rule 23(e)(2) and certify the class for purposes of settlement – "depend on the specifics of the particular class action and proposed settlement." "[G]eneral observations" as to the types of information that should be provided include, but are not limited to, the following:  (1) "the extent and type of benefits that the settlement will confer on the members of the class" and if "funds are . . . left unclaimed, the settlement agreement ordinarily

should address the distribution of those funds"; (2) "information about the likely range of litigated outcomes, and about the risks that might attend full litigation"; (3) "[i]nformation about the extent of discovery completed in the litigation or in parallel actions"; (4) "information about the existence of other pending or anticipated litigation on behalf of class members involving claims that would be released under the proposal"; (5) "the proposed handling of an award of attorney's fees under Rule 23(h)"; (6) "any agreement that must be identified under Rule 23(e)(3)"; and (7) "any other topic that [the parties] regard as pertinent to the determination whether the proposal is fair, reasonable, and adequate.").

## **DISCUSSION**

I.     CLASS CERTIFICATION.

     A.     Rule 23(a) Requirements.

          1.     **Numerosity**.

The first prerequisite of class certification requires that the class be "so numerous that joinder of all members is impracticable[.]"  Fed. R. Civ. P. 23(a)(1).  "A class satisfies the prerequisite of numerosity if it is so large that joinder of all class members is impracticable."  Ahlman v. Barnes, 445 F.Supp.3d 671, 684 (C.D. Cal. 2020).  "The Ninth Circuit has required at least fifteen members to certify a class, and classes of at least forty members are usually found to have satisfied the numerosity requirement."  Makaron v. Enagic USA, Inc., 324 F.R.D. 228, 232 (C.D. Cal. 2018).

Here, the class is so numerous that joinder is impracticable.  The settlement class includes 2,528 members, (see Dkt. 256-1, Memo I at 30), which easily exceeds the minimum threshold for numerosity.

          2.     **Commonality**.

The commonality requirement is satisfied if "there are questions of law or fact common to the class[.]"  Fed. R. Civ. P. 23(a)(2).  Commonality requires plaintiffs to demonstrate that their claims "depend upon a common contention . . . [whose] truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke."  Dukes, 564 U.S. at 350, 131 S.Ct. at 2551; see Wolin v. Jaguar Land Rover N. Am., LLC, 617 F.3d 1168, 1172 (9th Cir. 2010)

(The commonality requirement demands that "class members' situations share a common issue of law or fact, and are sufficiently parallel to insure a vigorous and full presentation of all claims for relief.") (internal quotation marks omitted).   "The plaintiff must demonstrate the capacity of classwide proceedings to generate common answers to common questions of law or fact that are apt to drive the resolution of the litigation." Mazza v. Am. Honda Motor Co., Inc., 666 F.3d 581, 588 (9th Cir. 2012) (internal quotation marks omitted).   "This does not, however, mean that every question of law or fact must be common to the class; all that Rule 23(a)(2) requires is a single significant question of law or fact." Abdullah v. U.S. Sec. Assocs., Inc., 731 F.3d 952, 957 (9th Cir. 2013) (emphasis and internal quotation marks omitted); see Mazza, 666 F.3d at 589 (characterizing commonality as a "limited burden[,]" stating that it "only requires a single significant question of law or fact").   Proof of commonality under Rule 23(a) is "less rigorous" than the related preponderance standard under Rule 23(b)(3). See Hanlon v. Chrysler Corp., 150 F.3d 1011, 1019 (9th Cir. 1998), overruled on other grounds as recognized by Castillo v. Bank of Am., NA, 980 F.3d 723 (9th Cir. 2020); Mazza, 666 F.3d at 589.   "The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." Hanlon, 150 F.3d at 1019.

This case involves common class-wide questions that are apt to drive the resolution of this litigation.   For example, this action arises from a common course of conduct by defendant – its design, manufacture, sale, promotion, and supply of PCBs – that resulted in the contamination of stormwater, stormwater systems, waterbodies, and/or sediments that require some corrective action.[15]   (Dkt. 256-1, Memo I at 1, 10-11).   Under the circumstances, the court finds that plaintiffs have satisfied the commonality requirement.

3.    **Typicality**.

"Typicality refers to the nature of the claim or defense of the class representative, and not to the specific facts from which it arose or the relief sought." Ellis v. Costco Wholesale Corp., 657 F.3d 970, 984 (9th Cir. 2011) (internal quotation marks omitted).   To demonstrate typicality,

---

[15] The court addresses specific common questions in connection with predominance below.

17

1    plaintiff's claims must be "reasonably co-extensive with those of absent class members[,]"

2    although "they need not be substantially identical."  Hanlon, 150 F.3d at 1020; see Ellis, 657 F.3d

3    at 984 ("Plaintiffs must show that the named parties' claims are typical of the class.").  "The test

4    of typicality is whether other members have the same or similar injury, whether the action is based

5    on conduct which is not unique to the named plaintiffs, and whether other class members have

6    been injured by the same course of conduct."  Ellis, 657 F.3d at 984 (internal quotation marks

7    omitted).

8        Here, plaintiffs' claims and the claims of the class arise from and are based on the same

9    or similar factual basis and legal theories, i.e., that Monsanto's design, manufacture, sale, and

10   distribution of PCBs resulted in impairment to water bodies, properties, and sites that are

11   maintained and/or operated by the class members.  (See Dkt. 201, TAC); (Dkt. 256-1, Memo I at

12   31-32).  Finally, the court is not aware of any facts that would subject the class representatives

13   "to unique defenses which threaten to become the focus of the litigation."  Hanon v. Dataproducts

14   Corp., 976 F.2d 497, 508 (9th Cir. 1992).   In short, plaintiffs have satisfied the typicality

15   requirement.

                    4.    **Adequacy of Representation**.

17   "The named Plaintiffs must fairly and adequately protect the interests of the class."  Ellis,

18   657 F.3d at 985 (citing Fed. R. Civ. P. 23(a)(4)).  "To determine whether [the] named plaintiffs will

19   adequately represent a class, courts must resolve two questions:  (1) do the named plaintiffs and

20   their counsel have any conflicts of interest with other class members and (2) will the named

21   plaintiffs and their counsel prosecute the action vigorously on behalf of the class?"  Id. (internal

22   quotation marks omitted).   "Adequate representation depends on, among other factors, an

23   absence of antagonism between representatives and absentees, and a sharing of interest

24   between representatives and absentees."  Id.

25   Here, the proposed class representatives, who have no individual claims separate from the

26   class claims, (see, generally, Dkt. 201, TAC), do not appear to have any conflicts of interest with

27   the absent class members.  (See Dkt. 256-1, Memo I at 32); (Dkt. 256-5, Summy Decl. at ¶ 22)

28   (representing that plaintiffs "have no interests that conflicts with those of the absent" class

members).  The class is comprised of a "diverse representation of class members, including Phase I, Phase II, city, county, and port permittees."  (Dkt. 256-6, Declaration of John Fiske ("Fiske Decl.") at ¶ 22); (see Dkt. 267-1, Memo II at 4).  According to plaintiffs' counsel, who represented the named plaintiffs in their individual cases prior to settlement, each plaintiff selected one or more in-house counsel – who each served as counsel of record in their respective case – to work as co-counsel with plaintiffs' counsel. (See Dkt. 256-6, Fisk Decl. at ¶¶ 6-10); (Dkt. 267-1, Memo II at 4).  The named plaintiffs, through their in-house counsel, "have been actively involved throughout the litigation, including the evaluation of the claims, the preparation of the complaint, the preparation, organization, and production of discovery, [and] the technical expert-intensive development of the cases."  (Dkt. 256-6, Fisk Decl. at ¶¶ 7, 12-13); (see also Dkt. 256-14) (Declarations of Named Plaintiffs).  They have "communicated that they understand their duties as class representatives, have agreed to consider the interests of absent [c]lass members," and "will continue to vigorously protect class interests[.]"  (Dkt. 256-6, Fisk Decl. at ¶ 23).  In addition, the class representatives and absent class members have the same or similar factual basis and legal theories, and seek the same form of relief, i.e., economic damages for PCB-related impairments to their water bodies, properties and sites. (See Dkt. 256-1, Memo I at 32); Barbosa v. Cargill Meat Sols. Corp, 297 F.R.D. 431, 442 (E.D. Cal. 2013) ("[T]here is no apparent conflict of interest between the named Plaintiffs' claims and those of the other Class Members' – particularly because the named Plaintiffs have no separate and individual claims apart from the Class.").  In short, plaintiffs have satisfied the adequacy-of-representation requirement.

Finally, as noted earlier, adequacy "also factors in competency and conflicts of class counsel."  Amchem, 521 U.S. at 626 n. 20, 117 S.Ct. at 2251 n. 20.  Plaintiffs request that the court appoint Summy, Fiske and Pickrel of Baron & Budd as lead class counsel, and Gomez of Gomez Trial Attorneys, Wertz, and Gordon and Wolf of Gordon Carey & Wolf as co-class counsel. (See Dkt. 256-1, Memo I at 76-77); (Dkt. 278-2, Settlement Agreement at ¶¶ 12, 24) (defining class counsel).  Having reviewed the declarations of proposed class counsel, (see Dkt. 256-5, Summy Decl. at ¶¶ 4-21); (Dkt. 256-6, Fisk Decl. at ¶¶ 3-4, 6-21), the court finds that plaintiffs' counsel are competent, and there are no issues as to the adequacy of representation.  See

Barbosa, 297 F.R.D. at 443 ("There is no challenge to the competency of the Class Counsel, and the Court finds that Plaintiffs are represented by experienced and competent counsel who have litigated numerous class action cases.").

        B.      Rule 23(b) Requirements.

Certification under Rule 23(b)(3) is proper "whenever the actual interests of the parties can be served best by settling their differences in a single action." Hanlon, 150 F.3d at 1022 (internal quotation marks omitted). The rule requires two different inquiries, specifically a determination as to whether: (1) "questions of law or fact common to class members predominate over any questions affecting only individual members[;]" and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

        1.      **Predominance**.

"[T]he general rule [is] that predominance is easier to satisfy in the settlement context." Jabbari v. Farmer, 965 F.3d 1001, 1006 (9th Cir. 2020). "To determine whether a class satisfies the [predominance] requirement, a court pragmatically compares the quality and import of common questions to that of individual questions." Id. at 1005. "[T]he predominance analysis under Rule 23(b)(3) focuses on the relationship between the common and individual issues in the case, and tests whether the proposed class is sufficiently cohesive to warrant adjudication by representation." Abdullah, 731 F.3d at 964 (internal quotation marks omitted); see Amchem, 521 U.S. at 623, 117 S.Ct. at 2249 ("The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."); In re Wells Fargo Home Mortg. Overtime Pay Litig., 571 F.3d 953, 959 (9th Cir. 2009) ("[T]he main concern in the predominance inquiry . . . [is] the balance between individual and common issues."). "If a common question will drive the resolution, even if there are important questions affecting only individual members, the class is sufficiently cohesive to warrant adjudication by representation." Jabbari, 965 F.3d at 1005 (internal quotation marks omitted); see Hanlon, 150 F.3d at 1022 ("When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis."); Abdullah, 731 F.3d at 964 ("Rule 23(b)(3)

requires a showing that questions common to the class predominate, not that those questions will be answered, on the merits, in favor of the class.") (internal quotation marks omitted). Finally, the class damages must be sufficiently traceable to plaintiffs' liability case. See Comcast Corp. v. Behrend, 569 U.S. 27, 35, 133 S.Ct. 1426, 1433 (2013).

Plaintiffs allege a common course of conduct by defendant – the design, manufacture, sale, promotion, and supply of PCBs – that resulted in the contamination of their stormwater, stormwater systems, waterbodies, and/or sediments that require some corrective action. (See Dkt. 256-1, Memo I at 33); (Dkt. 201, TAC); see, e.g., In re Hyundai, 926 F.3d at 559 (noting that common issues "which turn on a common course of conduct by the defendant, can establish predominance in nationwide class actions"). Common questions that predominate include whether: (1) PCBs, when used as intended, are unreasonably dangerous; (2) PCBs, when used as intended, contaminate stormwater and/or dry-weather runoff systems; (3) Monsanto could have reasonably foreseen that its PCBs would contaminate stormwater and/or dry-weather runoff systems and waterbodies through stormwater; (4) the presence of PCBs in contaminated stormwater and/or dry-weather runoff systems constitute a public nuisance; (5) Monsanto owed class members a duty to ensure that its PCBs did not contaminate stormwater and/or dry-weather runoff systems; (6) Monsanto owed a duty to warn about PCBs escaping applications and their propensity to contaminate through stormwater natural resources, including waterbodies such as lakes, streams, rivers, and bays; (7) Monsanto breached its duties; (8) Monsanto's actions directly and proximately caused class members' injuries and damages; and (9) Monsanto's conduct supports an award of punitive damages. (See Dkt. 256-1, Memo I at 33-34). Here, the answers to these questions will drive the resolution of the litigation, "as the common issues predominate over varying factual predicates[.]" Clesceri v. Beach City Investigations & Protective Services, Inc., 2011 WL 320998, *7 (C.D. Cal. 2011) (internal quotation marks omitted); see Tyson Foods, Inc. v. Bouaphakeo, 577 U.S. 442, 453, 136 S.Ct. 1036, 1045 (2016) ("When one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual

class members.") (internal quotation marks omitted).

Moreover, the court is persuaded that, under the circumstances here – i.e., a settlement-class predominance inquiry – it is not necessary to conduct a choice-of-law analysis.  "For purposes of a settlement class, differences in state law do not necessarily, or even often, make a class unmanageable."  Jabbari, 965 F.3d at 1007.  In other words, "a district court does not commit legal error by not conducting a choice-of-law analysis, despite variations in state law, before determining that common issues predominate for a settlement class."  Id.; see In re Hyundai, 926 F.3d at 559 (noting that common issues "which turn on a common course of conduct by the defendant, can establish predominance in nationwide class actions"); Sullivan v. DB Investments, Inc., 667 F.3d 273, 303-04 (3rd Cir. 2011) ("Because we are presented with a settlement class certification, we are not as concerned with formulating some prediction as to how variances in state law would play out at trial, for the proposal is that there be no trial. . . .  The proposed settlement here obviates the difficulties inherent in proving the elements of varied claims at trial or in instructing a jury on varied state laws, and the difference is key.  Accordingly, while we are cognizant of our responsibility to protect absentees by blocking unwarranted or overbroad class definitions, state law variations are largely irrelevant to certification of a settlement class[.]") (cleaned up).  Here, given the common course of conduct by Monsanto as reflected in the questions referenced above, a conclusion as to which state's law applies is not necessary to the predominance determination because the law of each state at issue shares common questions that are central to the resolution of the claims and capable of resolution in one fell swoop.  See Jabbari, 965 F.3d at 1006; see, e.g., Hyundai, 926 F.3d at 559 (common issues like whether the fuel economy statements were inaccurate and whether the automakers knew about the inaccuracies were the sort of "common course of conduct by defendant" that can establish predominance); Hanlon, 150 F.3d at 1022-23 (Variations in "products liability, breaches of express and implied warranties, and lemon laws" across the states did not defeat predominance because "there were still sufficient common issues to warrant a class action, particularly questions of Chrysler's prior knowledge of the latch deficiency, the design defect, and a damages remedy.").  Finally, the relief sought applies to all class members and is traceable to plaintiffs' liability case.

See Comcast, 569 U.S. at 35, 133 S.Ct. at 1433.  In short, the court is persuaded that "[a] common nucleus of facts and potential legal remedies dominates this litigation." Hanlon, 150 F.3d at 1022.

## 2. **Superiority**.

"The superiority inquiry under Rule 23(b)(3) requires determination of whether the objectives of the particular class action procedure will be achieved in the particular case" and "necessarily involves a comparative evaluation of alternative mechanisms of dispute resolution." Hanlon, 150 F.3d at 1023.  Rule 23(b)(3) provides a list of four non-exhaustive factors relevant to superiority.  See Fed. R. Civ. P. 23(b)(3)(A)-(D).

The first factor considers "the class members' interests in individually controlling the prosecution or defense of separate actions."  Fed. R. Civ. P. 23(b)(3)(A).  "This factor weighs against class certification where each class member has suffered sizeable damages or has an emotional stake in the litigation."  Barbosa, 297 F.R.D. at 444.  Here, although the potential damages are sizeable, those entities that have litigated against Monsanto, represented by the same counsel, have elected to proceed on a class basis.  (See Dkt. 201, TAC).  Moreover, there is no indication that absent class members have an intent to prosecute their own separate actions.  (See, generally, id.).  In short, there is no evidence that class members have any interest in controlling prosecution of their claims separately.  See 2018 Adv. Comm. Notes to Amendments to Rule 23(e)(1) (Among the type of information that should be provided to the court deciding whether to grant preliminary approval is "information about the existence of other pending or anticipated litigation on behalf of class members involving claims that would be released under the proposal").  But even if some do, it would not be sufficient, by itself, to deny class certification.

The second factor is "the extent and nature of any litigation concerning the controversy already begun by or against class members[.]"  Fed. R. Civ. P. 23(b)(3)(B).  While any class member that wishes to control its own case may opt out of the class, see Fed. R. Civ. P. 23(c)(2)(B)(v), "other pending litigation is evidence that [entities] have an interest in controlling their own litigation[.]"  2 Newberg on Class Actions § 4:70 (5th ed. 2012) (emphasis omitted).  Here, although most of the named plaintiffs filed separate individual actions against Monsanto,

they have since joined as plaintiffs in the instant putative class action. (See Dkt. 201, TAC). Thus, the court finds that the prior individual actions do not undermine a finding of superiority.

The third factor is "the desirability or undesirability of concentrating the litigation of the claims in the particular forum[,]" and the fourth factor is "the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3)(C)-(D). As noted above, "[i]n the context of settlement . . . the third and fourth factors are rendered moot and are irrelevant." Barbosa, 297 F.R.D. at 444; see Amchem, 521 U.S. at 620, 117 S.Ct. at 2248 ("Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, . . . for the proposal is that there be no trial.") (citation omitted); In re Hyundai, 926 F.3d at 556-57 ("The criteria for class certification are applied differently in litigation classes and settlement classes. In deciding whether to certify a litigation class, a district court must be concerned with manageability at trial. However, such manageability is not a concern in certifying a settlement class where, by definition, there will be no trial.").

The only factors in play here weigh in favor of class treatment. Further, the filing of separate suits by thousands of other class members "would create an unnecessary burden on judicial resources." Barbosa, 297 F.R.D. at 445. Under the circumstances, the court finds that the superiority requirement is satisfied.

II.    FAIRNESS, REASONABLENESS, AND ADEQUACY OF THE PROPOSED SETTLEMENT.

A.    The Settlement is the Product of Arm's-Length Negotiations.

Here, prior to reaching settlement, plaintiffs' counsel prosecuted the individual actions for over five years. (See Dkt. 256-1, Memo I at 37). During the litigation, counsel engaged in extensive discovery regarding many decades of PCB manufacture and use. (See id.); (Dkt. 256-5, Summy Decl. at ¶ 16); 2018 Adv. Comm. Notes to Amendments to Rule 23(e)(1) (Among the type of information that should be provided to the court deciding whether to grant preliminary approval is "[i]nformation about the extent of discovery completed in the litigation or in parallel actions"). With respect to written discovery, counsel responded to 36 sets of discovery; obtained and reviewed in excess of 300,000 Monsanto documents; gathered, coded, and reviewed more than

nine million of plaintiffs' own documents and produced a large subset of those documents; and obtained additional documents produced by subpoenaed third parties.  (See Dkt. 256-1, Memo I at 37-38); (Dkt. 256-5, Summy Decl. at ¶¶ 16).  Counsel also took or defended 82 depositions, 31 of which involved expert witnesses.  (See Dkt. 256-1, Memo I at 37); (Dkt. 256-5, Summy Decl. at ¶ 17).  Moreover, counsel briefed dozens of motions to dismiss, motions for summary judgment, and motions in limine.  (See Dkt. 256-5, Summy Decl. at ¶ 12).  In total, counsel either filed or responded to over 100 motions in the Public Entity Cases.  (See id.).

After years of litigation, the parties, in December 2019, began settlement discussions.  (See Dkt. 256-5, Summy Decl. at ¶ 20).  The parties, after agreeing on a structure for the settlement, participated in numerous mediation sessions with Judge Gandhi (ret.), (see id. at ¶ 21); (Dkt. 256-9, Declaration of Jay C. Gandhi ("Gandhi Decl.") at ¶¶ 11, 14), who "played a crucial role in supervising the negotiations and helping the parties bridge their differences and evaluate the strengths and weaknesses of their respective positions."  (Dkt. 256-1, Memo I at 39).  Judge Gandhi states that counsel for the parties "zealously advocated on their behalf" and that "the arguments and positions advanced by all involved were the product of hard work and thoughtfulness; they were complex and nuanced; and they were oppositional and credible."  (Dkt. 256-9, Gandhi Decl. at ¶¶ 12-13).  Judge Gandhi adds that the settlement "represents the parties' and counsels' best professional effort and judgment about a fair, reasonable, and adequate settlement[.]"  (Id. at ¶ 26).

Based on the evidence and record before the court, the court is persuaded that the parties thoroughly investigated and considered their own and the opposing parties' positions.  The parties had a sound basis for measuring the terms of the settlement against the risks of continued litigation, and there is no evidence that the settlement is "the product of fraud or overreaching by, or collusion between, the negotiating parties[.]"  Rodriguez v. West Publishing Corp., 563 F.3d 948, 965 (9th Cir. 2009).

B.   The Amount Offered in Settlement Falls Within a Range of Possible Judicial Approval and Is a Fair and Reasonable Outcome for Class Members.

    1.   **Recovery for Class Members.**

As described above, defendant will pay up to $550 million to be allocated among four separate funds to compensate class members for the manner in which PCBs may have affected them, (see Dkt. 278-2, Settlement Agreement at ¶¶ 73, 76); (Dkt. 256-1, Memo I at 14), and also "to compensate legal costs of litigating entities and to compensate special needs and costs of class members." (Dkt. 256-1, Memo I at 13). As noted earlier, class members may have been affected by Monsanto's PCBs in one or more of the following ways: (1) the need to monitor PCBs in stormwater; (2) the need to comply with a regulatory TMDL under the NPDES program; and/or (3) the need to comply with sediment remediation costs under a regulatory Superfund or Category 4(b) clean up order.   (See id.). The settlement will provide class members with funds to pay for at least one round of PCB sampling and testing, and will also provide funds to a subset of class members to compensate them for TMDL compliance and the costs of reducing PCBs in stormwater discharges and/or Superfund compliance, as well as the costs of remediating PCBs from certain sediments. (See id. at 43-44, 49-57).

Specifically, the Monitoring Fund will provide class members with compensation to "complete at least one round of PCB sampling to learn whether PCBs are in their storm water systems." (Dkt. 256-1, Memo I at 50).   The class members who use the funds to conduct monitoring and detect PCBs will also "have the opportunity to seek additional funds from Special Needs Fund, Part B to address remediation or mitigation that may be necessary as a result." (Dkt. 267-1, Memo II at 3). With respect to TMDL compliance, plaintiffs' expert concluded that, among the 242 TMDL entities covered by the settlement, the aggregate costs of complying with TMDLs would be between $3,046,346,664 to $13,894,871,905. (See Dkt. 256-1, Memo I at 52); (Dkt. 256-15, Declaration of Michael Trapp, Ph.D ("Trapp Decl.") at ¶ 12). With respect to sediment remediation, plaintiffs' expert determined that the costs to comply with the Superfund/Category 4(b) orders across the 12 qualifying class members may range between $440 million to $700 million (or more). (See Dkt. 256-1, Memo I at 56-57); (Dkt. 256-16, Declaration of Rob Hesse

("Hesse Decl.") at ¶ 9).

If a class member were to litigate its claims and prevail upon all causes of action, it "could potentially recover damages ranging from mere hundreds of dollars for testing to millions of dollars for sophisticated sediment dredging and removal[,]" (Dkt. 256-1, Memo I at 43), and without the friction of any defensive arguments, the damages sought on a classwide basis "could exceed several billions of dollars." (Id.); (see Dkt. 256-15, Trapp Decl. at ¶¶ 9-12); (Dkt. 256-16, Hesse Decl. at ¶ 9). However, according to plaintiffs, such damages are not "realistic" for several reasons. First, it "overestimates the PCB-only damages by ignoring contaminants other than PCBs that may be present in water and sediment and either (a) drive a portion of the remediation costs and/or (b) should cause an allocation of costs[.]" (Dkt. 256-1, Memo I at 43); (see Dkt. 256-15, Trapp Decl. at ¶¶ 4, 10, 12); (Dkt. 256-16, Hesse Decl. at ¶¶ 7-9). Second, it fails to "acknowledge the legal and factual difficulties that would face litigants including the potential for summary judgment rulings against plaintiffs as in the City of San Diego [case.]" (Dkt. 256-1, Memo I at 43); (see Dkt. 256-5, Summy Decl. at ¶ 13); San Diego Unified Port Dist. v. Monsanto Co., 445 F.Supp.3d 1098, 1113 (S.D. Cal. 2020) ("San Diego I") (granting Monsanto's motion for summary judgment against City of San Diego); San Diego Unified Port Dist. v. Monsanto Co., 2020 WL 1479071, *17 (S.D. Cal. 2020) ("San Diego II") (granting in part Monsanto's motion for summary judgment against port). Finally, the aspirational damages figure does not "value the benefit of certain settlement recovery against the risk, expense, time, and uncertainty of litigation and the possibility of zero recovery at trial." (Dkt. 256-1, Memo I at 43); see San Diego I, 445 F.Supp.3d at 1113; San Diego II, 2020 WL 1479071, at *17.

Under the circumstances, the court is persuaded that the settlement relief is fair, reasonable, and adequate, particularly when taking into account the costs, risks, and delay of trial and appeal. See Fed. R. Civ. P. 23(e)(1)(B)(i) & 23(e)(2)(C)(i); 2018 Adv. Comm. Notes to Amendments to Rule 23(e)(1) (The types of information that should be provided to the court deciding whether to grant preliminary approval  includes, among other things:  (1) "the extent and type of benefits that the settlement will confer on the members of the class"; and (2) "information about the likely range of litigated outcomes and about the risks that might attend full litigation").

Even putting aside Monsanto's defenses, and assuming class certification were granted and upheld on appeal, defeating summary judgment, winning the case at trial, and then sustaining the final judgment on appeal would be extremely difficult.  (See, e.g., Dkt. 256-1, Memo I at 41-42). In short, the risks of continued litigation are significant, and the court takes these real risks into account.  Weighed against those risks, and coupled with the delays associated with continued litigation, the court is persuaded that the benefits to the class fall within the range of reasonableness.  See, e.g., In re Mego Fin. Corp. Sec. Litig., 213 F.3d 454, 459 (9th Cir. 2000) (ruling that "the Settlement amount of almost $2 million was roughly one-sixth of the potential recovery, which, given the difficulties in proving the case, [was] fair and adequate"); In re Uber FCRA Litig., 2017 WL 2806698, *7 (N.D. Cal. 2017) (granting preliminary approval of settlement that was worth "7.5% or less" of the expected value); see also Linney v. Cellular Alaska P'ship, 151 F.3d 1234, 1242 (9th Cir. 1998) ("The fact that a proposed settlement may only amount to a fraction of the potential recovery does not, in and of itself, mean that the proposed settlement is grossly inadequate and should be disapproved.").

2. <strong>Release of Claims</strong>.

The court must also consider whether a class action settlement contains an overly broad release of liability.  See 4 Newberg on Class Actions § 13:15 (5th ed.) ("Beyond the value of the settlement, courts [have] rejected preliminary approval when the proposed settlement contain[s] obvious substantive defects such as . . . overly broad releases of liability."); see, e.g., Fraser v. Asus Comput. Int'l, 2012 WL 6680142, *3 (N.D. Cal. 2012) (denying preliminary approval of proposed settlement that provided defendant a "nationwide blanket release" in exchange for payment "only on a claims-made basis[,]" without the establishment of a settlement fund or any other benefit to the class).

Here, the release agreed to by the parties will release "all claims which were or could have been alleged in this Action, including but not limited to any claim for attorneys' fees, expenses, and costs." (Dkt. 278-2, Settlement Agreement at ¶ 41); (see also id. at ¶¶ 42-43, 106).  The release will not "preclude or affect any action under the Comprehensive Response, Compensation and Liability Act ('CERCLA') or similar state Superfund statutes and applicable regulations" and it will

28

not "affect any administrative test claims related to the California Water Board." (Id. at ¶ 41). Also, the Settlement Agreement provides that the release "shall [not] affect or limit any defenses Defendant may have in or against any claims or actions asserted against Defendant by any person or persons who are not parties to th[e] Settlement Agreement for any Released Claim, including but not limited to any defense based on protection from contribution claims or actions under any applicable federal, state, or local law."[16] (Id. at ¶ 106).

With the understanding that, under the Release, class members are not giving up any claims unrelated to those asserted in this action, the court finds that the Release adequately balances fairness to absent class members and recovery for the class with defendant's business interest in ending the litigation.  See Hess v. Sprint Corp., 598 F.3d 581, 590 (9th Cir. 2010) ("A settlement agreement may preclude a party from bringing a related claim in the future even though the claim was not presented and might not have been presentable in the class action, but only where the released claim is based on the identical factual predicate as that underlying the claims in the settled class action.") (internal quotation marks omitted); Fraser, 2012 WL 6680142, at *4 (recognizing defendant's "legitimate business interest in 'buying peace' and moving on to its next challenge" as well as the need to prioritize "[f]airness to absent class member[s]").

C.    Class Notice and Notification Procedures.

Upon settlement of a certified class, "[t]he court must direct notice in a reasonable manner to all class members who would be bound by the proposal[.]" Fed. R. Civ. P. 23(e)(1)(B).  Rule 23(c)(2) requires the "best notice that is practicable under the circumstances, including individual notice" of particular information. See Fed. R. Civ. P. 23(c)(2)(B) (enumerating notice requirements for classes certified under Rule 23(b)(3)).

"The standard for the adequacy of a settlement notice in a class action under either the Due Process Clause or the Federal Rules is measured by reasonableness." Wal-Mart Stores, Inc. v.

---

[16]    "Each Settlement Class Member agrees to be responsible for any liens, interests, actions, or claims asserted by any third party, in a derivative manner, for or against the portion of Settlement Funds allocated to that Settlement Class Member[.]"   (Dkt. 278-2, Settlement Agreement at ¶ 107).

Visa U.S.A., Inc., 396 F.3d 96, 113 (2d Cir. 2005); Low v. Trump Univ., LLC, 881 F.3d 1111, 1117 (9th Cir. 2018) ("The yardstick against which we measure the sufficiency of notices in class action proceedings is one of reasonableness.") (internal quotation marks omitted).  A class action settlement notice "is satisfactory if it generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard." Churchill Vill., L.L.C. v. Gen. Elec., 361 F.3d 566, 575 (9th Cir. 2004) (internal quotation marks omitted); see Gooch v. Life Invs. Ins. Co. of Am., 672 F.3d 402, 423 (6th Cir. 2012) (Settlement notices "are sufficient if they inform the class members of the nature of the pending action, the general terms of the settlement, that complete and detailed information is available from the court files, [and] that any class member may appear and be heard at the hearing[.]").  The notice should provide sufficient information to allow class members to decide whether they should accept the benefits of the settlement, opt out and pursue their own remedies, or object to the terms of the settlement but remain in the class.  See In re Integra Realty Res., Inc., 262 F.3d 1089, 1111 (10th Cir. 2001) ("The standard for the settlement notice under Rule 23(e) is that it must 'fairly apprise' the class members of the terms of the proposed settlement and of their options.") (internal quotation marks omitted).

Here, the parties request that Weisbrot be appointed as the settlement administrator.  (See Dkt. 278-2, Settlement Agreement at ¶ 11).  Class members will receive notice by first class mail, (see id. at ¶ 84), which will consist of the Notice of Pendency of Class-Action Proposed Settlement and Court-Approval Hearing, (id., Exh. I, "Notice").  The Notice describes the nature of the action and the claims alleged in the case.  (See id. at 2-3); see also Fed. R. Civ. P. 23(c)(2)(B)(i) & (iii). It provides the definition of the class, (see Dkt. 278-2, Settlement Agreement, Exh. I, Notice at 1, 3-4); see also Fed. R. Civ. P. 23(c)(2)(B)(ii), and explains the terms of the settlement, including the settlement amount, the distribution of that amount, and the release.  (See Dkt. 278-2, Settlement Agreement, Exh. I, Notice at 4-14).  It includes an explanation that lays out the class members' options under the settlement: they may remain in the class, object to the settlement but still remain in the class, or exclude themselves from the settlement and pursue their claims separately against defendant.  (See id. at 17-20); see also Fed. R. Civ. P. 23(c)(2)(B)(v)-(vi).

1  Finally, the Notice explains the procedures for objecting to the settlement, (see Dkt. 278-2,

2  Settlement Agreement, Exh. I, Notice at 19-21), and provides information about the Final Fairness

3  Hearing.  (See id. at 21).

4      Based on the foregoing, the court finds there is no alternative method of distribution that

5  would be more practicable here, or any more reasonably likely to notify the class members.  Under

6  the circumstances, the court finds that the procedure for providing notice and the content of the

7  class notice constitute the best practicable notice to class members and complies with the

8  requirements of due process.

9      D.    Summary.

10     The court's preliminary evaluation of the settlement does not disclose grounds to doubt its

11  fairness "such as unduly preferential treatment of class representatives or segments of the class,

12  inadequate compensation or harms to the classes, . . . or excessive compensation for attorneys."

13  Manual for Complex Litigation § 21.633 at 321 (4th ed. 2004); see also Spann, 314 F.R.D. at 323.

14                                    **CONCLUSION**

15     Based on the foregoing, IT IS ORDERED THAT:

16     1.  Plaintiffs' Renewed Motion for Certification of Settlement Class, Preliminary Approval

17  of Class Action Settlement, Approval of Notice Plan, Appointment of Class Action Settlement

18  Administrator, and Appointment of Class Counsel **(Document No. 278)** is **granted** upon the terms

19  and conditions set forth in this Order.

20     2.  The court preliminarily certifies the class, as defined in ¶ 51 of the Class Action

21  Settlement Agreement ("Settlement Agreement") (Dkt. 278-2), for the purposes of settlement.

22     3.  The court preliminarily appoints the City of Long Beach, County of Los Angeles, City of

23  Chula Vista, City of San Diego, City of San Jose, City of Oakland, City of Berkeley, City of

24  Spokane, City of Tacoma, City of Portland, Port of Portland, Baltimore County, Mayor and City

25  Council of Baltimore as class representatives for settlement purposes.

26     4.  The court preliminarily appoints Scott Summy, John Fiske, and Carla Burke Pickrel of

27  Baron & Budd, P.C. as lead class counsel, and John Gomez of Gomez Trial Attorneys, John R.

28  Wertz, and Richard Gordon and Martin Wolf of Gordon, Carey & Wolf as co-class counsel for

settlement purposes.

5.  The court preliminarily finds that the terms of the settlement are fair, reasonable and adequate, and comply with Rule 23(e) of the Federal Rules of Civil Procedure.

6.  The court approves the form, substance, and requirements of the class Notice, (Dkt. 278-2, Settlement Agreement, Exh. I).  The proposed manner of notice of the settlement set forth in the Settlement Agreement constitutes the best notice practicable under the circumstances and complies with the requirements of due process.

7.  The court appoints Steven Weisbrot as settlement administrator.

8.  The parties shall, no later than **April 4, 2022**, submit a proposed schedule of deadlines for purposes of final approval.

9.  All proceedings in the Action, other than proceedings necessary to carry out or enforce the Settlement Agreement or this Order, are stayed pending the final fairness hearing and the court's decision whether to grant final approval of the settlement.

Dated this 14th day of March, 2022.


/s/
Fernando M. Olguin
United States District Judge